UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| T.E., by her next friend and parent, SHERRI ECCLESTON; O.C. and D.C., by their next friend and parent, DAVID COHEN; A.R. and D.R., by their next friend and parent, JERROLD ROSEN, | | |
| Plaintiffs, | | **ECF CASE** |
| v. | | No. 12 Civ. 2303 (KMK) (PED) |
| PINE BUSH CENTRAL SCHOOL DISTRICT; PINE BUSH CENTRAL SCHOOL DISTRICT BOARD OF EDUCATION; PHILIP G. STEINBERG, Superintendent of Pine Bush Central School District, in his official and individual capacities; JOHN BOYLE, Principal of Crispell Middle School, in his official capacity; ERIC WINTER, Principal of Pine Bush Elementary School and former Assistant Principal of Crispell Middle School, in his individual capacity; STEVE FISCH, former Principal of Pine Bush Elementary School, in his individual capacity; ROBERT PETERS, former Assistant Principal of Crispell Middle School, in his individual capacity; and AARON HOPMAYER, Principal of Pine Bush High School, in his official capacity, | | |
| Defendants. | | |

## STATEMENT OF INTEREST
## OF THE UNITED STATES OF AMERICA

PREET BHARARA
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York  10007
Telephone:  (212) 637-2793
Facsimile:  (212) 637-2717

*Of Counsel:*

MICHAEL J. BYARS
Assistant United States Attorney

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT .......................................................................................... 1

LEGAL BACKGROUND ................................................................................................... 3

A.      Title VI ....................................................................................................................... 3

B.      The Department's Guidance Regarding Title VI ..................................................... 7

      1.      The 2004 Dear Colleague Letter ............................................................. 7

      2.      The 2010 Dear Colleague Letter ............................................................. 8

      3.      The 2004 and 2010 Letters Are Entitled to Deference ......................... 11

ARGUMENT ..................................................................................................................... 13

Plaintiffs Have Adduced Sufficient Evidence for a Jury to Conclude that
the District Was Deliberately Indifferent ....................................................................... 13

CONCLUSION .................................................................................................................. 23

# TABLE OF AUTHORITIES

## CASES

Page

*Auer v. Robbins*,
519 U.S. 452 (1997) ............................................................................................... 11

*Bd. of Educ. Isl. Trees Union Free Sch. Dist. v. Pico*,
457 U.S. 853 (1982) ................................................................................................. 6

*Barnes v. Gorman*,
536 U.S. 181 (2002) ................................................................................................. 4

*Biediger v. Quinnipiac Univ.*,
691 F.3d 85 (2d Cir. 2012) ......................................................................... 11, 12, 13

*Bleiler v. Coll. of Holy Cross*,
No. 11-11541-DJC, 2013 WL 471340 (D. Mass. Aug. 26, 2013) .................... 13

*Cannon v. Univ. of Chicago*,
441 U.S. 677 (1979) ................................................................................................. 4

*Davis ex rel. LaShonda Davis v. Monroe Cnty. Bd. of Educ.*,
526 U.S. 629 (1999) ...................................................................................... 4, 5, 9, 14

*Dibbern v. Univ. of Mich.*,
No. 12-15632, 2013 WL 6068808 (E.D. Mich. Nov. 18, 2013) ....................... 13

*DiStiso v. Cook*,
691 F.3d 226 (2d Cir. 2012) ................................................................................... 5

*Doe v. Sch. Bd. of Broward Cnty.*,
604 F.3d 1248 (11th Cir. 2010) ............................................................................. 5

*Gant v. Wallingford Bd. of Educ.*,
195 F.3d 124 (2d Cir. 1999) ............................................................................... 4, 5

*Hayut v. State Univ. of N.Y.*,
352 F.3d 733 (2d Cir. 2003) ................................................................................... 5

*Kajoshaj v. New York City Dep't of Educ.*,
___ F. App'x ____, No. 13-650, 2013 WL 5614113
(2d Cir. Oct. 15, 2013) ........................................................................................ 12

*Lopez v. Regents of Univ. of Cal.*,
___ F. Supp. 2d ____, No. C-13-2811 EMC, 2013 WL 6492395
(N.D. Cal. Dec. 10, 2013) ....................................................................................... 7

*Preusser v. Taconic Hills Cent. Sch. Dist.*,
    No. 10 Civ. 1347, 2013 WL 209470 (N.D.N.Y. Jan. 17, 2013) .......................................5

*Thomas Jefferson Univ. v. Shalala*,
    512 U.S. 504 (1994) ...........................................................................................12

*Tinker v. Des Moines Sch. Dist.*,
    393 U.S. 503 (1969) .............................................................................................6

*United States v. Nelson*,
    277 F.3d 164 (2d Cir. 2002) ..............................................................................12

*Vance v. Spencer Cnty. Pub. Sch. Dist.*,
    231 F.3d 253 (6th Cir. 2000) ...................................................................5, 11, 13

*Zeno v. Pine Plains Cent. Sch. Dist.*,
    702 F.3d 655 (2d Cir. 2012)...................................................................*passim*

## STATUTES and REGULATIONS

20 U.S.C. § 1681 (Title IX) ...........................................................................................4

28 U.S.C. § 517...............................................................................................................1

42 U.S.C. § 2000c (Title IV)...............................................................................1, 2, 23

42 U.S.C. § 2000d (Title VI).................................................................................*passim*

28 C.F.R. § 0.51 ............................................................................................................1

34 C.F.R. Part 100........................................................................................................1

34 C.F.R. § 100.1 ..........................................................................................................1

34 C.F.R. § 100.3 .................................................................................................3, 12-13

34 C.F.R. Part 101........................................................................................................1

## OTHER

Exec. Order No. 12,250 ..................................................................................................1

U.S. Dep't of Educ., Dear Colleague Letter dated Sept. 13, 2004 .......................*passim*

U.S. Dep't of Educ., Dear Colleague Letter dated Oct. 26, 2010........................*passim*

U.S. Dep't of Educ., Dear Colleague Letter dated Jan. 8, 2014 ..................................13

The United States, by its attorney, Preet Bharara, United States Attorney for the Southern District of New York, respectfully submits this Statement of Interest[1] in opposition to defendants' motion for summary judgment involving claims under Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d *et seq.* ("Title VI").

