UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X
T.E., by her next friend and parent, SHERRI ECCLESTON;
O.C. and D.C., by their next friend and parent, DAVID
COHEN; A.R. and D.R., by Their next friend and parent,
JERROLD ROSEN,

                           Plaintiffs,

      - against -

PINE BUSH CENTRAL SCHOOL DISTRICT; PINE BUSH
CENTRAL SCHOOL DISTRICT BOARD OF EDUCATION;
PHILIP G. STEINBERG, Superintendent of Pine Bush
Central School District, in his official and individual
capacities; JOHN BOYLE, Principal of Crispell Middle
School, in his official capacity; ERIC WINTER, Principal
of Pine Bush Elementary School and former Assistant
Principal of Crispell Middle School, in his individual
capacity; STEVE FISCH, former Principal of Pine Bush
Elementary School, in his individual capacity; ROBERT
PETERS, former Assistant Principal of Crispell Middle
School, in his individual capacity; and AARON HOPMAYER,
Principal of Pine Bush High School, in his official capacity,

                           Defendant.
-------------------------------------------------------------------------X

Index No.:  12-CV-2303
(KMK)

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Maree F. Sneed
HOGAN LOVELLS US LLP
Attorneys for Defendants
555 Thirteenth Avenue NW
Washington, DC  20004
(202) 637-5600

Daniel Petigrow
Laura Wong-Pan
THOMAS, DROHAN, WAXMAN,
PETIGROW & MAYLE, LLP
Attorneys for Defendants
2517 Route 52
Hopewell Junction, NY  12533
(845)  592-7000

Joan Gilbride
KAUFMAN, BORGEEST & RYAN LLP
Attorneys for Defendants
120 Broadway
New York, NY  10271
(212) 994-6517

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS ....................................................................................3

    A.    District And School Background Information ..........................................3

    B.    PBCSD's Policies And Practices Regarding Discrimination, Harassment, And Bullying.................................................................5

        1.    The Code Of Conduct, Anti-Harassment Policy, And Anti-Bullying Policy .................................................................5

        2.    Disciplinary Procedures ........................................................8

        3.    Training Of Administrators, Staff, And Students ..........................9

    C.    The District's Responses To Plaintiffs' Reports Of Alleged Anti-Semitic Behavior............................................................12

        1.    Pine Bush Elementary School.................................................12

        2.    Crispell Middle School .......................................................14

            a.    D.C. ....................................................................15

            b.    T.E. And O.C. ..........................................................16

        3.    Pine Bush High School ........................................................22

ARGUMENT.............................................................................................23

I.    SUMMARY JUDGMENT IS WARRANTED ON D.C.'S, T.E.'S, AND O.C.'S TITLE VI CLAIMS ...........................................................24

    A.    School Districts Are Liable For Peer Harassment Under Title VI Only In Very Narrow Circumstances ..........................................25

    B.    Under Settled Legal Standards, There Are No Triable Issues Of Fact On D.C.'s, T.E.'s, or O.C.'s Title VI Claims.............................27

        1.    D.C. ................................................................................28

        2.    T.E. ................................................................................30

        3.    O.C. ................................................................................33

i

<u>**TABLE OF CONTENTS**</u>—Continued

<u>Page</u>

II.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON
       PLAINTIFFS' EQUAL PROTECTION CLAIMS ........................................................34

       A.    The District Administrators Sued In Their Individual Capacities
             Did Not Deprive T.E. Or O.C. Of Her Constitutional Rights...............................34

             1.    Superintendent Steinberg ........................................................................35

             2.    PBE Principal Fisch ................................................................................36

             3.    Crispell Assistant Principal Winter..........................................................37

       B.    Alternatively, The Individual Defendants Are Entitled To
             Qualified Immunity..............................................................................................38

       C.    Plaintiffs Have Adduced No Evidence Of An Official Policy Or
             Custom Sufficient To Impose *Monell* Liability On PBCSD ...............................39

       D.    Claims Against Defendants Sued In Their Official Capacities
             Should Be Dismissed As Redundant With The Claims Against
             PBCSD....................................................................................................................42

III.   THE COURT SHOULD NOT DECIDE THE NEW YORK CIVIL
       RIGHTS LAW CLAIMS, AND THOSE CLAIMS ARE MERITLESS, IN
       ANY EVENT...................................................................................................................42

CONCLUSION...........................................................................................................................43

## TABLE OF AUTHORITIES

Page(s)

**CASES:**

*Anderson v. Creighton,*
    483 U.S. 634 (1987) ...........................................................................................39

*Barmore v. Aidala,*
    2006 WL 1978449 (N.D.N.Y. July 12, 2006) .....................................................32

*Bd. of Educ. Island Treen Union Free  Sch. Dist. v. Pico,*
    457 U.S. 853 (1982) .............................................................................................1

*Booker v. Bd. of Educ., Baldwinsville Cent. Sch. Dist.,*
    238 F. Supp. 2d 469 (N.D.N.Y. 2002) ................................................................40

*Carmody v. Village of Rockville Ctr.,*
    661 F. Supp. 2d 299 (E.D.N.Y. 2009) .................................................................42

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ............................................................................................23

*Cerra v. Pawling Cent. Sch. Dist.,*
    427 F. 3d 186 (2d Cir. 2005) ..............................................................................27

*Chambers v. N. Rockland Cent. Sch. Dist.,*
    815 F. Supp. 2d 753 (S.D.N.Y. 2011) .............................................................*1, 23*

*DT v. Somers Cent. Sch. Dist.,*
    348 Fed. App'x 697 (2d Cir. 2009) ...............................................................28, 32

*Davis v. Monroe Cnty. Bd. of Educ.,*
    526 U.S. 629 (1999) ..................................................................................... *passim*

*DiStiso v. Cook,*
    691 F.3d 226 (2d Cir. 2012) ...............................................................................34

*Gant ex rel. Gant v. Wallingford Bd. of Educ.,*
    195 F.3d 134 (2d Cir. 1999) ...........................................................................2, 34

*Gebser v. Lago Vista Indep. Sch. Dist.,*
    524 U.S. 274 (1998) ......................................................................................26, 29

*Gilles v. Repicky,*
    511 F. 3d 239 (2d Cir. 2007) ..............................................................................39

*Hamlin v. City of Peekskill Bd. of Educ.*,
  377 F. Supp. 2d 379 (S.D.N.Y. 2005)....................................................29

*Harlow v. Fitzgerald*,
  457 U.S. 800 (1982)....................................................38

*HB v. Monroe Woodbury Cent. Sch. Dist.*,
  2012 WL 4477552 (S.D.N.Y. Sept. 27, 2012)....................................................26

*Malley v. Briggs*,
  475 U.S. 335 (1986)....................................................38

*Monell v. Dept. of Soc. Servs. of City of N.Y.*,
  436 U.S. 658 (1978)....................................................3

*Morse v. Frederick*,
  551 U.S. 393 (2007)....................................................1

*Panzica v. Mas-Maz, Inc.*,
  2007 WL 1732123 (E.D.N.Y. June 11, 2007)....................................................43

*Pearson v. Callahan*,
  555 U.S. 223 (2009)....................................................38

*Preusser v. Taconic Hills Cent. Sch. Dist.*,
  2013 WL 209470 (N.D.N.Y. Jan. 17, 2013)....................................................2, 26, 40

*Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*,
  647 F.3d 156 (5th Cir. 2011) ....................................................34

*Schreiber v. East Ramapo Cent. Sch. Dist.*,
  700 F.Supp. 2d 529 (S.D.N.Y. 2010)....................................................42

*Schubert v. City of Rye*,
  775 F. Supp. 2d 689 (S.D.N.Y. 2011)....................................................42

*Thomas v. Roach*,
  165 F. 3d 137 (2d Cir. 1999)....................................................38

*Village or Arlington Heights v. Metro. Housing Dev. Corp.*,
  429 U.S. 252 (1977)....................................................34

*Walsczak v. Fla. Union Free Sch. Dist.*,
  142 F.3d 119 (2d Cir. 1998)....................................................27

*Wood v. Strickland*,
  420 U.S. 308 (1975)....................................................38

*Yap v. Oceanside Union Free Sch. Dist.*,
   303 F. Supp. 2d 284 (E.D.N.Y. 2004) ........................................................................31, 36, 40

*Young v. Cnty. of Fulton*,
   160 F. 3d 903 (2d Cir. 1998)........................................................................................39

*Zahra v. Town of Southold*,
   48 F.3d 674 (2d Cir. 1995).........................................................................................39

*Zeno v. Pine Plains Cent. Sch. Dist.*,
   702 F.3d 655 (2d Cir. 2012).................................................................................. *passim*

## STATUTES:

28 U.S.C. § 1367(c)(3).................................................................................................42

29 U.S.C. § 1681 *et seq.*..............................................................................................26

42 U.S.C. § 1983.........................................................................................................1

42 U.S.C. § 2000d.......................................................................................................25

Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000 *et seq.* ....................................1

Title IX, 42 U.S.C. §§ 1681 *et seq.*.................................................................................26


N.Y. Civ. Rights Law § 40-c ........................................................................................42

N.Y. Civ. Rights Law § 40-d ........................................................................................42

N.Y. Educ. Law §§ 10-18 ..............................................................................................7

N.Y. Educ. Law § 13.1 ..................................................................................................7

N.Y. Educ. Law § 1709(26) ...........................................................................................1

N.Y. Educ. Law § 2801 .................................................................................................5

N.Y. Educ. Law § 2802 .................................................................................................9

N.Y. Educ. Law § 3214 .................................................................................................8

N.Y. Educ. Law § 3813 .................................................................................................1

## CONSTITUTIONAL PROVISIONS:

U.S. Const. amend. XIV, § 1 .........................................................................................1

N.Y. Const. Art. 11, § 1 ......................................................................................................................6

**REGULATIONS:**

34 C.F.R. §§ 100.1-100.13 ................................................................................................................3

34 C.F.R. § 106.8 ...............................................................................................................................3

8 N.Y.C.R.R. §§ 100.1 *et seq.* ..........................................................................................................5

**RULES:**

Fed. R. Civ. P. 56(a) ........................................................................................................................23

## **PRELIMINARY STATEMENT**

As this Court recently recognized, " '[s]chool principals have a difficult job,' " especially when students allege that they have been mistreated by other students. *Chambers v. N. Rockland Cent. Sch. Dist.*, 815 F. Supp. 2d 753, 771 (S.D.N.Y. 2011) (quoting *Morse v. Frederick,* 551 U.S. 393, 409 (2007)) (granting summary judgment to school district and administrators in student-on-student harassment case).    School administrators constantly exercise their professional judgment deciding how best to respond to claims of peer harassment and issues of bullying and prejudice that arise in their schools.  As the Court observed, " '[f]ederal courts should not ordinarily intervene in the resolution of conflicts which arise in the daily operation of school systems.' "  *Id.* at 776 (quoting *Bd. of Educ. Island Trees Union Free Sch. Dist. v. Pico*, 457 U.S. 853, 864 (1982)).  This case illustrates the same points.