## PRELIMINARY STATEMENT

The United States has a strong interest in ensuring that all children have the opportunity to learn in an environment free from discriminatory harassment.  That federal interest is reflected in multiple titles of the Civil Rights Act of 1964.  The United States, through the Attorney General, enforces Title IV of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000c *et seq.*, which prohibits discrimination based on, among other things, race, color, national origin, and religion. *See id.* § 2000c-6(a)(1).

In addition, in Title VI of the Act, Congress prohibits recipients of federal funds, including public elementary and secondary schools, from discriminating based on race, color or national origin.  Although Title VI authorizes enforcement by private parties through suits such as this one, the Department of Justice has authority to enforce Title VI in federal court and coordinates the implementation and enforcement of Title VI by federal agencies.  *See* 42 U.S.C. § 2000d-1; Exec. Order No. 12,250; 28 C.F.R. § 0.51.  Title VI also charges federal agencies, including the United States Department of Education (the "Department"), with issuing rules and regulations under Title VI and ensuring compliance by funding recipients.   The Department has issued such rules and regulations, *see* 34 C.F.R. Parts 100 and 101, as well as other guidance, and also has extensive experience with Title VI compliance reviews, complaint resolutions, and

---

[1] Under the United States Code, "[t]he Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States."  28 U.S.C. § 517.

other administrative enforcement actions, including termination of funds or referral to the Department of Justice.[2]

This case concerns a school district's alleged deliberate indifference to student-on-student anti-Semitic discrimination, which implicates the federal government's interest under both Title IV and Title VI.  Given the Department's expertise in this area, and the substantial reach of its programs, both in the amount of federal funding for schools as well as the number of schools and students benefited,[3] as well as the additional expertise of the Department of Justice, the United States has a distinct interest in ensuring that the proper legal standards are applied in Title VI cases.  The United States therefore respectfully submits this Statement of Interest for the Court's consideration.

As explained below, under the proper application of the standard for deliberate indifference, there are genuine issues of material fact for trial regarding whether Pine Bush Central School District (the "district") can be held liable for its response to the alleged discriminatory environment.  Accordingly, the defendants' motion should be denied.

---

[2] Samples of the Department's efforts in this regard are available on the Department's Office for Civil Rights "Recent Resolutions" web page: http://www2.ed.gov/about/offices/list/ocr/docs/investigations/index.html#title6res.

[3] For example, the United States provided over $78 billion for elementary and secondary education in 2012.  *See* National Center for Education Statistics, *Digest of Education Statistics*, Table 419 ("Federal support and estimated federal tax expenditures for education, by category: Selected fiscal years, 1965 through 2012"), *available at* http://nces.ed.gov/programs/digest/d12/tables/dt12_419.asp.  "In 2007-08, the Department's elementary and secondary school programs served approximately 55 million students (pre-K through grade 12) attending some 100,000 public schools and 34,000 private schools."  U.S. Department of Education, *Overview of the U.S. Department of Education* (2010), at 1, *available at* http://www2.ed.gov/about/overview/focus/what.pdf.

# LEGAL BACKGROUND

A.    **Title VI**

Title VI provides that

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d; *see also* 34 C.F.R. § 100.3 (same).

The Department's Title VI regulations further provide that a recipient of federal funds may not, "on ground of race, color, or national origin . . . [r]estrict an individual in any way in the enjoyment of any advantage or privilege enjoyed by others receiving any service, financial aid, or benefit under the program."  34 C.F.R. § 100.3(b)(1)(iv).   Nor may the funding recipient "[d]eny an individual an opportunity to participate in the program through the provision of services or otherwise or afford him an opportunity to do so which is different from that afforded others under the program" on the basis of race, color or national origin.  *Id.* § 100.3(b)(1)(vi).

The Second Circuit recently set forth the standards for determining a school district's liability in a private action for damages under Title VI and its implementing regulations in *Zeno v. Pine Plains Central School District*, 702 F.3d 655 (2d Cir. 2012).[4]   *Zeno* involved a bi-racial student who was subjected to multiple incidents of harassment by fellow students throughout his three and one-half years of high school.  *Id.* at 658-59.   In affirming the jury verdict holding the school district liable for failing to respond adequately to discriminatory acts of others (such as students or certain employees), *Zeno* looked to Supreme Court case law interpreting Title IX of

---

[4] We address only the legal standard applied in a private damages action against a school district in cases alleging deliberate indifference to student-on-student harassment.  This case does not implicate, nor do we address, the standard applicable in other cases, including those seeking only injunctive relief and administrative or judicial actions brought by the Department of Education or Department of Justice.

the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX"). *Zeno*, 702 F.3d at 665 n.9 (reasoning that "the Supreme Court has applied parallel analyses to claims brought under [both titles]" and citing *Barnes v. Gorman*, 536 U.S. 181, 185 (2002) ("[T]he Court has interpreted Title IX consistently with Title VI[.]")); *see also Cannon v. Univ. of Chicago*, 441 U.S. 677, 694-98 (1979) (holding that private suits were authorized under Title IX by analogy to Title VI's implied right of action, and explaining that the "drafters of Title IX explicitly assumed that it would be interpreted and applied as Title VI had been"). Thus, in *Zeno*, the Second Circuit held that, to hold a school district liable under Title VI, a private plaintiff must show "(1) substantial control, (2) severe and discriminatory harassment, (3) actual knowledge, and (4) deliberate indifference." *Zeno*, 702 F.3d at 665 (citing *Davis ex rel. LaShonda Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 644-45 (1999) (Title IX case)).[5]