Plaintiffs, five Jewish students currently or formerly enrolled in the Pine Bush Central School District ("PBCSD" or "the District"), assert claims against PBCSD[1] and several District administrators under Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d *et seq.* ("Title VI"), and the Equal Protection Clause, U.S. Const. amend. XIV, § 1, through 42 U.S.C. § 1983 ("Section 1983").  Plaintiffs allege that from approximately 2007 through 2012 they experienced anti-Semitism in three PBCSD schools.

Most of the allegations concern graffiti, "jokes," taunting, and name-calling by students at Crispell Middle School ("Crispell").  The alleged behavior was immature and, in some cases, deeply offensive.  The District and individual Defendants, some of whom are themselves Jewish,

---

[1] The Complaint also names the PBCSD Board of Education ("Board") as a defendant, but PBCSD and the Board are the same entity for litigation purposes. *See, e.g.*, N.Y. Educ. Law § 3813 (permitting plaintiffs to file suit against either a "school district" *or* a "board of education"); *id.* §1709(26) (school board is responsible "[t]o pay any judgment levied against the school district").  For convenience, this Memorandum refers collectively to both entities as "PBCSD."

unequivocally condemn such conduct. The legal question in this case, however, is not whether the conduct Plaintiffs allege is objectionable. It is whether PBCSD and its administrators can be held responsible in damages under federal and state civil rights laws for the misbehavior of adolescents.

Because school children often engage in a "dizzying array of immature . . . behaviors" and "interact in a manner that would be unacceptable among adults," *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 643-653 (1999) (internal quotation marks omitted), the Supreme Court and Second Circuit have set the bar for liability in student-on-student harassment cases under both Title VI and the Equal Protection Clause very high. Plaintiffs must prove, among other things, that school officials' response to discriminatory harassment of which the officials were actually aware was so "clearly unreasonable that a fact finder could draw the inference that the defendants *wanted* the discrimination to continue." *Preusser v. Taconic Hills Cent. Sch. Dist.*, 2013 WL 209470, at *6 (N.D.N.Y. Jan. 17, 2013) (emphasis added) (citing *Gant ex rel. Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 140 (2d Cir. 1999) (citation omitted)).

Under this stringent test, the claims of three of the five Plaintiffs—D.C., T.E., and O.C.— are ripe for summary judgment. D.C.'s claims under Title VI fail as a matter of law because, based on his own testimony, no reasonable fact finder could conclude that PBCSD administrators actually knew of actionable harassment against him. T.E.'s and O.C.'s Title VI claims fail because the District's responses to their repeated complaints about other children's' allegedly anti-Semitic behavior—responses that included prompt investigations and, where appropriate, disciplinary action, as well as ongoing, proactive measures to teach children about the harms of bullying and prejudice, including anti-Semitism—easily surpass the deliberate indifference threshold.

2

T.E.'s and O.C.'s Section 1983 claims against certain school administrators in their individual capacities fail for the same reason: they cannot prove deliberate indifference. And in any event, the individual Defendants are entitled to qualified immunity. Moreover, the Section 1983 claims of all five Plaintiffs against PBCSD fail as a matter of law under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), because Plaintiffs have not identified any District policy, practice, or custom that violated their constitutional rights.

By aggregating their claims in this lawsuit, Plaintiffs have tried to paint a picture of "rampant" and "relentless" Anti-Semitic harassment "persist[ing] across grade levels, academic years, and schools within the District." (First Amended Complaint ¶¶ 2, 4, 7, 9 (Jan. 7, 2013) ("Amended Complaint"), attached as Exhibit A to Declaration of Maree F. Sneed ("Sneed Decl.")) But to prevail, each Plaintiff must individually prove the essential elements of his or her own claims. For the reasons that follow, D.C., T.E., and O.C. have not adduced sufficient evidence to do so. Their claims should be dismissed, as should all of the *Monell* claims.

## STATEMENT OF FACTS

### A.      District And School Background Information

PBCSD, a public school district located about ninety miles north of New York City, covers seven townships located in portions of Ulster, Sullivan, and Orange Counties in the State of New York. The District serves approximately 5,600 students in kindergarten through twelfth grades at four elementary schools, two middle schools, and one high school. (Affidavit of Joan Carbone ¶¶ 4-6 (Dec. 6, 2013) ("Carbone Aff.")) Approximately 72% of PBCSD students identify as Caucasian; 12% as Hispanic or Latino; 11% as African-American; and 4% as belonging to another ethnic group. The District is economically diverse, with about 25%-30% of students qualifying for free or reduced-price meals. (Carbone Aff. ¶¶ 7-8)

Defendant Philip Steinberg, who is Jewish, was superintendent of PBCSD from the 2008-09 school year until his retirement in July 2013.  (Deposition of Philip Steinberg 17:24-18:7 (Apr. 24, 2013), attached as Sneed Decl. Exh. M ("Steinberg Tr.")); Deposition of Joan Carbone 12:17-25 (May 7, 2013), attached as Sneed Decl. Exh. N ("Carbone Tr."))  His successor, Joan Carbone (who is not a Defendant), has served as PBCSD Superintendent since August 2013, and she was the assistant superintendent for instruction from 2006 through July 2013.  (Carbone Tr. 31-32; Carbone Aff. ¶ 1)  During the time period relevant to this litigation, Ms. Carbone also was designated by the PBCSD Board of Education ("Board") as the District's Title VI/Title IX Officer.  (Carbone Tr. 34:5-12, 35:12-22)  Because federal law requires appointment of a Title IX officer, but not a Title VI officer, the District exceeded its legal obligations.  *Compare* 34 C.F.R. § 106.8 (Title IX "designation of responsible employee" requirement) *with id.* §§ 100.1-100.13 (Title VI regulations).

Plaintiffs' allegations involve three of PBCSD's seven schools:  Pine Bush Elementary School ("PBE"), Crispell Middle School, and Pine Bush High School.   PBE serves approximately 700 students in kindergarten through fifth grade.  (Steinberg Tr. 108:10-12)  Defendant Steven Fisch, who is Jewish, was principal of PBE for twenty years, from 1991 to 2011.  (Deposition of Steven Fisch 17:8-18, 62:13-16 (Apr. 18, 2013), attached as Sneed Decl. Exh. I ("Fisch Tr."))

Crispell serves nearly 800 students in grades six to eight.  (Steinberg Tr. 108:7-9; Carbone Tr. 8:14-15)  Defendant John Boyle  has been principal of Crispell since 2002.  (Deposition of John Boyle 13:5-10 (Apr. 26, 2013), attached as Sneed Decl. Exh. K ("Boyle Tr.))  There were three assistant principals at Crispell during the time period relevant to this lawsuit:  Defendant Robert Peters, who served from September 2007 to June 2010 (Boyle Tr.

4

19:20-20:7); Defendant Eric Winter, who served during school year 2010-11, after which he became principal of PBE (Boyle Tr. 20:8-14; Winter Tr. 23:3-13); and Christopher Mummery (not a Defendant), who has been Crispell's assistant principal since September 2011. (Boyle Tr. 20:19-25) At Crispell, student discipline is primarily handled by the assistant principal. (Boyle Tr. 21:19-22:1)

PBHS serves almost 2,000 students in grades nine to twelve. (Deposition of Aaron Hopmayer 148:21-23 (Apr. 29, 2013), attached as Sneed Decl. Exh. L ("Hopmayer Tr.")) Defendant Aaron Hopmayer, who is Jewish, has been principal of PBHS since September 2007. (Hopmayer Tr. 149:11-12, 217:6-19)

**B.      PBCSD's Policies And Practices Regarding Discrimination, Harassment, And Bullying**

PBCSD is committed to providing a safe educational environment for all students free of discrimination, harassment, and bullying. The District works constantly to strengthen existing programs designed to prevent and productively respond to incidents of student-on-student misconduct. (Carbone Aff. ¶ 35)

**1.      The Code Of Conduct, Anti-Harassment Policy, And Anti-Bullying Policy**

At all times relevant to this litigation, and in compliance with New York Education Law § 2801 and Part 100 of the Regulations of the Commissioner of Education, 8 N.Y.C.R.R. §§ 100.1 *et seq.*, the District has operated under a Code of Conduct that prohibits, among other types of student misconduct, "discrimination" and "harassment." Discrimination is defined as "the use of race, color, creed, national origin, religion, gender, sexual orientation, or disability as a basis for treating another in a negative light." Harassment is defined as a "sufficiently severe action or a persistent or pervasive pattern of actions or statements directed at an identifiable individual or group that are intended to be or that a reasonable person would perceive as

ridiculing or demeaning." (Sneed Decl. Exh. O, at DEF002993; P, at DEF003032; Q, at DEF000544-000545))

The Code of Conduct, which was revised in 2005, 2007 and 2012, has at all relevant times prescribed a range of permissible disciplinary actions for student misconduct, ranging from oral warning to long-term suspension. (Sneed Decl. Exh. O, at DEF002995; P, at DEF003035; Q, at DEF000547) The right to an education is constitutionally protected (N.Y. Const. Art. 11, §1), and the penalty of expulsion may be imposed only for the most egregious misconduct, such as violent criminal conduct, and is infrequently sustained on appeal to the Commissioner of Education. (Carbone Aff. ¶ 31)

A Disciplinary Chart appended to the 2007 Code of Conduct recommends a progressive discipline approach for various categories of offenses, with discipline ranging from oral warnings to long-term suspensions, but all disciplinary actions are "determined at the discretion of the administrator" based on the particular circumstances of each case. (Sneed Decl. Exh. P, at DEF003059) The District requires consideration of the student's age, the nature of the offense, prior disciplinary action, and other extenuating circumstances, in determining the appropriate level of discipline to be imposed. (Sneed Decl. Exh. O, at DEF002995; P, at DEF3034; Q, at DEF000547) Under the terms of the Code of Conduct, teachers may take minor disciplinary measures without consulting with an administrator, such as administering oral warnings. However, misconduct that warrants more severe discipline must be administered by, or in consultation with, a District administrator. (Sneed Decl. Exh. O, at DEF002995-3003; P, at DEF003034-42; Q, at DEF000547-555)

In August 2012 the Code of Conduct was amended specifically to include "bullying" and "cyberbullying" as prohibited offenses. Bullying is defined as "[a]ggressive behavior that is

intentional and involves an imbalance of power"; cyberbullying is "online social cruelty or electronic bullying."   (Sneed Decl. Exh. Q at DEF000534-535)   Although such conduct was already prohibited under other provisions of the Code of Conduct, the more specific language was added to bring the Code of Conduct into compliance with the Dignity for All Students Act, which became effective July 1, 2012. *See* N.Y. Educ. Law §§ 10-18 ("DASA"). *See id.* § 13.1 (requiring New York public school districts, among other things, to develop policies and procedures "intended to create a school environment that is free from harassment, bullying and discrimination").   (Carbone Tr. 151:9-14)

During the relevant time period, the District has also operated under Anti-Harassment and Anti-Bullying policies. (Sneed Decl. Exh. R)   The Anti-Harassment Policy that was adopted in 2008 "prohibits and condemns all forms of harassment on the basis of race, color, creed, religion, national origin," and other categories, including harassment of students by other students. (Sneed Decl. Exh. R)   Harassment of students is defined as "communication (verbal, written or graphic) and/or physical conduct based on" a protected characteristic that

> Has  the purpose or effect of substantially or unreasonably interfering with a student's academic performance or participation in an educational or extracurricular activity, or creates an intimidating, hostile or offensive learning environment; and/or effectively bars the student's access to an educational opportunity or benefit; [or] . . .
>
> Otherwise adversely affects the . . .educational opportunities and benefits provided by the District.