As defendants' motion for summary judgment here turns largely on the standard for the last of these elements, *i.e.*, deliberate indifference, *see* Memorandum of Law in Support of Defendants' Motion for Summary Judgment at 28 ("Defendants' Brief" or "Defs.' Br."), the Government focuses on that standard here.[6]

"A finding of deliberate indifference depends on the adequacy of a school district's response to the harassment." *Zeno*, 702 F.3d at 666. A school district's actions are deliberately indifferent only "if they [are] 'clearly unreasonable in light of the known circumstances.'" *Id.* (quoting *Davis*, 526 U.S. at 648, and citing *Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 141

---

[5] The Title VI standards enunciated in *Zeno* also draw on well-established principles discussed in other courts of appeals cases brought under Title IX and other anti-discrimination statutes, as referenced below.

[6] Defendants separately argue that D.C.'s claims under Title VI also fail as a matter of law because no reasonable fact finder could conclude that school administrators actually knew of actionable harassment against him. Defs.' Br. at 2, 28-29. The United States does not address those arguments.

(2d Cir. 1999) (racial discrimination case brought under 42 U.S.C. § 1981)).[7]  While a court should not second-guess the disciplinary decisions made by school administrators, *id.*, a school's decision to discipline a harasser does not immunize a school district against Title VI liability in all cases.  "The sufficiency of the district's response . . . must be considered 'in light of the known circumstances.'"  *Id.* at 668 (quoting *DiStiso v. Cook*, 691 F.3d 226, 241 (2d Cir. 2012) (racial discrimination case brought under 42 U.S.C. § 1983), and citing *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 751 (2d Cir. 2003) (Title IX case), and *Gant*, 195 F.3d 141).  Responses must be "reasonably calculated to end [the] harassment."  *Id.* at 669 (citing two Title IX cases, *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 262 (6th Cir. 2000), and *Doe v. Sch. Bd. of Broward Cnty.*, 604 F.3d 1248, 1261 (11th Cir. 2010)).  This obligation is an evolving one – the district may need to refine its approach as the district learns more about the harassment.  *Id.* at 668.  A finding that the district's response was adequate under Title VI does not require a showing that the district's efforts actually ended the harassment.  *Id.* at 670.  Liability turns on whether the district's actions could "plausibly change[] the culture of bias at [the school] or stop[] the harassment directed at [plaintiff]."  *Id.*  Put another way, the district may not "ignore[] the many signals that greater, more directed action [is] needed."  *Id.* at 671; *see also Vance*, 231 F.3d at 261 ("Where a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, [the] district has failed to act reasonably in light of the known circumstances." (interpreting *Davis*, 526 U.S. at 647-48)).

---

[7] Although one court has described the deliberate indifference standard as looking to whether the defendants' response was "so clearly unreasonable that a fact finder could draw the inference that the defendants wanted the discrimination to continue," *Preusser v. Taconic Hills Cent. Sch. Dist.*, No. 10 Civ. 1347 (MAD/CFH), 2013 WL 209470, at *6 (N.D.N.Y. Jan. 17, 2013), the relevant determination is essentially one of constructive, not actual, intent.  "[D]eliberate indifference is not the same as action (or inaction) taken maliciously or sadistically for the very purpose of causing harm."  *Gant*, 195 F.3d at 141.

In applying these standards in *Zeno*, the Second Circuit listed various circumstances that should have informed the district's continued response to the harassment of plaintiff by other students, including that the continued harassment demonstrated that mere discipline of the harassers was insufficient to deter others, the harassment grew increasingly severe, the district knew that the harassment predominately targeted plaintiff's race and color, and the district turned down outside offers of free resources (namely, a free "shadow" to accompany plaintiff and a free racial sensitivity training series). *Id.* at 669. The court also noted that there were at least three bases for the jury to find that the district's remedial response was inadequate, *i.e.*, clearly unreasonable: namely, the district's delay in implementing non-disciplinary remedial action for over a year, the district's failure to institute non-disciplinary measures that were both targeted to the type of harassment at issue and mandatory (*i.e.*, not for a self-selecting group), and the district's ignoring of multiple signals that greater, more directed action was needed. *Id.* at 669-71.

*Zeno* and the other case law cited above demonstrate that, while courts "should not ordinarily intervene in the resolution of conflicts which arise in the daily operation of school systems," Defs.' Br. at 1 (internal quotation marks omitted), a proper inquiry under Title VI examines more than just how a school district resolves everyday incidents, such as discipline; it also requires a nuanced, case-by-case analysis of the adequacy of the district's overall response to a hostile environment.[8] An analysis under Title VI includes consideration of, among other things, whether the district reasonably should have evolved in its approach as it became more

---

[8] Indeed, the passage quoted by defendants originates from two Supreme Court cases dealing with entirely different concerns in the context of schools. *See Bd. of Educ. Isl. Trees Union Free Sch. Dist. v. Pico*, 457 U.S. 853, 864 (1982) (removal of certain books from school libraries); *Tinker v. Des Moines Sch. Dist.*, 393 U.S. 503, 507 (1969) (wearing black armbands in school to protest against the Vietnam War). Neither case limits the inquiry under Title VI.

aware of the nature of the problem.  *Zeno*, 702 F.3d at 668 ("As the known circumstances change, the sufficiency of a response may also have to evolve.").  Contrary to defendants' assertions, plaintiffs do not seek to hold the district liable under Title VI simply "for the misbehavior of adolescents."  Defs.' Br. at 2.  Rather, the district may be held liable for damages where its approach to ongoing harassment on the basis of race, color or national origin could not reasonably have been expected to end the discriminatory behavior.  *See, e.g.*, *Zeno*, 702 F.3d at 670-71.