(Sneed Decl. Exh. R, at DEF000496)    Violations are subject to "appropriate disciplinary measures  .  .  . up to and including suspension, in accordance with applicable laws and/or regulations, District policy and regulation, and the District Code of Conduct." (Sneed Decl. Exh. R, at DEF000496-497)

The 2011 Anti-Bullying policy prohibits physical, verbal, and psychological  behaviors

that are "carried out repeatedly over time, and that "involve[ ] a real or perceived imbalance of power." (Sneed Decl. Exh. R, at DEF-G-000518)  The policy requires that reports be made to administrators and that appropriate prevention and intervention strategies be used to curtail the behavior. (Sneed Decl. Exh. R. at DEF-G-00519-20)

Pursuant to DASA, the Anti-Harassment Policy was amended on August 21, 2012 to require training of a representative at each school building "to handle human relations in the areas of race, color, weight, national origin, ethnic group, religious practice, disability, sexual orientation, gender and sex." (Sneed Decl. Exh. R, at DEF000515)

## 2.    Disciplinary Procedures

As is the practice in school districts throughout the country, student discipline in PBCSD is handled primarily at the school building level.   Teachers are the "first line of defense," handling minor disciplinary matters on their own on a daily basis.  If the infraction warrants more formal discipline than a warning, teachers refer such issues to the school administration. Students may report infractions, as well.  (Carbone Tr. 153:2-14; Sneed Decl. Exh. O, at DEF002994; P, at DEF003034; Q, at DEF000546)

The administrator responsible for student discipline in each school building investigates disciplinary reports and, where appropriate, imposes discipline consistent with the Code of Conduct.  (Sneed Decl. Exh. O, at DEF002994; P, at  DEF003034; Q, at  DEF000546) Furthermore, consistent with the practice in other school districts and with New York Education Law § 3214, the Superintendent ordinarily does not become involved in discipline issues, except when the infraction is serious enough to warrant long-term suspension of over five days, triggering the statutory right to a Superintendent's hearing. (Sneed Decl. O, at DEF003002; P, at DEF003041-42; Q, at DEF000553-554)

PBCSD maintains disciplinary records to facilitate the reporting of "violent and disruptive incidents" to the New York State Education Department ("NYSED") pursuant to state law. Each year, the District files a Violent and Disruptive Incident Report ("VADIR") with NYSED, which documents incidents that met the regulatory definition of "violent and disruptive" during the prior school year. (Carbone Tr. 181:6-12, 190:15-20) *See generally* N.Y. Educ. Law § 2802. State law requires school districts to report whether incidents meeting the VADIR threshold are "bias-related," but it does not require more specific information about the nature of the bias. (Sneed Decl. Exh. GG)

### 3.   Training Of Administrators, Staff, And Students

PBCSD administrators and staff receive periodic training on the Code of Conduct and the procedures for documenting discipline in accordance with New York law. For example, in 2006 the Education Department provided training on VADIR reporting requirements. (Carbone Aff. ¶ 30(D))   In addition, school building administrators review discipline procedures and forms with new faculty at the beginning of each school year. (Carbone Tr. 159:14-24)

The District also provides regular training for administrators and staff on issues related to bullying, harassment, and discrimination, including religious discrimination. For example:

- PBCSD administrators regularly attend conferences and workshops addressing methods for preventing and combating bullying and discrimination, conducted, for example, by the New York State School Boards Association. (Carbone Aff. ¶ 29; Hopmayer Tr. 28:3-30:17)

- Issues related to diversity, tolerance, and anti-bullying have been addressed repeatedly at Superintendent Conference Days, which are mandatory for all District faculty and staff. The September 1-3, 2009 conference, for example, featured several such presentations, including a keynote speech by a recognized diversity expert, Dr. Michael Fowlin, who addressed racism and anti-Semitism, among other topics, and a presentation by Dr. Arthur Flug of Queensborough College's Kupferberg Holocaust Resource Center, entitled "Understanding Hate Crimes through the Holocaust."   Dr. Flug's presentation specifically addressed anti-Semitism to instruct "teachers in assisting their students who may become

victims of such unlawful acts." (Carbone Aff. ¶¶ 30(L)–(R))

- In September and November 2010, outside speakers addressed PBCSD staff on the issues of teaching diverse students and cyber-bullying. (Carbone Aff. ¶ 30(W))

- In January 2006, the District's Diversity Task Force, together with PBCSD Board of Education ("Board") member Sher Singh, led a diversity workshop for Crispell staff. (Carbone Aff. ¶ 30 (A))

Training has also been provided for parents. On June 23, 2011, bullying expert Barbara Colorosa gave a workshop on bullying and discrimination for all PBCSD parents held at PBHS; she gave a similar workshop for all District staff at PBHS on June 24, 2011. (Carbone Aff. ¶ 30(DD))

The District covers the Holocaust and anti-Semitism multiple times in its curriculum. For example, Crispell eighth graders learn about the Holocaust in English class. Class discussions deal with anti-Semitism and the importance of tolerance for all races and religions, and students usually watch a Holocaust video. (Boyle Tr. 48:10-22; Carbone Aff. ¶¶ 11-13) PBHS offers an elective course on the Holocaust. In October 2009, a Holocaust survivor gave a presentation to the class. (Carbone Aff. ¶ 30(T)) Other students who had social studies during that period attended, as well. Approximately 100 students attended in all. (Steinberg Tr. 227:17-228:7, 232:9-16)

In addition, every year the District runs numerous programs for students across grade levels to educate them in an age-appropriate manner on issues related to bullying and prejudice, including anti-Semitism. Many such programs were held throughout the time period relevant to this litigation at the schools about which Plaintiffs complain. On March 9 and March 10, 2010, for example, Crispell and PBHS held mandatory student assemblies at which Dr. Fowlin (the diversity expert mentioned above) discussed prejudice, anti-Semitism, and the need for tolerance

10

of others' differences.  (Carbone Aff. ¶ 30(U))  Other examples include:

- *All PBE students* participate in age appropriate anti-bullying programs that address the issue of tolerance, including religious tolerance.  (Fisch Tr. 146:10-21)

- *PBE fifth graders*, on May 12, 2009, also attended a special assembly led by the school principal that addressed bullying and name-calling and explained the consequences for students who bullied or harassed others.  (Fisch Tr. 281:19-285:21; Sneed Decl. Exh. V)  This assembly is discussed *infra* at 13.

- *All Crispell students* participate in mandatory anti-bullying workshops run annually by the school's Guidance Office.  Students watch videos, hear from outside speakers, and engage in classroom discussions about bullying.  (Carbone Aff. ¶¶ 14, 30(F), (H), (J), (K), (S), (V), (Z))

- *Crispell sixth graders* participate in a mandatory anti-bullying program each year in which they role-play or read about bullying scenarios, and they receive instruction on the disciplinary consequences for bullying.  (Carbone Aff. ¶¶ 30(E), (X))

- *Crispell seventh graders* receive annual anti-bullying training and coursework, which can include role-playing, research projects, or watching an anti-bullying movie.  (Carbone Aff. ¶¶ 14, 30(C))  In addition, on March 29, 2011, a Town of Crawford Police diversity task force officer conducted an assembly for seventh graders on bullying and cyber-bullying.  (Carbone Aff. ¶ 30(AA))  On June 10, 2011, the entire grade attended an assembly on anti-Semitism that featured a presentation by a Holocaust survivor, Hanne Liebmann.  (Boyle Tr. 47:10-14; Steinberg Tr. 280:23-281:8; Winter Tr.147:24-148:7; Carbone Aff. ¶ 30(BB))  This assembly is discussed *infra* at 20.

- *All PBHS students* meet with Principal Hopmayer at the beginning of each school year, usually in the first week of school, when he sets clear expectations with regard to bullying, race discrimination, and anti-Semitism.  On one occasion in 2009 or 2010 Mr. Hopmayer also brought in an outside speaker to address the same issues before the student body in the PBHS auditorium.  (Hopmayer Tr. 144:19-145:12)

- *PBHS ninth graders* receive anti-bullying and diversity training from the school's "Teen Outreach" and "Multi-Cultural and Diversity" clubs.  The clubs' faculty advisors include Guidance Counselors Mindy Brock and School Psychologist Howard Leibovitch, both of whom are Jewish.  Student volunteers from the clubs visit all ninth grade classrooms twice a year to address issues such as bullying, sexual harassment, and prejudice, including anti-Semitism.   (Carbone Aff. ¶¶ 15-20; Hopmayer Tr. 388:9-25)

- *PBHS*'s Multi-Cultural and Diversity Club also puts on other events each year to increase multicultural awareness and to speak out against harassment of all kinds. (Hopmayer Tr. 58:18-60:8; Carbone Aff. ¶¶ 21-24)

- *PBHS* offers annual summer academies, including a program that culminates in a Diversity Fair often attended by up to 300 PBHS students and 300-400 elementary school students. The Diversity Fair addresses issues including anti-Semitism. (Hopmayer Tr.81:12-83:23)   In 2011 representatives from the Department of Justice and the N.Y.P.D. Hate Crimes Division met with academy participants and Principal Hopmayer to discuss ways of improving relationships among diverse groups of PBHS students. (Carbone Aff. ¶¶ 30 (EE))

**C.     The District's Responses To Plaintiffs' Reports Of Alleged Anti-Semitic Behavior**

**1.     Pine Bush Elementary School**

T.E. attended PBE for grades two to five, from 2005-06 to 2008-09. (Amended Complaint ¶ 25)  During the 2008-09 school year, when T.E. was in fifth grade, her mother Sherri Eccleston ("Mrs. Eccleston") contacted Principal Fisch four times about matters Plaintiffs now characterize as anti-Semitic.  Mr. Fisch personally addressed each of Mrs. Eccleston's concerns.

First, in early Fall 2008, Mrs. Eccleston complained to Mr. Fisch that T.E.'s teacher had planned a field trip to Ellis Island for October 8, 2008, the eve of Yom Kippur.  The bus was scheduled to return by 5:30, well before sundown, when Jewish people begin observing the holiday.  After talking to the teacher and determining that the field trip could not be rescheduled, Mr. Fisch invited Mrs. Eccleston to attend the trip so that she and T.E. could leave early, if necessary, and he also offered to pay her expenses.  Mrs. Eccleston accused Mr. Fisch of anti-Semitism, and neither she nor T.E. went on the trip.  (Fisch Tr. 33:24-34:7, 197:3-198:7, 205:2-211:10, 212:6-8; Sherri Eccleston Tr. 48:18-19, 50:5-12  (Apr. 4, 2013), attached as Sneed Decl. Exh. G ("S.E. Tr."))