## B.    The Department's Guidance Regarding Title VI

To assist state and local educational agencies in their efforts to comply with federal law, the Department periodically issues "Dear Colleague" letters.[9]  Several of those letters set forth the Department's interpretation of the statutory and regulatory obligations of schools under Title VI.

### 1.    The 2004 Dear Colleague Letter

On September 13, 2004, the Department issued a Dear Colleague letter regarding the obligations of schools and colleges under Title VI and Title IX to address incidents involving religious discrimination (the "2004 Letter," available at http://www2.ed.gov/about/offices/list/ocr/religious-rights2004.html).  The 2004 Letter explains that OCR "aggressively enforces" Title VI with respect to cases of religious discrimination that also involve racial, ethnic or sex discrimination.  *Id.*  The 2004 Letter specifically notes that "since the attacks of September 11, 2001, OCR has received complaints of race or national origin harassment commingled with aspects of religious discrimination against Arab Muslim, Sikh, and

---

[9] To the extent necessary, the Court may take judicial notice of the "Dear Colleague" letters.  *See, e.g.*, *Lopez v. Regents of Univ. of Cal.*, No. C-13-2811 EMC, ___ F. Supp. 2d ____, 2013 WL 6492395, at *3 n.4 (N.D. Cal. Dec. 10, 2013).

Jewish students." *Id.* The 2004 Letter cautions that "the existence of facts indicative of religious

discrimination does not divest OCR of jurisdiction to investigate and remedy allegations of race

or ethnic discrimination." *Id.* Such an investigation necessarily requires a fact-specific inquiry

to determine whether the alleged conduct discriminates on the basis of a Title VI characteristic,

including "shared ethnic characteristics." *Id.*

Thus, since 2004, school districts such as Pine Bush have been on notice that their

obligations under Title VI extend to circumstances that may include some element of religious

discrimination if the facts also indicate possible discrimination on the basis of race, color, or

national origin, and that discrimination against Jewish students may be covered under Title VI.

> **2.** **The 2010 Dear Colleague Letter**

On October 26, 2010, the Department issued a Dear Colleague letter on the topic of

harassment and bullying (the "2010 Letter," available at

http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf).  The 2010 Letter

advises school districts that they might be subject to administrative enforcement for violating

Title VI "when peer harassment based on race, color [or] national origin . . . is sufficiently

serious that it creates a hostile environment and such harassment is encouraged, tolerated, not

adequately addressed, or ignored by school employees." *Id.* at 1.  The 2010 Letter defines a

hostile environment as one resulting from conduct that is "severe, pervasive, or persistent so as

to interfere with or limit a student's ability to participate in or benefit from the services,

activities, or opportunities offered by a school." *Id.* at 2.  The 2010 Letter cautions that "by

limiting its response to a specific application of its anti-bullying policy, a school may fail to

properly consider whether the student misconduct also results in discriminatory harassment." *Id.*

at 1.  Where the harassment is discriminatory in nature, the school "must take prompt and

effective steps reasonably calculated to end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring." *Id.* at 2-3.

Although primarily directed at the possibility of administrative enforcement, a context in which legal standards differ from those applicable in private lawsuits, the 2010 Letter's suggested responses to student-on-student harassment are useful here as illustrations of various approaches that may be appropriate in specific cases to prevent continued harassment.[10]  For example, the 2010 Letter explains that appropriate steps to end harassment may include separating the accused harasser and the target (with minimal burden to the target), providing counseling for the target and/or harasser, and taking disciplinary action against the harasser.  *Id.* at 3.  It also may be appropriate to provide training or other interventions to the larger school community so that all members of the community can recognize harassment if it recurs and respond appropriately.  *Id.*  The school also may need to provide services to the target, particularly where the response has been delayed or prior efforts inadequate, and issue new policies and procedures for reporting harassment (or widely re-distribute existing information about the school's policies and procedures).  *Id.*

---

[10] While the Supreme Court has applied the deliberate indifference standard in private damages actions under Title IX, *see Zeno*, 702 F.3d at 665 (citing, *inter alia*, *Davis*, 526 U.S. at 643; *Gebser*, 524 U.S. at 290-91), *Davis* and *Gebser* did not require proof of deliberate indifference for purposes of administrative enforcement or equitable claims under that statute, *see Davis*, 526 U.S. at 639 ("Here, however, we are asked to do more than define the scope of the behavior that Title IX proscribes. We must determine whether a district's failure to respond to student-on-student harassment in its schools can support a private suit for money damages."); *Gebser*, 524 U.S. at 283 ("[P]etitioners seek not just to establish a Title IX violation but to recover damages[.]").  That said, reasonable responses such as those suggested in the 2010 Letter (or other, similar responses, as appropriate to the circumstances), which the Department has provided as guidance in the administrative enforcement context, should inform the evaluation of whether a school district's response to harassment was clearly unreasonable in light of the known circumstances in the context of private suits for monetary damages.

When the harassing conduct has civil rights implications, regardless of the label used to describe the incident or incidents, the 2010 Letter advises that "school administrators should look beyond simply disciplining the perpetrators."  *Id.*  Although such discipline is "likely a necessary step," "it often is insufficient."  *Id.*  In cases involving discriminatory harassment,

> [a] school's responsibility is to eliminate the hostile environment created by the harassment, address its effects, and take steps to ensure that harassment does not recur.  Put differently, the unique effects of discriminatory harassment may demand a different response than would other types of bullying.

*Id.* at 3-4.