Second, also in Fall 2008, Mrs. Eccleston reported to Mr. Fisch and Superintendent

Steinberg that T.E. had seen drawings of swastikas in the personal planners of two classmates, ███████████████████   (Fisch Tr. 46:24-47:22)   T.E. did not know what the symbols were until she asked her mother.   (Deposition of T.E.   Eccleston 25:14-25 (March 14, 2013), attached as Sneed Decl. Exh. D ("T.E. Tr."))   Because Mr. Fisch was away from school, Mr. Steinberg asked an assistant principal to investigate.   Mr. Fisch completed the investigation upon his return and found drawings of swastikas in the boys' planners.   Mr. Fisch called the boys into his office, counseled them about the significance of the symbol, warned them that they could be subject to further discipline, and called their parents.   (Fisch Tr. 59:5-60:8, 62:4-63:23, 64:8-11; Steinberg Tr. 132:3-20)   An oral warning is a form of discipline under the Code of Conduct. (Sneed Decl. Exh. P, at DEF3035)   T.E.'s teacher also rearranged the boys' desks so that they were no longer sitting close to T.E..   (T.E. Tr. 30:23-31:16)

Third, on about March 13, 2009, Mrs. Eccleston reported that ████ had called T.E. a "Jew" on the school bus and displayed his middle finger to Mrs. Eccleston.   (Fisch Tr. 110:10-18, 113:6-17)   Although the bus driver stated that he had not seen the incident, Mr. Fisch asked him to fill out an incident report and called ████ to his office.   Mr. Fisch disciplined ████ with at least a lunch and recess detention and called his parents.   (Fisch Tr. 117:2-15, 122:4-17, 124:14-18; Sneed Decl. Exh. T)

In addition to disciplining the boys for their behavior, on May 12, 2009, Mr. Fisch led a special assembly for fifth graders to discuss bullying and name-calling and to explain the consequences for students who bullied or harassed others.   (Fisch Tr. 281:19-285:21)   He also sent a letter about the assembly discussing bullying and discrimination to fifth grade parents. (Fisch Tr. 104:22-105:25; Sneed Decl. Exh. V)   The assembly was in addition to the regular anti-bullying programs that PBE runs for its students.

Fourth, on May 1, 2009, Mrs. Eccleston told Mr. Fisch that T.E. had seen a small etching of what she thought was a swastika carved under an enclosed covering at the top of a slide on the PBE playground, which is used by the school and members of the community.  (Fisch Tr. 152:2-5, 155:7-11, 176:16-21; T.E. Tr. 39:13-14, 40:23-25)  The same day, Mr. Fisch spoke to PBE's head custodian, directing him to remove the symbol, and followed up by submitting a work order for the job on May 5, 2009.  (Fisch Tr. 156:5-24, 158:13-162:23; Sneed Decl. Exh. U)  Although Mrs. Eccleston testified that she never personally saw the original carving (S.E. Tr. 76:6-8, 77:4-7, 78:7-9), she reported in April 2010, when T.E. no longer attended PBE, that there was still a swastika on the slide.  The carving that Mrs. Eccleston identified was found and removed. (Affidavit of Deborha Brush ¶¶ 11, 16, Exh. B (Dec. 6, 2013) ("Brush Aff."); S.E. Tr. 78:10-17)

**2.     Crispell Middle School**

According to Mr. Boyle, who has been principal of Crispell for over a decade, the middle school years, when children are typically between the ages 10 and 14, can be challenging. Students often engage in objectionable behaviors because they have not yet developed critical social skills, including the ability to empathize with other students or to respond appropriately. Middle school students can be immature and will tease other students or use inappropriate language without regard to their peers' feelings.  (Boyle Aff. ¶¶ 4-7)

As discussed above, Crispell frequently addresses topics related to bullying and prejudice in its curriculum and in assemblies, and it did so throughout the time period relevant to this lawsuit.  In addition, Crispell, along with every other school in the District, uses a nationally-recognized program called Positive Behavioral Intervention and Supports ("PBIS") to develop behavioral expectations for students.   PBIS, which involves all members of the school community, was planned for in 2011 and implemented in all schools in 2012.  The program's

14

purpose, among other things, is to address bullying, including bullying of an anti-Semitic nature, and to recognize students who exhibit positive behavior at school.    Mr. Steinberg was instrumental in the initiative to implement PBIS.  (Carbone Aff. ¶ 30(HH))

      **a.**    **D.C.**

D.C., who is O.C.'s older brother, attended Crispell from 2006-07 to 2008-09.  (Amended Complaint ¶ 73; Deposition of O.C. 5:19-6:2 (March 21, 2013), attached as Sneed Decl. Exh. E ("O.C. Tr."))  D.C. testified at deposition that he "was always being made fun of for being Jewish" at Crispell, including by other students throwing coins at him; that he heard anti-Semitic slurs and jokes; and that he observed "swastikas . . . everywhere."  (Deposition of D.C. 34:13-21, 37:13-20 (Mar. 27, 2013), attached as Sneed Decl. Exh. F ("D.C. Tr."))    When asked at deposition if he ever reported such behavior at Crispell, however, D.C. identified only three isolated incidents.  (D.C. Tr. 91:11-25)

When D.C. was in sixth grade (school year 2006-07), his father, David Cohen, complained to Crispell Principal Boyle that a high school girl had yelled the phrase "f---ing Jew" on the school bus.  (D.C. Tr. 29:6-10; Deposition of David Cohen Tr. 10:14-21 (Mar. 22, 2013), attached as Sneed Decl. Exh. H ("D. Cohen Tr."))  Because the girl attended PBHS, Mr. Boyle informed a PBHS administrator of the misconduct, and the administrator addressed the incident with the girl.  (Boyle Tr. 99:12-100:7, 101:20-102:13, 166:23-164:11)  Mr. Boyle telephoned Mr. Cohen to inform him that the situation had been handled at the high school level. (D. Cohen Tr. 15:7-15)

D.C. testified that he reported graffiti to two Crispell teachers when he was in eighth grade, and in each case it was promptly addressed.  First, he told his science teacher that someone had drawn a swastika on a bathroom wall, and the swastika was removed.  When it was

redrawn in the same place a couple of days later, D.C. informed his Spanish teacher, and the graffiti was removed again. (D.C. Tr. 11:24-13:15)

D.C. further testified that on one occasion in seventh grade he alerted a bus driver about an anti-Semitic chant some children were singing on the bus. He mentioned it "as I was getting off the bus in passing." (D.C. Tr. 72:2-73:13) He also visited the Crispell school nurse about anxiety on several occasions and talked to a school counselor, but he did not mention anti-Semitism to them. (D.C. Tr. 50:4-52:18)

**b.** **T.E. And O.C.**

T.E. and O.C. were classmates at Crispell in grades six to eight, from 2009-10 to 2011-12, until T.E. withdrew on January 25, 2012 to be home-schooled. (Amended Complaint ¶¶ 33, 55, 59) Both girls reported several incidents of allegedly anti-Semitic behavior while at Crispell, the vast majority of it during Spring of 2011, when they were in the seventh grade. Administrators investigated the reports, imposed disciplinary action when it was warranted, and took additional measures to address the girls' concerns.

Sixth Grade (2009-10). O.C. admits that she did not report any incidents of anti-Semitism to any Crispell or other PBCSD administrator, or to her parents, during sixth grade. (O.C. Tr. 23:22-24:5, 27:23-28:6)

When T.E. was in sixth grade, her mother raised concerns about the school bus. On April 19, 2010, Mrs. Eccleston informed Deborha Brush, PBCSD's Assistant Superintendent for Business, that T.E. had overheard two high school students on the bus refer to April 20 as "Hitler's birthday." (Brush Aff. ¶¶ 4-5) Superintendent Steinberg was included on the email, and he asked Ms. Brush to follow up. (Steinberg Tr. 212:1-17) Ms. Brush immediately contacted the bus company, which interviewed the bus driver, reviewed the April 19, 2010 video

recording from T.E.'s bus, and found nothing inappropriate.   Ms. Brush also notified administrators at Crispell and PBHS that they should be on high alert for potential misconduct on April 20, not only because of Mrs. Eccleston's concern, but also because April 20 is the Columbine anniversary and is referred to as "cannabis culture day."  There is no evidence that any anti-Semitic incidents occurred at either Crispell or PBHS on April 20, 2010.  (Brush Aff. ¶¶ 7-9, 12-14,18)

Mrs. Eccleston also told Ms. Brush that T.E. had seen students make anti-Semitic gestures (such as "Hitler salutes" and curving their hands into swastika shapes) when a substitute driver was present.  Ms. Brush contacted the bus company, which agreed to monitor the situation and to contact Mrs. Eccleston directly to get more information. (Brush Aff. ¶¶ 14-15, 17, Exh. C)

Seventh Grade (2010-11).  Much of the misconduct reported by T.E. and O.C. in seventh grade involved anti-Semitic name-calling, which Mr. Winter, who was the assistant principal that year, investigated and addressed.  For example, on March 8, 2011, O.C. reported having learned that another girl had called her a "dirty disgusting Jew."  Mr. Winter counseled the girl about the reasons why the statement was offensive, gave her lunch detention, and called her parents; she did not make statements like that to O.C. again.   (Winter Tr. 102:14-103:18, 109:10-110:10, 120:24-123:15; O.C. Tr. 38:25-40:18, 42:16-20; Sneed Decl. Exh. X)

Other name-calling incidents were handled in similar fashion.  See, e.g., Winter Tr. 126:4-24; T.E. Tr. 140:23-145:20 (March 8, 2011 report that T.E. heard one girl tell another girl that O.C. (who was not present) should go back to picking up pennies off the street; Mr. Winter had a conference with the girl who allegedly made the statement); Winter Tr. 71:6, 74:2, 79:12-80:6, 84:5-16, 85:15-24; T.E. Tr. 111:9-24, 115:12-116:14  (April 11, 2011 report that a student called T.E. "crispy"; Mr. Winter investigated, found that the statement was made six or seven

17

months previously, had a conference with the student involved, and called his parent); Winter Tr. 97:24-99:6; Sneed Decl. Exh. Y (April 27, 2011 report that O.C. had learned that a boy called her a derogatory name; Mr. Winter investigated, determined that the boy had uttered an anti-Semitic slur, and issued a two-day suspension).

T.E. and O.C. also reported seeing anti-Semitic graffiti at Crispell on several occasions in seventh grade.  In one case T.E. reported a swastika that she could not have even seen herself, because it was in the boys' bathroom.  She told Mr. Winter that a boy had told her about it, and it was removed.  (Winter Tr. 143:15-144:23; T.E. Tr. 122:5-24, 126:14-23)  In each case when the girls reported graffiti, Mr. Winter had the graffiti removed and took other action as appropriate. *See* O.C. Tr. 43:7-45:23, 48:7-10; Winter Tr. 91:11-93:18 (around April 27, 2011, O.C. reported that there was a swastika on a desk in the English classroom on two occasions; Mr. Winter had the swastika removed both times and met with the teacher to attempt to identify the child who had drawn it); Winter Tr. 303:25-304:3, 306:9-13, 309:3-7, 393:8-396:4; O.C. Tr. 55:21-56:23, 84:14-86:6; T.E. Tr. 95:25-96:9; Sneed Decl. Exh. EE (June 15, 2011 report that a boy had drawn a swastika in another student's yearbook and shaped a pipe cleaner into a swastika; Mr. Winter met with the boy, issued a two day out-of-school suspension for the pipe cleaner incident, contacted his mother, and also crossed the swastika out of the yearbook); Winter Tr. 142:21-144:13; T.E. Tr. 167:8-168:25 (swastika in music room removed).