The 2010 Letter also contains hypothetical examples of actionable harassment under Title VI and proposed actions schools may take to meet their obligation to prevent future harassment, based on the Department's experience in administrative matters.  *Id.* at 4-6.  One hypothetical that is particularly relevant here posits anti-Semitic harassment in the form of graffiti (including swastikas) in a school bathroom, repeated name-calling of a Jewish student ("Drew the dirty Jew"), and older students' demands that younger students (who were not Jewish) give them money on the ground that "Jews have all the money," which caused younger Jewish students to avoid the school library and computer lab because they were near the older students' lockers.  *Id.* at 5.  Consistent with the 2004 Letter, the 2010 Letter explains that "harassment against students who are members of any religious group triggers a school's Title VI responsibilities when the harassment is based on the group's actual or perceived shared ancestry or ethnic characteristics, rather than solely on its members' religious practices."  *Id.*  In such circumstances, the 2010 Letter advises, an approach focused only on disciplining the harassers and addressing each incident in isolation likely will be insufficient to remedy the hostile environment.  *Id.* at 6.

The 2010 Letter suggests the following as possible additional responses, in addition to imposing discipline:

- Counseling the harassers about the hurtful effects of their conduct;

- Publicly labeling the conduct as anti-Semitic;

- Reaffirming the school's anti-discrimination policy;

- Publicizing the means for students to report harassment;

- Providing teachers with training to recognize and address anti-Semitism;

- Creating an age-appropriate program to educate students about the history and dangers of anti-Semitism; and

- Conducting outreach to involve parents and community groups in preventing future harassment.

*Id.*

In sum, although the 2010 Letter principally concerns possible administrative enforcement of Title VI, it is relevant here because it recognizes that application of the district's disciplinary policy, by itself, may be an inadequate response, particularly where the harassment is discriminatory in nature.  The 2010 Letter also suggests possible courses of action to end continuing harassment of a more systemic nature than simply applying the regular disciplinary code.  Finally, the 2010 Letter reaffirms the direction in the law of this circuit and others that a school district must take an iterative approach where the district's usual activities do not end the harassment.  *See Zeno*, 702 F.3d at 670; *Vance*, 231 F.3d at 261.

### 3.    The 2004 and 2010 Letters Are Entitled to Deference

The Second Circuit recently looked to the Department's Dear Colleague letters for interpretive guidance regarding Title IX.  *See Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 96-97 (2d Cir. 2012).  In *Biediger*, the court concluded that the letters merited "substantial deference because they reflect reasonable agency interpretations of ambiguities in its own regulation, and there is no reason to think that the agency's interpretations do not reflect its 'fair and considered judgment on the matter in question.'"  *Id.* (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997));

*see also Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (agency's permissible interpretation of its own regulation normally "must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation," (citations omitted) (internal quotation marks omitted).[11]  The requirements of the Dear Colleague letters cited above are reasonable interpretations of a school district's obligations under Title VI and its implementing regulations. Title VI broadly prohibits discrimination on the basis of "race" and "national origin," capacious terms that can easily be read to encompass some forms of anti-Semitism.  *Cf. United States v. Nelson*, 277 F.3d 164, 177 (2d Cir. 2002) ("the Supreme Court's case law firmly and clearly rules that Jews count as a 'race' under certain civil rights statutes enacted pursuant to Congress's power under the Thirteenth Amendment").  In addition, the letters reasonably interpret, in the context of a school district, the Department's regulations stating that Title VI does not permit a funding recipient to "[r]estrict an individual in any way in the enjoyment of any advantage or privilege enjoyed by others" or to "[d]eny an individual an opportunity to participate in the program . . . which is different from that afforded others under the program" on the basis of race

---

[11] Defendants do not seriously contest that Title VI applies here but, rather, simply note in passing that they have found "no case holding that claims of discrimination based on the plaintiffs' identification as Jewish come within Title VI's protection," Dfs.' Br. 25, a defense that presumably would have allowed them to move for summary judgment as to plaintiffs A.R. and D.R. as well (which they have not).  While it is true that the applicability of Title VI to mixed claims appears to be a matter of first impression in the federal courts, *see, e.g.*, *Kajoshaj v. New York City Dep't of Educ.*, ___ F. App'x ____, No. 13-650, 2013 WL 5614113, at *1 n.2 (2d Cir. Oct. 15, 2013) (declining to address whether, in cases where religious bias is allegedly deeply intertwined with national origin bias, "bias of both sorts can properly support a Title VI claim"), the Court should defer to the Department's reasonable interpretation of Title VI as extending to claims on the basis of race, color, or national origin that also include religious discrimination. *See Biediger*, 691 F.3d at 96-97.

or national origin.  34 C.F.R. §§ 100.3(b)(1)(iv), (vi).   As in *Biediger*, the Dear Colleague letters cited here are entitled to substantial deference.[12]

## ARGUMENT

## PLAINTIFFS HAVE ADDUCED SUFFICIENT EVIDENCE FOR A JURY TO CONCLUDE THAT THE DISTRICT WAS DELIBERATELY INDIFFERENT

Defendants' summary judgment motion largely relies on their assertion that plaintiffs D.C., T.E., and O.C. cannot show deliberate indifference by the district.  This assertion, in turn, relies on defendants' arguments that they responded to all known complaints and imposed discipline where appropriate, and that they also addressed anti-Semitism more systemically, although the only actual change specifically directed to anti-Semitism was the one-time seventh grade assembly with a Holocaust survivor in June 2011.  *See* Dfs.' Br. at 30-34.  These assertions are unavailing here.