On February 25, 2011, T.E.'s mother reported that a high school senior named ▓▓▓▓▓ was chanting "white power" on the school bus.  (Winter Tr. 61:2-14)  A report from the bus driver indicates that ▓▓▓▓▓ was making "racial" and other harassing comments on February 24, 2011. (Sneed Decl. Exh. W, at DEF0003596) Mr. Winter called PBHS administrators, and PBHS

suspended ██████ from the bus for two weeks for harassing and disruptive comments.  (Winter Tr. 68:12-69:24, 210:15-23; Sneed Decl. Exh. W, at DEF0003596)

Three months later, near the end of the school year on about May 31, 2011, ██████ sat down next to T.E. on the school bus.  T.E. texted her mother that ██████ would not let her out of the seat.  Mrs. Eccleston called Mr. Winter while the bus trip was still in progress, asking to have ██████ moved to a different seat.  Mr. Winter immediately called the bus company to make that request.  The bus company contacted the driver, who told ██████ to move to a different seat, and ██████ did so.   (Winter Tr. 161:2-12, 214:6-15; T.E. Tr. 152:18-154:3, 156:7-14 )  Mrs. Eccleston subsequently informed Mr. Winter that ██████, who was about to graduate, then remarked that T.E. was going to get beaten up the next year in eighth grade. (Winter Tr. 161:23-162:21, 219:6-220:2)  Mr. Winter called Brian Lynn, Assistant Principal of the High School, to discuss the incident, and Mr. Lynn spoke to ██████   Although ██████ would have received a bus suspension for his conduct, he did not, because May 31 was ██████'s last day on the bus.  (Winter Tr. 164:23-165:3, 220:19-25, 248:17-20; Steinberg Tr. 248:19-249:7)

The Crispell administration also investigated and addressed other reports that T.E., T.E.'s mother, and O.C. made when the girls were in seventh grade.  *See, e.g.*, T.E. Tr. 161:20-164:20; Winter Tr. 166:9-168:20 (May 31, 2011 report from T.E.'s mother that a boy drew a "Hasidic Jew" on his stomach; Mr. Winter investigated, but discipline was not imposed because, after Mr. Winter contacted him, the boy did not return to school and withdrew from the District).

In addition, Mr. Winter began looking for additional ways to help the girls beyond simply investigating their complaints and imposing discipline.  He researched anti-Semitism and sought out resources from the U.S. Department of Justice and N.Y. Police Department Hate Crimes

Unit, and informed Mrs. Eccleston about his efforts.    (Winter Tr. 147:14-149:19, 257:10-14; Sneed Decl. Exhs. Z, AA)  He also consulted with Superintendent Steinberg, and, with Mr. Steinberg's assistance, arranged for a Holocaust survivor and her husband to speak to the entire seventh grade about the Holocaust and anti-Semitism. (Winter Tr. 147:14-149:20; 267:6-269:22; Sneed Decl. Exh. DD)  The mandatory assembly, which took place on June 10, 2011, was in response to a specific request from Mrs. Eccleston that Crispell hold an assembly on anti-Semitism, and both Mrs. Eccleston and Mr. Cohen were invited. (Steinberg Tr. 227:2-11; Sneed Decl. Exh. DD)

Mr. Steinberg was actively involved in addressing the Eccleston and Cohen families' concerns in other ways, as well.  Just before the Holocaust assembly, for example, on June 7, 2011, he met with Mrs. Eccleston and Mr. Cohen at their request and discussed the possibility of transferring T.E. and O.C. to the District's other middle school, Circleville Middle School ("Circleville").  After meeting with the girls to hear their thoughts, Mr. Steinberg approved the transfer.   Transportation issues were not finally resolved before the end of the school year, however, and the families elected not to change schools for eighth grade. (Steinberg Tr. 268:18-22, 271:12-17, 315:4-317:12, T.E. Tr. 178:24-180:18)

Eighth Grade (2011-12).  When T.E. and O.C. were in eighth grade, their reports of anti-Semitic conduct were sporadic. O.C. told Mr. Mummery, who was the assistant principal that year, about two incidents.  First, she reported that a boy drew a Star of David on her locker on about June 8, 2012.  (O.C. Tr. 156:19-157:6; Affidavit of Christopher Mummery ¶ 9 (Dec. 6, 2013) ("Mummery Aff."))  Mr. Mummery directed the boy to research the symbol and write an essay, in addition to issuing him a five day out-of-school suspension. (Mummery Aff.  ¶ 10) The other incident involved a small swastika, together with the word "gay," drawn on the

forehead of a 4" x 4" photo of President Obama on a wall of presidential photographs in one of the classrooms. Mr. Mummery removed and replaced the photo. He investigated, including by speaking to the interim substitute teacher then responsible for the classroom, but could not determine who had done the drawing. (Mummery Aff ¶¶ 4-5, 7-8, 10)

There is no evidence that T.E. made any complaints about anti-Semitism to Mr. Mummery during the first half of eighth grade. (T.E. Tr. 212:18-24) The first incident involving T.E. that came to his attention occurred on or about December 2, 2011, when T.E.'s thumb was fractured in an altercation with another girl during a field hockey game in gym class. Mr. Mummery received incident statements from the girls. In her statement, T.E. did not allege that the incident was related to anti-Semitism. (Mummery Aff. ¶ 17, Exh. D, at DEF001186)

Mr. Mummery conducted a mediation session on December 6, 2011. He concluded that the injury was a result of both girls playing competitively during the hockey tournament, and no one was at fault. (Mummery Aff. ¶¶ 15-16) The Town of Crawford Police Department also investigated the incident, after Mrs. Eccleston filed a police report. The police found T.E.'s injury to be accidental and dismissed the complaint. (Sneed Decl. Exh. FF) In her deposition, T.E. admitted that the incident was not anti-Semitic in nature. (T.E. Tr. 263:22-264:2)

On January 24, 2012, T.E. told Mr. Mummery that a boy had made an anti-Semitic "joke" during health class. (T.E. Tr. 216:11-19) Mr. Mummery investigated, issued the boy lunch detention for two days, contacted his parents, and required him to write an essay about the Holocaust. (Mummery Aff. ¶¶ 19-22) On January 24 or January 25, 2012, T.E.'s mother reported to Principal Boyle that a different boy threw a coin at T.E. in the hallway. (T.E. Tr. 220:3-229:13) Mr. Boyle interviewed the boy, who denied tossing the coin, and because there

were no other witnesses, Mr. Boyle decided he had insufficient evidence to impose discipline. (Boyle Aff. ¶ 13)

On January 25, 2012, T.E.'s mother withdrew her from school.  (Amended Complaint ¶ 55)  Mrs. Eccleston subsequently filed a police report about the coin-throwing incident with Town of Crawford police.  After investigation, the police dismissed the report based on a lack of evidence of any anti-Semitic harassment.  (Sneed Decl. Exh. II)

### 3.    Pine Bush High School

Like Crispell, PBHS has undertaken many initiatives to combat bullying and prejudice. As discussed above, for example, PBHS Principal Hopmayer meets with all students at the beginning of each school year to establish his clear expectations with regard to matters such as bullying, race discrimination, and anti-Semitism.   In addition, twice yearly all ninth graders engage in role-playing and other exercises with the Teen Outreach and Multi-Cultural and Diversity Clubs to learn about the same issues.   Mr. Hopmayer testified that very few of the 6,000 disciplinary referrals received at PBHS each year involve alleged anti-Semitic conduct. (Hopmayer Tr. 250:12-251:3)

D.C. attended grades nine to twelve at PBHS, from 2009-10 to 2012-13.  He graduated in June 2013 and, at the time of his deposition, planned to attend Orange County Community College to pursue film-making.  (D.C. Tr. 5:11-19, 43:2-11)  D.C. admitted during his deposition that he never reported any anti-Semitic incidents at PBHS to school administrators.  *See, e.g.,* D.C. Tr. 96:12-14 (during his time at PBHS, no reports to Principal Hopmayer); 97:4-11 (during his time at PBHS, no reports to Assistant Principal Lynn).   He testified that a boy made anti-Semitic "jokes" during his tenth-grade trigonometry class, but when the teacher told the boy to "stop it," he did.   (D.C. Tr. 91:25-95:18)   D.C. also testified that he was "close with" two

22

teachers in high school with whom he discussed personal matters, but he never mentioned any problems with anti-Semitism at the high school to either of those teachers until after this lawsuit was filed. (D.C. Tr. 55:10-20, 56:22-59:12)

T.E. has never attended PBHS because she is home-schooled. O.C. entered PBHS as a ninth grader in September 2012, after this lawsuit was filed. (Amended Complaint ¶ 59) At her March 21, 2013 deposition, O.C. testified that she had not reported any anti-Semitic incidents at PBHS to the principal, guidance counselors, or school psychologist. (O.C. Tr. 218:9-219:4) Principal Hopmayer testified that on April 10, 2013, O.C. reported to him that there was a small swastika etched into the cafeteria door, near the handle, and it had not been removed since she reported it to the security guard two weeks before. Mr. Hopmayer immediately had the door sanded to remove the graffiti, investigated the reason for the delay, and determined that a custodian had inadvertently cleaned the wrong door. At Mr. Hopmayer's direction, security camera footage was reviewed by PBHS security staff members, but they were unable to identify the creator of the graffiti. (Hopmayer Tr. 375:15-378:20, 383:15-384:8)

## ARGUMENT

Summary judgment is warranted where "there is no genuine dispute as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A court's goal" on summary judgment "should be 'to isolate and dispose of factually unsupported claims.' " *Chambers*, 815 F. Supp. 2d at 762 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-324 (1986)).

I.     **SUMMARY JUDGMENT IS WARRANTED ON D.C.'S, T.E.'S, AND O.C.'S TITLE VI CLAIMS**

Some of Plaintiffs' claims in this case are demonstrably inaccurate based on the documentary evidence and/or Plaintiffs' own deposition testimony.   For example, they characterize T.E.'s field hockey injury as a "physical attack[ ] against [a] Jewish student" (Amended Complaint ¶ 5), even though T.E. admitted during her deposition that the incident was not anti-Semitic in nature, and the police determined that her injury was accidental.   Plaintiffs claim that O.C. once reported an "anti-Semitic physical assault" involving two boys "attempt[ing] to shove a quarter down her throat"   (*id.* ¶ 62), but O.C. testified that she does not remember any anti-Semitic remarks being made during that alleged incident, and she does not remember reporting it to anyone.   (O.C. Tr. 63:16-66:12)   Plaintiffs also characterize an incident when O.C. reported seeing a girl with a swastika painted on her cheek as a "physical attack[ ] against [a] Jewish student."   *Id.*   But there is no evidence that the girl was Jewish, and she explained in an incident report that she and the friends who drew on her face "were just playing around . . . it wasn't [meant] to be afencive [sic]."   Mr. Boyle investigated and imposed discipline on the children involved.   (Boyle Tr. 96:12-97:18, 204:6-19, 209:11-23, 211:2-14; O.C. Tr. 68:3-19; Sneed Decl. Exh. HH)

Plaintiffs' repeated claims of "rampant anti-Semitic graffiti," including "countless swastikas," on "books, notebooks, bathroom walls, desks, bleachers, and playground equipment," is also hard to square with the evidence.   Mr. Boyle and Mr. Winter have stated that they never saw anti-Semitic graffiti at Crispell other than what T.E. and O.C. reported.   (Boyle Aff. ¶¶ 17-18; Winter Tr. 189:16-190:5)   Although PBCSD schools are open to parents, guests, visitors, government officials, police officers, and others, Mr. Boyle did not receive reports of

swastika graffiti from anyone who visited Crispell.  (Boyle Aff. ¶¶ 19-20)  Furthermore, once

Plaintiffs' allegations about graffiti in textbooks came to his attention during this litigation, Mr.