To begin with, an approach that focuses only on disciplining the harassers and addressing each incident in isolation often may be insufficient to remedy a hostile environment, particularly where the harassment is pervasive.  *See Zeno*, 702 F.3d at 670; *Vance*, 231 F.3d at 261; 2010 Letter 6.  A jury could reasonably conclude from the record that reliance on disciplinary efforts would be an unreasonable response to the known circumstances.  For example, Philip Steinberg, the Superintendent of Pine Bush Central School District from 2008 to 2013, testified that "the issue is not three students doing it all the time.  The question is if you have 30 students doing it,

---

[12] *See also Dibbern v. Univ. of Mich.*, No. 12-15632, 2013 WL 6068808, at *14 (E.D. Mich. Nov. 18, 2013) (in denying motion to dismiss, noting plaintiff's reliance on Department's Title IX Dear Colleague letter suggesting that certain universities implement training and procedures to prevent sexual harassment and violence); *Bleiler v. Coll. of Holy Cross*, No. 11-11541-DJC, 2013 WL 471340, at *10 (D. Mass. Aug. 26, 2013) (evaluating compliance with Department's Title IX regulations and guidance by reference to Dear Colleague letter).  In addition, it should be noted that, in a Dear Colleague letter issued earlier this month, OCR reminded school districts of their obligation to respond to student misconduct that constitutes discriminatory harassment, as discussed in the 2010 Letter.  *See* Dear Colleague Letter dated January 8, 2014, at 5 n.15, *available at* http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201401-title-vi.pdf.

how do you handle . . . [m]aking inappropriate or intolerable comments. . . .  One week it's one

child, the next week it's another child."  Deposition of Philip G. Steinberg ("Steinberg Dep.")

(attached to the Wilson Decl. as Ex. 1) at 277:13-25.

Moreover, as discussed more fully below, the evidence adduced in discovery could

support a conclusion that the district's non-disciplinary efforts to combat anti-Semitism were

"'clearly unreasonable in light of the known circumstances.'"  *Zeno*, 702 F.3d at 666 (quoting

*Davis*, 526 U.S. at 648).  As in *Zeno*, a jury could conclude that the district continued its

practices despite their demonstrated inefficacy, did not timely implement mandatory non-

disciplinary remedial measures that were targeted to the type of harassment at issue, and ignored

multiple signals that greater, more directed action was needed.  *Zeno*, 702 F.3d at 669-71.  That a

jury could find that such an iterative process is required in circumstances such as those alleged

here makes eminent sense.  Good schools may have functioning disciplinary systems and regular

programs regarding citizenship, anti-bullying, and even anti-Semitism.  Notwithstanding these

features, such schools also may develop a pattern of discriminatory behavior among the student

body.  Should that occur, such schools are not immunized from Title VI liability simply because

they applied their regular disciplinary code and continued their regular programs.  More directed

and responsive action may be needed when the prior response was inadequate to address the

harassment, prevent its recurrence, and eliminate any hostile environment.  Defendants' motion

fails to demonstrate that the district's efforts involved the type of responsive analysis and timely

action that Title VI requires.  Thus, at a minimum, there is a genuine issue of material fact as to

whether the district's activities were clearly unreasonable in light of the known circumstances.

Indeed, the deposition testimony and defendants' summary judgment submission

demonstrate that issues of fact exist regarding whether defendants' response to repeated incidents

of anti-Semitism over the years covered in the complaint was clearly unreasonable in at least six

areas.

First, a trier of fact could conclude that the district did not separately address issues of

anti-Semitism with its student body and considered the topic to be subsumed in the district's

anti-bullying efforts, despite knowledge of repeated incidents of anti-Semitic conduct.  Steven

Fisch, the principal of Pine Bush Elementary School from 1991 through June 2011, testified that

"[w]e had no programs that addressed specifically anti-Semitism."  Deposition of Steven Fisch

("Fisch Dep.") (attached to the Declaration of O. Andrew F. Wilson in Opposition to

Defendants' Partial Motion for Summary Judgment (the "Wilson Decl.") as Ex. 4) at 17:15-18;

147:7-8.  John Boyle, who has been the Crispell Middle School ("Crispell") principal since 2002,

similarly agreed that there were no anti-bullying efforts at Crispell that were targeted at anti-

Semitism, other than the June 2011 seventh grade assembly.  Deposition of John Boyle ("Boyle

Dep.") (attached to the Wilson Decl. as Ex. 5) at 13:2-10; 47:19-23.   Robert Peters, the Crispell

assistant principal from August 2007 to June 2010, described these efforts as "character

education" and noted that they contained nothing specific to anti-Semitism.  Deposition of

Robert Peters ("Peters Dep.") (attached to the Wilson Decl. as Ex. 6) at 21:13-17; 76:15-79:3.

Eric Winter, who replaced Peters as the Crispell assistant principal for the 2010-2011 school

year, also confirmed that Crispell's bullying assemblies did not talk about anti-Semitic bullying.

Deposition of Eric Winter ("Winter Dep.") (attached to the Wilson Decl. as Ex. 3) at 23:3-13;

60:8-10; 187:17-20.  Joan Carbone, formerly the Assistant Superintendent but promoted in 2013

to Superintendent, testified in her affidavit that Crispell students are shown a PowerPoint

presentation every fall regarding bullying, but the presentation slides do not mention anti-

Semitism or other discriminatory harassment.  Affidavit of Joan Carbone ("Carbone Aff.")

¶ 30(F) & Ex. D.  The Carbone Affidavit, as a whole, suggests that the district's approach is and has been to focus on certain generalized anti-bullying and diversity training, *see, e.g.*, *id.* at ¶¶ 30 (timeline), 34-35 (noting district's efforts at combatting bullying and prejudice), not on developing a prompt and effective response tailored to addressing known incidents of harassment.