Boyle reviewed and photocopied the inside cover of almost 500 textbooks that Plaintiffs had

identified as containing anti-Semitic graffiti, and he found very few examples of graffiti that

could be characterized as anti-Semitic.  (Boyle Aff. ¶¶ 15-16)  Mr. Hopmayer also testified that

he was did not observe any swastikas on PBHS property other than the one that O.C. reported on

April 10, 2013, which he promptly investigated and had removed.  (Hopmayer Tr. 329:14-21,

159:18-160:6)  Nor has Ms. Carbone seen any anti-Semitic graffiti at either Crispell or PBHS.

(Carbone Aff. ¶ 33)

Significantly, none of the foregoing factual disputes creates a *material* issue for trial.  For

summary judgment purposes, the Court need not decide whether all of the alleged misconduct

happened as Plaintiffs claim, because even if it did, they cannot carry their burden of proving

actionable harassment under the law.

### A.      School Districts Are Liable For Peer Harassment Under Title VI Only In Very Narrow Circumstances

Title VI prohibits intentional discrimination on the basis of "race, color, or  national

origin" by federal funding recipients such as local school districts.  *See* 42 U.S.C. § 2000d; *Zeno*

*v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 664-665 (2d Cir. 2012) (Title VI requires proof of

"intentional" discrimination).  As an initial matter, Defendants found no prior case holding that

claims of discrimination based on the plaintiff's identification as Jewish come within Title VI's

protection.  Assuming *arguendo* that Plaintiffs can bring their claims under the statute, the

following legal standards control.

In very limited circumstances a school district may be held liable under Title VI for

injuries that a student has suffered as a result of peer harassment.  To prove such a claim,

plaintiffs must show that (1) the alleged misconduct was "so severe, pervasive and objectively offensive" that it "deprive[d] the victims of access to the educational opportunities or benefits provided by the school"; (2) the school district had "actual knowledge" of the harassment; and (3) the district was nonetheless "deliberately indifferent" to it.   *Davis*, 526 U.S. at 650 (interpreting Title IX, 29 U.S.C. §§ 1681 et seq.); *Zeno*, 702 F.3d at 665 (applying *Davis* standard under Title VI).   Each prong of the *Davis* test sets a high bar for plaintiffs seeking to recover damages against the school district based on the conduct of fellow students.

*Severity.*   "[S]imple acts of teasing and name-calling among school children" do not suffice under the first *Davis* prong, "even where these comments target differences" based on protected characteristics.   *Davis*, 526 U.S. at 652.   Nor will a decline in grades or extracurricular performance suffice to prove the requisite denial of "educational . . . benefits."   As another court in the Southern District recently reasoned, "[i]f liability were appropriate . . . every time a student was subject to repeated name-calling by his or her callous peers, with an occasional eruption into physical contact causing no serious injury," then parents often "would be entitled to pull their child out of public school and place him or her in private school at the school district's expense."   *HB v. Monroe Woodbury Cent. Sch. Dist.*, 2012 WL 4477552, at * 17 (S.D.N.Y. Sept. 27, 2012).

*Actual notice.*   Constructive knowledge—what the district arguably "*should have known*"—is not enough to establish liability under the second *Davis* prong.   *Davis,* 526 U.S. at 642 (emphasis in original); *Zeno*, 702 F.3d at 666.   Actual knowledge that the plaintiff has been harassed must be held by a school official "who at minimum has authority to address the alleged [conduct] and to institute corrective measures on the [school district's] behalf."   *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998).

*Deliberate Indifference.*   For a school district's actions to amount to deliberate indifference under the third *Davis* prong, they "must, 'at a minimum, *cause* students to undergo harassment or make them liable to or vulnerable to it.' " *Zeno*, 702 F.3d at 666 (quoting *Davis*, 526 U.S. at 645) (emphasis added).   To be actionable, the school district's response to known harassment must be " 'clearly unreasonable in light of the known circumstances.' " *Id.* (quoting *Davis*, 526 U.S. at 648).   Put differently, district officials' conduct must be so "clearly unreasonable that a fact finder could draw the inference that the defendants *wanted* the discrimination to continue." *Preusser*, 2013 WL 209470, at *6 (emphasis added).

School districts need not "purg[e] their schools of actionable peer harassment" to avoid liability for deliberate indifference.  *Davis*, 526 U.S. at 648; *Zeno* 702 F.3d at 670 ("*actually eliminating harassment is not a prerequisite*") (emphasis in original). Nor must a school district engage in any "particular disciplinary action." *Davis*, 526 U.S. at 645.  On the contrary, courts must "refrain from second-guessing the disciplinary decisions made by school administrators." *Id.*  The deliberate indifference standard affords educators substantial latitude to exercise their judgment to determine how to address the issues of prejudice and bullying in their schools.  This latitude is consistent with the deference that courts traditionally give to educational judgments in other contexts, recognizing that "the judiciary generally 'lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.' " *See Cerra Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d Cir. 2005) (quoting *Walsczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998)) (addressing claim under Individuals with Disabilities in Education Act).

**B.**   **Under Settled Legal Standards, There Are No Triable Issues Of Fact On D.C.'s, T.E.'s, or O.C.'s Title VI Claims**

In this case, it is far from clear that D.C., T.E., or O.C. can satisfy the first *Davis* prong.

27

Their complaints consist mostly, if not entirely, of "teasing and name-calling among school children." *Davis*, 526 U.S. at 652.  It is also unclear that any of these plaintiffs suffered a deprivation of "educational opportunities or benefits" within the meaning of the law. *Id.* at 650. The Court need not reach those issues, however, because each Plaintiff's Title VI claim founders on a different prong:  D.C.'s, for want of actual knowledge, and T.E.'s and O.C.'s, for want of deliberate indifference.

### 1.   **D.C.**

Although D.C. claims to have suffered "rampant" anti-Semitic harassment at Crispell and PBHS (Amended Complaint ¶78),  there is no evidence that any "appropriate person" in a position to "institute corrective measures on the [school district's] behalf" had actual knowledge that D.C. was experiencing such harassment. *Gebser*, 524 U.S. at 290.  D.C. admits that he never reported any anti-Semitic conduct to PBHS administrators, and that his father reported only one incident to Crispell Principal Boyle involving a single anti-Semitic slur on the bus when D.C. was in sixth grade (in 2006-07), which was promptly addressed.

D.C. claims that two of his Crispell teachers and one PBHS teacher were aware of anti-Semitic behavior.  But as the Second Circuit has recognized, *Davis* "rejected the use of agency principles to impute liability in the student-on-student harassment context." *DT v. Somers Cent. Sch. Dist.*, 348 Fed. App'x 697, 700 (2d Cir. 2009).  The Court declined to decide whether this also "precludes imputing [a teacher's] knowledge" to a school district, *id.*, but on the facts of the present case, there is no basis for doing so.

By his own account, the teachers that D.C. identifies as having knowledge about his situation were aware of only isolated instances of anti-Semitic behavior.  The two teachers to whom D.C. reported graffiti on a Crispell bathroom wall each knew only that a swastika had

been drawn once, and in each case it was removed. Ms. Kelly allegedly may have overheard anti-Semitic "jokes" on one occasion in her tenth-grade trigonometry class. These isolated incidents certainly would not have given any one of the teachers reason to think that D.C. was suffering from the harassment he now alleges.

Furthermore, there is no evidence that the teachers would have had authority to "institute corrective measures on [PBCSD's] behalf" to address such harassment, as the law requires. *Gebser*, 524 U.S. at 290. As discussed, the Code of Conduct authorizes a teacher to carry out only minor discipline, such as an oral warning, without reporting to or consulting an administrator; suspensions, by contrast, can be imposed only by an administrator. For the same reasons, D.C.'s alleged off-hand comment to his seventh-grade bus driver about a school bus chant did not suffice to give District administrators actual notice of D.C.'s claims. *See Hamlin v. City of Peekskill Bd. of Educ.*, 377 F. Supp. 2d 379, 383 (S.D.N.Y. 2005) (where student was assaulted by another student on bus, school district "could not be held liable for any defalcation by" the private bus company "under a theory of respondeat superior").

In sum, school administrators cannot respond to alleged harassment that they do not know about. Regardless of the reasons why D.C. may have chosen many years ago not to tell his parents or school officials about the harassment he now claims to have experienced, no reasonable fact finder could conclude that the District had actual knowledge that he was being harassed. PBCSD accordingly is entitled to summary judgment on D.C.'s Title VI claim in Count II of the Amended Complaint.

###### 2.   T.E.

Unlike D.C., T.E. and her mother reported several allegedly anti-Semitic incidents to PBCSD administrators.  Even viewing the facts most favorably to Plaintiffs, no reasonable fact finder could conclude that school officials were deliberately indifferent to these complaints.

PBE Principal Fisch promptly responded to each of Mrs. Eccleston's complaints at PBE, both by disciplining the two boys who behaved inappropriately and by holding a grade-wide assembly to address issues of bullying and prejudice.  He also addressed her field trip concern and acted promptly to have the graffiti on the slide removed.  Even if, as Plaintiffs suggest, a custodian did not originally follow through on Mr. Fisch's work order to remove graffiti from the slide, that omission by a nonmanagerial employee hardly raises a genuine issue as to whether Mr. Fisch was deliberately indifferent to anti-Semitism.

T.E.'s claims regarding her middle school experience fare no better.  Crispell officials have for years run programs for students at each grade level to address issues of bullying, harassment, and discrimination.  Anti-Semitism is addressed in these programs and also in the school curriculum.  Crispell also recently implemented the PBIS program, which involves the entire school community in constructing positive solutions to the particular behavioral challenges of adolescence.

When T.E. was in sixth grade at Crispell, Assistant Superintendent Brush responded appropriately to Mrs. Eccleston's concerns about the school bus by contacting the bus company, which interviewed the driver, reviewed video, and agreed to follow up with Mrs. Eccleston for additional information.  Assistant Principal Winter likewise responded promptly to T.E.'s complaints of name-calling and graffiti in seventh grade.  The record is replete with evidence that he removed graffiti when it was reported, investigated allegations of student misconduct,

and, when they could be identified, disciplined the children engaged in improper behavior. Mr. Mummery, who became assistant principal when T.E. was in eighth grade, not only disciplined a boy whom T.E. reported for making an anti-Semitic joke, but also took the additional positive step of requiring the boy to write an essay about the Holocaust.