Defendants' suggestion that the district's regular programs or events relating to the Holocaust are sufficient evidence of a reasonable response to severe and pervasive harassment is unavailing on a motion for summary judgment.  Although, every year, the eighth grade at Crispell read the *Diary of Anne Frank* in English class and discussed how anti-Semitism is wrong, Boyle Dep. 48:10-20, a jury could find that the mere continuation of that unit was an insufficient response to continued anti-Semitic harassment.  And although the Pine Bush High School offers an elective course to tenth graders on the Holocaust, which included a presentation from a Holocaust survivor in October 2009, *see* Carbone Aff. ¶ 30(T), and holds a diversity fair that "deals with issues including anti-Semitism," Deposition of Aaron Hopmayer ("Hopmayer Dep.") (attached to the Wilson Decl. as Ex. 7) at 81:12-25, for students participating in its summer programs, the self-selecting nature of these programs undermines their claimed effectiveness.  A trier of fact could question whether these actions constitute a "response" at all, and could therefore reasonably conclude that these efforts were severely inadequate to address the hostile environment created by ongoing incidents of harassment in the district.  *Zeno*, 702 F.3d at 670 (jury could reasonably find optional nature of training relevant to whether district's additional remedial measures were unreasonable).  Similarly, a jury could conclude that a one-time presentation by a Holocaust survivor to the Crispell seventh grade in June 2011 was a clearly unreasonable response to the "known circumstances," particularly given that the

presentation was made only to one grade, that the same types of incidents allegedly recurred after the assembly, and that the district already was discussing transferring some of the plaintiffs out of Crispell at the time of the presentation.  Steinberg Dep. 268:18-279:14.[13]

Second, the district leadership does not appear to have engaged the school board or the faculty in any substantial discussion regarding the specific topic of anti-Semitic harassment in the district, thus further suggesting that the district was not focused on developing a prompt and effective response.  Steinberg testified that anti-Semitism was never discussed at school board meetings.  Steinberg Dep. 9:2-4; 14:7-8; 55:11-14; *see also* Hopmayer Dep. 70:14-18 (same); Peters Dep. 337:6-9; 338:13-16.  Hopmayer estimated that during his six years as high school principal he made presentations to the school board nearly twenty times, but none of those presentations directly addressed bullying or anti-Semitism.  Hopmayer Dep. 68:15-70:8. Although Hopmayer's testimony is not entirely clear on this point, he appears to have discussed anti-Semitism during the monthly meetings with the high school faculty only twice, once in connection with an anti-bullying presentation and a second time during the 2012-2013 school year.  Hopmayer Dep. 75:21-78:1.  Peters did not recall specifically discussing anti-Semitism at any team meeting with Crispell teachers.  Peters Dep. 98: 8-11.  Although plaintiff Sherri Eccleston met with Steinberg and certain members of the school board in June 2011, the purpose of that meeting appears not to have been to address anti-Semitism systemically, but rather to discuss transferring some of the plaintiff students out of Crispell.  Steinberg Dep. 268:18-279:14.

Third, the district failed to ensure that school administrators were aware of the scope and nature of the problem across the district's schools – calling into question their ability to institute measures realistically designed to stop the broader anti-Semitic climate in the district.  For

---

[13] By contrast, a suggested approach for separating the target of harassment from her harassers is to do so with minimal burden to the target.  2010 Letter 3.

example, the leadership in each school did not discuss with the leaders of other Pine Bush schools whether anti-Semitism was a problem in the other schools, or in the incoming class.  As assistant principal at Crispell, Peters was not aware whether anti-Semitism was a problem at Pine Bush Elementary School or Pine Bush High School.  Peters Dep. at 265:14-25.  When Winter took over from Peters as the Crispell assistant principal at the beginning of the 2010-2011 year, he was not told of any existing issues within the student body (such as anti-Semitism), nor did he ask for such information.  Winter Dep. 58:10-59:6.  Although Hopmayer testified that high school guidance counselors met with middle school guidance counselors regarding "domestic issues at home, possible substance or drug abuse issues, [or] at risk behavior" of students entering the high school, he did not know the substance of those discussions and did not recall personally ever discussing anti-Semitic issues with any administrator at Crispell.  Hopmayer Dep. 103:21-105:7.  In light of the pervasive incidents of harassment in the district, a fact-finder would be entitled to consider the absence of a district-wide dialogue among administrators regarding anti-Semitic harassment as evidence of the lack of a pro-active approach by the district.

Fourth, the district did not maintain reliable and searchable records of anti-Semitic incidents that would have allowed the district to evaluate the pervasiveness of such harassment across district schools and to develop a plan reasonably calculated to address the problem.  For example, although the district's disciplinary referral forms included a check box to indicate "bias related" incidents, this box does not appear to have been regularly used and the school officials in charge of discipline were not trained regarding when to check the box.  Peters did not receive any training regarding when to indicate on the discipline referral form that an incident was bias-related, and could not recall ever checking the box indicating that an incident was bias-related.

Peters Dep. 147:12-148:10.  Winter also testified that he did not use the bias-related box on the form.  Winter Dep. 314:20-23.  Nor was a specific numerical code used on the disciplinary referral forms to indicate that an incident was anti-Semitic in nature.  Peters Dep. 86:5-7.  Not only did the district fail to properly track incidents of anti-Semitic harassment, it also failed to record adequate information on its disciplinary referrals to ensure it had a complete picture of the climate in each school.  For example, one particular disciplinary referral cited a student for a "culturally insensitive joke," but did not provide sufficient detail to determine whether the "joke" was anti-Semitic.  Steinberg Dep. 158:25-159:12.  As a result, although school officials had knowledge of each incident of harassment, they failed to use reasonable and available tools to track and evaluate the pervasiveness of anti-Semitic harassment in district schools.

Fifth, a jury could reasonably find that the absence of a coordinated district-wide response and proper tracking of incidents at each school contributed to the district's failure to appropriately identify certain incidents of anti-Semitic harassment when they occurred.  For example, plaintiff Eccleston reported that her daughter complained about an incident on the school bus in which a student drew what he identified as a Hasidic Jew on his bare stomach and another student threw coins at the figure's "mouth."  Winter Dep. 203:23-204:4.  Winter testified, however, that his investigation did not determine the figure to be a Hasidic Jew, but instead a "bearded person," based on what the student who drew the figure would admit to him.  Winter Dep. 169:7-11.   Thus, on the basis of the accused harasser's account, Winter was unwilling to characterize the incident as anti-Semitic:

Q:      Did they both have to do with anti-Semitism on the bus?