Mr. Winters not only investigated and addressed specific incidents in seventh grade, when the girls' complaints were most concentrated, but he also made efforts to address anti-Semitism more systemically. He reached out for additional guidance and, with Mr. Steinberg's help, planned a special Holocaust assembly for the seventh grade to further educate the children about the dangers of anti-Semitism. A Holocaust assembly was particularly appropriate, since T.E. and O.C. had reported seeing swastikas and hearing "jokes" about the Holocaust. Indeed, Mrs. Eccleston had specifically requested the assembly. Mr. Steinberg also worked closely with T.E.'s and O.C.'s parents in an effort to address their concerns.

The responses of PBCSD administrators to T.E.'s complaints were more than adequate under the settled law of this Circuit. Courts have repeatedly granted summary judgment to school districts where, as here, administrators took disciplinary action and other proactive measures in response to harassment complaints, even if the harassment was not entirely eliminated. In *Yap v. Oceanside Union Free Sch. Dist.*, 303 F. Supp. 2d 284 (E.D.N.Y. 2004), for example, a fourth-grade boy of Chinese ancestry and his mother reported many times to the school principal that classmates verbally harassed him with racial slurs and " 'slanty eyes' jokes" and repeatedly attacked him physically by pushing him down, kicking, and stomping on him. The principal maintained a code of conduct, imposed a range of discipline on the offending students, and made regular presentations to students and faculty about bullying and racial tolerance, but the harassing behavior continued throughout the boy's fifth grade year. The

31

school district denied the parents' request for a transfer, and the boy withdrew from school. *Id.*
at 288-293.

The court held that these facts presented no genuine issues for trial. Although "[t]he
evidence, construed in Plaintiffs' favor, reveals that [he] has suffered through an extremely
unpleasant experience," the court reasoned, and the measures taken by the principal "were
insufficient to completely end the abuse," deliberate indifference "requires something more than
a proffer indicating the ultimate inadequacy of preventative and curative measures." *Id.* at 294-
295. That the boy was denied a transfer did not change the result, because plaintiffs adduced no
evidence "that the situation in the requested transfer school" would have been better. *Id.* at 295.
*See also, e.g., Somers*, 348 Fed. App'x  at 700 (discipline of student harasser was not "clearly
unreasonable" as matter of law, even if he uttered a subsequent racial epithet); *Barmore v.
Aidala*, 2006 WL 1978449, at * 8 (N.D.N.Y. July 12, 2006) ("While Plaintiff may not have
like[d] the results" of harassment investigation, "and while Defendants' actions may not have
stopped the harassment, that is not the determinative issue.").

T.E.'s claim is much less compelling than that of the plaintiff in *Yap*, who suffered
repeated racially-motivated physical attacks that included pushing, kicking, and stomping. Her
case is also a far cry from the facts in *Zeno*, on which Plaintiffs are likely to rely. In that case the
Second Circuit affirmed a jury verdict where a male high school student suffered not only
repeated racial taunts and slurs for more than three years, but also multiple threats and acts of
serious teen-aged violence, some of which led the police to issue protective orders. The
superintendent in *Zeno*, unlike Mr. Steinberg, repeatedly declined to meet with the victim's
mother. In addition, the school district delayed more than a year to implement the type of anti-
discrimination and anti-bullying training programs that PBCSD has consistently offered all

along. And, when it did implement such programs, unlike PBCSD, it did not make them mandatory. *Zeno*, 702 F.3d 659-663.

That a jury could reasonably find deliberate indifference on the extreme facts presented in *Zeno* does not mean that a trial is warranted here. Like the principal in *Yap*, PBCSD administrators responded diligently to T.E.'s complaints of graffiti, taunting and name-calling by imposing discipline, where appropriate, and by working continuously to educate students about bullying and discrimination. Because no reasonable fact finder could find deliberate indifference on these facts, T.E.'s Title VI claim in Count I of the Amended Complaint should be dismissed.

### 3.     O.C.

The same reasoning applies to O.C.'s claim. District administrators responded appropriately to O.C.'s reports of anti-Semitic conduct at Crispell by investigating and disciplining children identified as engaging in such behavior, and by working to educate students about bullying and prejudice generally, and about anti-Semitism in particular. To the extent O.C.'s claim extends to her experience at PBHS, moreover, it is woefully deficient. The record shows that she made only one complaint about anti-Semitism at the high school after this lawsuit was filed—a single instance of graffiti on a cafeteria door, which Principal Hopmayer addressed as soon as she told him about it.

Plaintiffs may point to situations in which they believe PBCSD administrators, in response to a particular complaint from O.C. or T.E., should have followed up with another witness, reached a different conclusion, or imposed different discipline. Plaintiffs may also fault the District for not choosing different measures to combat prejudice. But in cases involving claims of peer harassment, the law "does not require flawless investigations or perfect solutions." *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 170 (5th Cir. 2011)

(citing additional authorities).  PBCSD's responses to O.C.'s and T.E.'s complaints easily satisfy the deliberate indifference test.  For the same reasons that T.E.'s claim should be dismissed, O.C.'s Title VI claim in Count III of the Amended Complaint should be dismissed, as well.

## II.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' EQUAL PROTECTION CLAIMS

### A.   The District Administrators Sued In Their Individual Capacities Did Not Deprive T.E. Or O.C. of Her Constitutional Rights

T.E. seeks to hold Superintendent Steinberg, PBE Principal Fisch, and Crispell Assistant Principal Winter liable in their individual capacities under the Equal Protection Clause through Section 1983.  O.C. asserts individual capacity claims against Mr. Steinberg and Mr. Winter.  (D.C. does not assert claims against any Defendant in his individual capacity.)  All of the individual capacity claims fail as a matter of law.

Just as under Title VI, to prevail on an Equal Protection claim, the plaintiff ultimately must prove " 'discriminatory intent or purpose.' "  *DiStiso v. Cook*, 691 F.3d 226, 240 (2d Cir. 2012) (quoting *Village or Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 265 (1977)).   The plaintiff's burden of proof in an Equal Protection case involving student-on-student harassment claims is similar to the high standard set by *Davis* under Title VI.  To prove such a claim against an individual defendant, the plaintiff must show "(1) that the child in question was in fact harassed by other students based on" an impermissible characteristic; "(2) that such . . . harassment was 'actually known' to the defendant school official; and (3) that the defendant's response to such harassment  was so 'clearly unreasonable in light of the known circumstances' as to give rise to a reasonable inference that the defendant himself intended for the harassment to occur."  *Id.* at 244  (emphasis added) (quoting *Gant*, 195 F.3d at 140-141 & 141 n.6).

Under this settled standard, no reasonable fact finder could conclude that Mr. Steinberg, Mr. Fisch, or Mr. Winter violated T.E.'s or O.C.'s constitutional rights.

### 1.    Superintendent Steinberg

With regard to Mr. Steinberg, who is Jewish, the undisputed evidence shows that whenever he was alerted to one of T.E.'s or O.C.'s concerns, he ensured that it would be addressed by the appropriate PBCSD administrator.  For example, he contacted the PBE assistant principal to investigate Mrs. Eccleston's complaint about swastikas in two boys' personal planners (which Principal Fisch also addressed himself upon his return), and he asked Assistant Superintendent Brush to follow up on Mrs. Eccleston's concerns about April 20, "Hitler's Birthday."  Furthermore, when Mr. Steinberg learned that T.E. and O.C. had reported swastikas in bathrooms at Crispell, he "sent Mr. Boyle and Mr. Winter both in to all the bathrooms." (Steinberg Tr. 236:19-237:3)

Mr. Steinberg also met with the Eccleston and Cohen families to discuss their concerns. He carefully considered their suggestions and accepted some of them, including Mrs. Eccleston's request for a Holocaust assembly at Crispell, which he helped to organize, and he approved their request to transfer T.E. and O.C. to Circleville.

Plaintiffs may claim that Mr. Steinberg demonstrated deliberate indifference when he told Mrs. Eccleston in a June 15, 2011 email that "her expectations for changing inbred prejudice may be a little unrealistic," and that her concerns would be more appropriately addressed in person or by phone.  (Sneed Decl. Exh. KK)  Mrs. Eccleston had been sending Mr. Steinberg frequent emails for weeks, and he believed a live conversation would be more productive. (Steinberg Tr. 310:25-313:12)  His reference to "inbred prejudice" is nothing more than a empathetic acknowledgment of Mrs. Eccleston's concerns, as is an alleged comment that his

own family had also experienced prejudice.  (Steinberg Tr. 25:2-12; 26:7-21)  Mr. Steinberg's attentiveness to the families' concerns, along with the many training programs for students and staff related to bullying and anti-Semitism that PBCSD implemented during his administration, belie any suggestion that Mr. Steinberg was uninterested in addressing issues of anti-Semitism.

Plaintiffs may also claim that there is a dispute about whether Mr. Steinberg offered to provide transportation for T.E. and O.C. to transfer to Circleville.  But such a dispute would be immaterial to the deliberate indifference inquiry, because Plaintiffs have adduced no evidence that the situation at Circleville would have been any better for the girls.  *See Yap*, 303 F. Supp. 2d at 295 (denial of school transfer insufficient to defeat summary judgment on deliberate indifference claim where plaintiffs adduced no evidence "that the situation in the requested transfer school" would have been superior).

### 2.    PBE Principal Fisch

The evidence shows that Mr. Fisch, who is also Jewish, responded conscientiously to all of Mrs. Eccleston's concerns by investigating and, where appropriate, imposing discipline, and by organizing a special fifth-grade assembly to deal with issues of bullying and prejudice.  The custodian's alleged failure to follow through on Mr. Fisch's oral and written requests to remove graffiti from the playground slide does not remotely prove that Mr. Fisch wanted anti-Semitic behavior in his school.

Mr. Fisch "[a]bsolutely" denies saying to Mrs. Eccleston, as Plaintiffs have alleged, that swastikas in other children's planners were not a problem if they were not directed at T.E.. (Fisch Tr. 55:16-25, 58:25-59:4).  Even if he made this remark, moreover, it does not create a genuine issue for trial, because it is undisputed that Mr. Fisch proceeded to address the problem

by locating the planners in the classroom, holding a conference with the boys to warn them about the future consequences for such behavior, and contacting their parents.

### 3.     Crispell Assistant Principal Winter

Nor can there be any genuine dispute that Mr. Winter was not deliberately indifferent to T.E.'s and O.C.'s concerns.  He repeatedly investigated their complaints, imposed discipline, and reached out to Mr. Steinberg and multiple outside sources in order to generate additional ideas for educating Crispell students about anti-Semitism.

Even if, as Plaintiffs allege, Mr. Winter once told Mrs. Eccleston "it's rather hard to stop . . . inbred" anti-Semitism (S.E. Tr. 119:2-8), that statement (like the similar statement attributed to Mr. Steinberg) would not prove that he was uninterested in addressing the issue.  Indeed, his actions prove the opposite.  Likewise, T.E.'s allegation that at some point during seventh grade Mr. Winter told her and O.C. that they were "looking for trouble" (T.E. 101:19-103:8) cannot create a triable issue on deliberate indifference.  Even if Mr. Winter made such a remark, it does not negate the overwhelming evidence that he continued to work diligently to respond to T.E.'s and O.C.'s concerns throughout his tenure at Crispell.