A:      This wasn't determined whether it was a Hasidic Jew on his stomach or not.

Q.      It was determined someone was throwing pennies on the stomach?

> A.     As far as I got from that it was a bearded person drawn on his stomach.
>
> Q.     You never interviewed the person that did it?
>
> A.     I did.
>
> Q.     Did you interview the person who was allegedly throwing pennies?
>
> A.     No.

Winter Dep. 206:2-15.

This example demonstrates the limits of a narrow, rather than comprehensive, approach to documenting and combatting anti-Semitism.  The factual record is replete with allegations of stereotyping Jewish individuals as particularly concerned with money, including coin-throwing at plaintiffs.  Given that evidence, a jury could conclude that Winter should have considered the incident in the context of other similarly discriminatory incidents in determining whether or not to consider it as anti-Semitic conduct.  Indeed, after discussing incidents of coin-throwing at his deposition, Boyle appears to have recognized their discriminatory nature:

> Q.     What about students rolling change past Jewish students and telling them to pick it up, do you consider that to be anti-Semitic?
>
> A.     Do I now since it's being brought up?
>
> Q.     Do you now like you do today?
>
> A.     Yes.
>
> Q.     Did you before today's deposition?
>
> A.     No.

Boyle Dep. 119:22-120:6.

Given the context of money-related, ethnic stereotyping by students in the district, a jury also would have a basis to find an anti-Semitic basis for the alleged physical assault of O.C. that involved two boys who tried to shove a quarter in her mouth, notwithstanding O.C.'s testimony

that she did not recall whether the boys said anything during the alleged assault.  Deposition of O.C. 64:2-3.  Similarly, contrary to defendants' assertion, a jury could conclude that an incident in which a non-Jewish student was allegedly held down while a swastika was drawn on her face contributed to a hostile anti-Semitic environment, even though the student was not Jewish.  *See* Defs.' Br. at 24.  As the 2010 Letter explains, incidents involving non-Jewish students can contribute to a hostile anti-Semitic environment in certain circumstances.  *See* 2010 Letter 5.

In light of the known circumstances, a jury would be entitled to view the district's alleged failures to accurately record bias incidents as such and to recognize incidents of harassment when they occurred as evidence that its response was clearly unreasonable.  The jury might also view these failures as indicative of a desire by the district not to officially report bias incidents or allegations.  *See, e.g.*, Declaration of Ilann M. Maazel in Opposition to Defendants' Partial Motion for Summary Judgment, Ex. 71 (no bias incidents or allegations indicated in Crispell's 2009 OCR report).

Sixth, the district's designation of Carbone as the Title VI officer does not appear to have had any practical effect, and indeed suggests that the district had specific personnel in a position to address the hostile climate and yet failed to do so.  Carbone does not appear to have done anything specific in that capacity with regard to anti-Semitism in the district and she incorrectly described Title VI at her deposition as "ha[ving] to do with any type of discrimination, equal opportunity for employment."  Deposition of Joan Carbone ("Carbone Dep.") (attached to the Wilson Decl. as Ex. 2) at 36:14-16.  She testified that she had not discussed anti-Semitic harassment or bullying with Boyle, Peters, Winter, Hopmayer, Fisch or Steinberg.  Carbone Dep. 46:12-17.  Nor did she regularly receive reports of discipline concerning bias-related incidents, including anti-Semitic or racist incidents.  Carbone Dep. 135:4-8.  Peters did not recall ever

speaking with Carbone about any anti-Semitic incident at Crispell.  Peters Dep. 341:4-17.  Nor did Winter recall ever speaking with Carbone or referring anyone to speak with her about any anti-Semitic incident at Crispell.  Winter Dep. 435:19-436:8.  Similarly, Boyle testified that he was unaware whether or not Carbone had any role regarding incidents of bias or anti-Semitism by students and that he never reported such incidents to her (or anyone else).  Boyle Dep. 327:2-22.  Thus, Carbone's designation as Title VI officer does not demonstrate that the district "exceeded its legal obligations," Defs.' Br. 4, except in the narrow sense that the position is not required by statute or regulation.  A trier of fact could find that the Title VI officer's failure to take any action reasonably calculated to end the harassment and remedy the hostile environment is evidence that the district's response was clearly unreasonable.

*     *     *

In sum, there are genuine issues of material fact in the record on summary judgment that raise questions as to whether the district was deliberately indifferent to the known harassment. The evidence cited above is sufficient for a jury to find that the district's disciplinary system was inadequate to accurately track, and therefore to adequately and promptly respond to, anti-Semitic incidents in the district's schools.  Moreover, the evidence is sufficient for a jury to find that the district failed to respond to pervasive anti-Semitic harassment in its schools by taking ongoing, iterative steps to address the hostile environment, as required by Title VI.

Should the case reach the stage in which the Court is considering appropriate relief, the United States respectfully requests that it be permitted an opportunity to be heard with regard to the scope of any injunctive relief, which should address all protected characteristics.  The United States notes that, although this case deals with alleged anti-Semitic conduct, some of the allegations implicate race as well.  *See, e.g.*, Steinberg Dep. 321:21-322:14 (describing photos

- 22 -

taken of graffiti in high school stating "white power"); Winter Dep. 61:8-12 (describing complaint of chants of "white power" on school bus).  In any discussion of injunctive relief, the United States may wish to address the remedies available under Title IV as well as Title VI.

## CONCLUSION

For the reasons set forth above, the Court should deny Defendants' motion for summary judgment.

Dated:  New York, New York
       January 24, 2014

                                      Respectfully submitted,

                                      PREET BHARARA
                                      United States Attorney

By: s/ *Michael J. Byars*   
                                      MICHAEL J. BYARS
                                      Assistant United States Attorney
                                      Telephone:  (212) 637-2793
                                      Facsimile:  (212) 637-2717
                                      Email:  michael.byars@usdoj.gov