In short, T.E. and O.C. have failed to adduce sufficient evidence to allow a reasonable fact finder to conclude that Mr. Steinberg, Mr. Fisch, or Mr. Winter violated their Equal Protection rights by responding do their complaints with deliberate indifference.  The Section 1983 claims against Mr. Steinberg, Mr. Fisch, and Mr. Winter in their individual capacities in Counts VI and VII of the Amended Complaint should therefore be dismissed.

**B.      Alternatively, The Individual Defendants Are Entitled To Qualified Immunity**

Even were the Court to conclude that one or more of the individual defendants deprived T.E. or O.C. of her constitutional rights, the individual defendants would be entitled to qualified immunity.  Qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Such immunity abrogates the risk that " 'fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties.' "  *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999) (quoting *Anderson v. Creighton*, 483 U.S. 634, 638 (1987)).  Qualified immunity thus provides "ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986) (emphasis omitted).

As this Court recognized in *Chambers*, the purposes underlying the qualified immunity doctrine have particular importance in lawsuits involving public school officials.   Denying school administrators qualified immunity for the discretionary educational judgments they make every day  " 'would contribute not to principled and fearless decision-making but to intimidation.' "  *Chambers*, 815 F. Supp. 2d at 776 (quoting *Wood v. Strickland*, 420 U.S. 308, 319 (1975)).

Under these established principles, even if the individual Defendants in this case violated T.E.'s or O.C.'s constitutional rights, they are immune from liability unless " 'the right at issue was "clearly established" at the time of . . . the defendant[s'] alleged misconduct.' "  *Id.* at 772 (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).   " 'If the conduct did not violate a clearly established constitutional right, or if it was objectively reasonable" for the Defendants to

believe that their "conduct did not violate such a right, then [they are] protected by qualified immunity.'" *Id.* (quoting *Gilles v. Repicky*, 511 F.3d 239, 244 (2d Cir. 2007)). " 'The question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in [the] defendant's position should know about the constitutionality of the conduct.' " *Id.* at 773 (quoting *Young v. Cnty. of Fulton*, 160 F.3d 899, 903 (2d Cir. 1998)).

Applying these standards, there can be no genuine dispute that at the time Mr. Steinberg, Mr. Fisch, and Mr. Winter acted in this case, they not only did not violate T.E.'s or O.C.'s Equal Protection rights, but they had no objective reason to know that the actions they were taking to respond to the girls' concerns were constitutionally inadequate. Accordingly, even if the Court finds a constitutional violation (and it should not), summary judgment is warranted for the Defendants sued under Section 198 in their individual capacities on the basis of qualified immunity.

### C.  Plaintiffs Have Adduced No Evidence Of An Official Policy Or Custom Sufficient To Impose *Monell* Liability On PBCSD

In Counts VI to X, all five Plaintiffs (including D.C., T.E., O.C., Alex Rosen, and Drew Rosen) assert Section 1983 claims against PBCSD itself. A municipal entity such as PBCSD "may not be held liable" under Section 1983 "solely on the basis of *respondeat superior.*" *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995). Rather, under *Monell*, PBCSD is liable for Plaintiffs' purported injuries only if an "official policy or custom" of the District caused the alleged deprivation of their constitutional rights. *Id.* Because the *Monell* claim does not depend on the culpability of any individual Defendant, the *Monell* claims of all of the Plaintiffs can be considered together, and all of them should be dismissed.

Plaintiffs have not identified any PBCSD policy or practice that caused the conduct of which they complain, nor could they. On the contrary, PBCSD's official policies, including the

Code of Conduct, Anti-Harassment Policy, and Anti-Bullying Policy, explicitly prohibit discrimination, harassment, and bullying. *See Booker v. Bd. of Educ., Baldwinsville Cent. Sch. Dist.*, 238 F. Supp. 2d 469, 475-476 (N.D.N.Y. 2002) (dismissing plaintiffs' *Monell* claim against school district because "[t]he official policy of the District is not to illegally discriminate for any reason," and its "policy concerning the handling of allegations [of] racial harassment," which is "to investigate the claim and, when the investigation shows the harassment took place, to discipline the culprits," comports with state law).

Plaintiffs are expected to argue that PBCSD's disciplinary practices caused their alleged injuries, because the discipline that some students received for anti-Semitic conduct was, in their view, too light. But *Davis* makes clear a school district's choice of discipline does not subject it to liability. *Davis,* 526 U.S. at 645 (courts should "refrain from second-guessing the disciplinary decisions made by school administrators"). PBCSD administrators exercised their educational judgment to impose a range of discipline, from warnings to out-of-school suspension, in response to established incidents of anti-Semitic behavior in different contexts and at different grade levels. This approach, which comports with both the District's Code of Conduct and with state law, as a matter of law is not clearly unreasonable. *Yap*, 303 F. Supp. 2d at 294-295.

Plaintiffs also may contend that the District's practices were legally deficient because the Title VI/Title IX officer, Ms. Carbone, did not personally address Plaintiffs' complaints. A court from the Northern District recently rejected a similar argument, holding that "a school district is not required to proceed in a particular manner" in response to a harassment complaint, "even if there are policies in place that would appear to require the initiation of a formal investigation" by a Title IX officer. *Preusser*, 2013 WL 209470, at *11 (citing additional authorities). In that case, because other school district administrators "timely investigated and promptly and

40

reasonably responded" to the plaintiff's complaint, any inaction on the Title IX officer's part did "not equate to deliberate indifference." *Id.*   The same reasoning applies here.   When Ms. Carbone became aware of T.E.'s and O.C.'s complaints, she discussed them with Mr. Steinberg and determined that they were being appropriately handled by the Superintendent and the building administrator. (Carbone Tr. 24:12-25:9)

In addition, Plaintiffs may argue that the District's VADIRs reflect deliberate indifference because some of their experiences should have been reported as "violent and disruptive incidents" but were not. In *Chambers* this Court rejected a similar claim, holding as a matter of law that inaccurate VADIRs did not suffice to establish school administrators' deliberate indifference to student-on-student harassment.   "[T]he mere inaccuracy of the reports," the Court held, did not "in any way show that Defendants tolerated violent behavior," and plaintiffs offered "no evidence remotely linking these inaccurate reports" to their injuries. *Chambers*, 815 F. Supp. 2d at 768-769.   So, too, in this case.   Even assuming that PBCSD's VADIRs omitted some reportable incidents, which the District does not concede, that fact would not establish that the omissions *caused* the alleged anti-Semitic harassment.

Plaintiffs also may fault PBCSD for not following a host of other practices that they think desirable.  For example, they apparently think the District should have a written policy regarding graffiti removal; should require teachers and administrators to document every arguably anti-Semitic remark or gesture made by children; and should compile and analyze statistics regarding alleged anti-Semitic incidents District-wide.  Such duties would be impracticable, and no federal or state law, including DASA, imposes them.  PBCSD cannot be held deliberately indifferent for failing to adopt policies that go well beyond existing regulatory requirements.  Furthermore,

Plaintiffs can only speculate that such proposals would have had any material effect on the conduct of which they complain.

In sum, because Plaintiffs have not identified any official policy or custom responsible for their purported injuries, the Section 1983 claims against PBCSD in Counts VI to X of the Amended Complaint should be dismissed.

### D.   Claims Against Defendants Sued In Their Official Capacities Should Be Dismissed As Redundant With The Claims Against PBCSD

Counts VIII to X assert Section 1983 claims against PBHS Principal Hopmayer and Crispell Principal Boyle solely in their official capacities. Superintendent Steinberg and PBE Principal Fisch, who are also sued in their individual capacities (*see* Part II.A above), are sued in their official capacities in Counts VI to X. Because Plaintiffs have asserted a *Monell* claim, the official capacity claims are redundant to the claims against PBCSD and should be dismissed. *See Schubert v. City of Rye*, 775 F. Supp. 2d 689, 700 (S.D.N.Y. 2011) (" '[C]ourts have routinely dismissed . . . claims against individuals named in their official capacity as redundant and an inefficient use of judicial resources.' ") (quoting *Carmody v. Village of Rockville Ctr.*, 661 F. Supp. 2d 299, 329 (E.D.N.Y. 2009)); *Schreiber v. East Ramapo Cent. Sch. Dist.*, 700 F. Supp. 2d 529, 562 n.18 (S.D.N.Y. 2010).

### III.   THE COURT SHOULD NOT DECIDE THE NEW YORK CIVIL RIGHTS LAW CLAIMS, AND THOSE CLAIMS ARE MERITLESS, IN ANY EVENT

Counts XI, XII, and XIII assert claims under New York Civil Rights Law ("NYCRL") § 40-c, which guarantees "equal protection of the laws" and prohibits discrimination based on "race, creed," and other characteristics, and § 40-d, which establishes the penalties for violations. Because Defendants are entitled to summary judgment on all of D.C.'s, T.E.'s, and O.C.'s other claims, the Court should decline to exercise supplemental jurisdiction over their NYCRL claims.

*See* 28 U.S.C. § 1367(c)(3) (district court may decline to exercise supplemental jurisdiction over state law claims once it "has dismissed all claims over which it has original jurisdiction").   *See also Chambers*, 815 F. Supp. 2d at 777-778 (declining to exercise supplemental jurisdiction on state law claims after dismissing federal claims on summary judgment).

Even were the Court to reach the merits, moreover, the NYCRL claims should be dismissed, because, as Magistrate Davison previously ruled, they are governed by the same standards as Plaintiffs' federal claims.   *See* Amended Mem. and Order 24 (Jan. 8, 2013), Doc. # 22.   *See also Panzica v. Mas-Maz, Inc.*, 2007 WL 1732123, at *2 n.1 (E.D.N.Y. June 11, 2007) (discrimination claims under NYCRL §40-c "are governed by the same legal standard as federal . . . claims").   Defendants accordingly are entitled to summary judgment on Counts XI, XII, and XIII of the Amended Complaint.

## CONCLUSION

For the reasons stated above, Counts I-III, VI-VIII, and XI-XIII of the First Amended Complaint should be dismissed with prejudice in their entirety.   The claims against PBCSD and the Board in Counts IX and X should also be dismissed with prejudice.

Dated:  December 6, 2013

Respectfully submitted,

  s/Maree Sneed
Maree Sneed (MS 3148)*
HOGAN LOVELLS US LLP
Attorney for Defendants
555 Thirteenth Avenue NW
Washington, D.C. 20004
(202) 637-5600
maree.sneed@hoganlovells.com
* admission *pro hac vice* pending

Daniel Petigrow
Laura Wong-Pan
THOMAS, DROHAN, WAXMAN, PETIGROW
& MAYLE, LLP
Attorneys for Defendants
2517 Route 52
Hopewell Junction, NY 12533
(845) 592-7000
dpetigrow@tdwpm.com
lwong-pan@tdwpm.com

Joan Gilbride
KAUFMAN, BORGEEST & RYAN LLP
Attorneys for Defendants
120 Broadway
New York, New York  10271
(212) 994-6517
jgilbride@kbrlaw.com

44