UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

T.E., O.C., and D.C., et al.,

                              Plaintiffs,

          -v-

PINE BUSH CENTRAL SCHOOL DISTRICT, et al.,

                              Defendants.

Case No. 12-CV-2303(KMK)

OPINION & ORDER

<u>Appearances</u>

Adele Phyllis Kimmel, Esq.
Public Justice
Washington, DC
*Counsel for Plaintiffs*

O. Andrew F. Wilson, Esq.
Ilann M. Maazel, Esq.
Zoe Antonia Salzman, Esq.
Emery Celli Brinckerhoff & Abady, L.L.P.
New York, NY
*Counsel for Plaintiffs*

Michael David Meth, Esq.
Meth Law Offices, P.C.
Chester, NY
*Counsel for Plaintiffs*

Joan M. Gilbride, Esq.
Kaufman, Borgeest & Ryan, L.L.P.
New York, NY
*Counsel for Defendants Pine Bush Central School District,*
*Pine Bush Central School District Board of Education,*
*Philip G. Steinberg, John Boyle, Steve Fisch,*
*Robert Peters, and Aaron Hopmayer*

Maree Sneed, Esq.
Hogan Lovells, L.L.P.
Washington, DC
*Counsel for Defendants Pine Bush Central School District,*
*Pine Bush Central School District Board of Education,*
*Philip G. Steinberg, Eric Winter John Boyle, Steve Fisch,*
*Robert Peters, and Aaron Hopmayer*

Laura Wong-Pan, Esq.
Thomas Drohan Waxman Petigrow & Mayle, L.L.P.
Hopewell Junction, NY
*Counsel for Defendants Pine Bush Central School District,*
*Pine Bush Central School District Board of Education,*
*Philip G. Steinberg, Eric Winter John Boyle, Steve Fisch,*
*Robert Peters, and Aaron Hopmayer*

KENNETH M. KARAS, United States District Judge:

Plaintiffs, five Jewish students who attended schools in the Pine Bush Central School

District ("PBCSD" or "the District"), bring this Action against the District and several PBCSD

Administrators under Title VI of the Civil Rights Act of 1964, 42 U.S.C §§ 2000d *et seq.* ("Title

VI"), the Equal Protection Clause, U.S. Const. amend. XIV, § 1, under 42 U.S.C. § 1983

("Section 1983"), and New York Civil Rights Law §§ 40-c and 40-d.[1]  Plaintiffs' claims arise

from anti-Semitic harassment that Plaintiffs allegedly suffered while they were enrolled in the

District.  Defendants move for summary judgment with respect to the claims brought by T.E.,

D.C., and O.C., pursuant to Rule 56 of the Federal Rules of Civil Procedure.[2]  For the following

reasons, Defendants' Motion is granted in part and denied in part.

## I.  BACKGROUND

### A.  Factual History

The harassment alleged by Plaintiffs in this case spans half a decade and three separate

schools within PBCSD: Pine Bush Elementary School ("PBE"), Crispell Middle School

---

[1] As Plaintiffs were all minors at the time this suit was filed, the Court will refer to them using their initials.  In the interest of maintaining Plaintiffs' relative anonymity, the Court will refer to the parents of these Plaintiffs as each student's "mother" or "father," or Mr. C. or Mrs. E, rather than disclosing Plaintiffs' surnames.

[2] Defendants do not move for summary judgment as to Plaintiffs A.R. and D.R.

2

("Crispell"), and Pine Bush High School ("PBHS").[3]  In addition to the District itself, Plaintiffs

named the PBCSD Administrators who oversaw these schools as Defendants.  These Defendants

include Philip Steinberg, ("Steinberg" or "the Superintendent"), the Superintendent of PBCSD

from 2008 to 2013; Steve Fisch ("Fisch"), the Principal of PBE from 1991 to 2011; John Boyle

("Boyle"), the Principal of Crispell since 2002; Robert Peters ("Peters"), the Assistant Principal

of Crispell from 2007 to 2010; Eric Winter ("Winter"), the Assistant Principal of Crispell from

2010 to 2011; and Aaron Hopmayer ("Hopmayer"), the Principal of PBHS from 2007 through

the time of his deposition.  (Fisch Deposition Tr. ("Fisch") 17 (Wilson Decl. Ex. 4 (Dkt. No.

79)); Boyle Deposition Tr. ("Boyle") 16–17, 20 (Wilson Decl. Ex. 5 (Dkt. No. 79)); Hopmayer

Deposition Tr. ("Hopmayer") 28 (Wilson Decl. Ex. 7 (Dkt. No. 79)); *See* Declaration of Ilann M

Maazel ("Maazel Decl.") Ex. 2 (Dkt. No. 63) (chart summarizing administrators that were in

charge during the relevant times and at the relevant locations to Plaintiffs' claims)).)

For the purposes of the instant Summary Judgment Motion, the Court will consider the

harassment allegedly suffered by Plaintiffs D.C., T.E., and O.C., as well as the District's

response to that harassment.  The specifics of many of the incidents of harassment alleged, as

well as the District's response—or lack thereof—are contested, even though Defendants do not

dispute many of them for the purposes of the instant Motion.  (*See* Defs.' Rule 56.1 Statement

("Defs.' 56.1.") (Dkt. No. 76); Pls.' Response to Defs.' Rule 56.1 Statement ("Pls.' 56.1 Resp.")

(Dkt. No. 71); Defs.' Reply to Pls.' 56.1 Counterstatement ("Defs.' 56.1 Resp.") (Dkt. No. 81).)[4]

---

[3] PBE educates students from kindergarten through fifth grade, Crispell educates students from sixth through eighth grade, and PBHS educates students in grades nine through twelve.

[4] Defendants' Reply to Plaintiffs' 56.1 Counterstatement reiterates Plaintiffs' factual assertions before noting whether Defendants dispute or concede these facts for the purposes of the instant Motion.  The Court will cite to this document, where possible, for the reader's ease of reference.  As Defendants do not dispute the majority of Plaintiffs' statements, the Court will

Plaintiffs' allegations catalogue years of harassment at the hands of their fellow students, but a few key incidents, and the District's responses thereto, are informative for the purposes of the instant Motion.[5]

### 1.  Plaintiff D.C.

D.C. is a male student who claims to have suffered anti-Semitic harassment and to have been subject to physical and verbal threats during his enrollment in PBCSD from sixth through twelfth grade.  (*See* Defs.' 56.1 Resp. ¶ 50; D.C. Deposition Tr. ("D.C.") 28 (Wilson Decl. Ex. 11 (Dkt. No. 79)).)  He alleges that, throughout this time, other students physically and verbally threatened him by "pellet[ing]" change at him, telling him he "was going to be burned in an oven," and that "if [he] did anything [in response to this harassment,] that they knew where [he] lived."  (Defs.' 56.1 Resp. ¶¶ 51–53; D.C. 28.)  D.C. also witnessed "swastikas everywhere in the high school and in the middle school" that he testified "would be impossible" for teachers to miss.  (Defs.' 56.1 Resp. ¶ 55; D.C. 11.)  He further describes "fairly constant" harassment, during his years in PBCSD, (D.C. 66–67), during which time he was called "countless" names, including "dirty jew," "filthy jew," "stupid Jew," "fat Jew," "Jew faggot," "fucking Jew kike," "ashes," "dust," and "mocky fuck."  (Defs.' 56.1 Resp. ¶¶ 56–57; D.C. 68–69.)

When D.C. was in sixth grade, a girl who "bull[ied D.C.] constantly" on the school bus yelled "F'ing Jew" while D.C. was on the bus.  (Defs.' 56.1 Resp. ¶ 290; D.C. 29.)  Mr. C.,

---

only highlight where such factual disputes exist, rather than where they are undisputed.

[5] The Court recognizes that some of the language that Plaintiffs allege to have been directed against them is undeniably offensive and may be painful for some readers.  Nonetheless, the Court does not see fit to censor or euphemize Plaintiffs' allegations in this Opinion.  As Plaintiffs' counsel stated at oral argument, "the language matters in this case, and there's a way in which, by not articulating some of these things, they lose their force."  (*See* July 17, 2014 Oral Argument Transcript ("July 17, 2014 Tr.") 39.)

D.C.'s father, reported the slur to Boyle, (*see* Defs.' 56.1 Resp. ¶ 291; D.C. 29; Mr. C.'s

Deposition Tr. ("Mr. C.") 10, 13 (Wilson Decl. Ex. 12 (Dkt. No. 79))), and told Boyle that D.C.

"had been the butt of many Jewish jokes," that the bus incident "crossed a very severe line," and

that D.C. was being harassed by "multiple kids over the course of that year" and was

experiencing intolerance from "a lot of kids," (Defs.' 56.1 Resp. ¶¶ 292–93; Mr. C. 10–13).

When Boyle told Mr. C. that the incident would be handled on an individual basis, Mr. C. told

Boyle that "this isn't an individual thing, this is systemic." (Defs.' 56.1 Resp. ¶¶ 294–295; Mr.

C. 13.) Mr. C. further told Boyle that D.C. was hearing Jewish jokes from older students on the

school bus, which transported both middle and high school students. (*See* Defs.' 56.1 Resp.

¶ 296; Mr. C. 14.) During a follow-up call about this incident, Boyle informed Mr. C. that a girl

involved in the harassment had been spoken to. (*See* Defs.' 56.1 Resp. ¶ 267; Mr. C. 15.)

However, Boyle had no response to Mr. C.'s question about how the District would handle "all

the other kids that [we]re making Jewish jokes," (Defs.' 56.1 Resp. ¶ 298; Mr. C. 15), and also

did not follow up with Mr. C. about addressing anti-Semitism in the school, (Mr. C. 57–58;

Boyle 309). Boyle does not remember Mr. C. reporting harassment of D.C. by multiple children,

nor any discussion with Mr. C. of systemic harassment or anti-Semitism, but instead recalls the

incident involving "one kid on the bus." (Boyle 167–70.) D.C. attempted to discuss this

incident with Boyle, but Boyle "dismissed it so that he could reprimand [D.C.] for playing video

games in the computer lab, when all the other students were also playing video games in the

computer lab." (Defs.' 56.1 Resp. ¶ 301; D.C. 29.)

When D.C. was in seventh grade, students repeatedly sang and chanted a "song about

stomping the niggers and killing the Jews and washing off their blood," in both the school

cafeteria near D.C.'s table, and on D.C.'s bus. (D.C. 73.) When students sang this "white power

song" on D.C.'s bus, D.C. complained to the bus driver, but the white power chants continued—in fact, other students found out that D.C. had complained and the harassment "got worse." (Defs.' 56.1 Resp. ¶¶ 314–17; D.C. 72–77.)

When D.C. was in eighth grade, D.C. notified his science teacher of a "giant swastika . . . [approximately] a foot in diameter" in the boys' bathroom. (Defs.' 56.1 Resp. ¶¶ 306–07; D.C. 11–12.) The teacher saw the swastika, and it was removed. (*See* Defs.' 56.1 Resp. ¶¶ 308-09; D.C. 11–13.) However, "a couple days" later, the swastika reappeared and D.C. reported it to his Spanish teacher. (Defs.' 56.1 Resp. ¶¶ 309–10; D.C. 11–12.) Although D.C. could not be sure whether the second swastika he reported was removed, he testified that other swastikas in the bathroom were not removed. (*See* Defs.' 56.1 Resp. ¶ 311; D.C. 13.)

When D.C. was in ninth grade, another student "would constantly berate [D.C]," telling him that D.C.'s "ancestors died in the Holocaust," calling D.C. "ashes," and pantomiming the blowing of dust off his hands while telling D.C. that he was "just ashes." (Defs.' 56.1 Resp. ¶¶ 56, 318; D.C. 69–70.) The same student would slap D.C. in the face as the student got off the bus and smirk at D.C. (*See* Defs.' 56.1 Resp. ¶ 56; D.C. 70.) Other students joined in this harassment, slapping D.C. in the face and telling him "shut up, D., or I will burn you in an oven." (Defs.' 56.1 Resp. ¶ 57; D.C. 70.) The bus driver did nothing in response to this harassment, which continued throughout D.C.'s ninth grade year. (*See* Defs.' 56.1 Resp. ¶¶ 319–20; D.C. 85–86.) D.C. also witnessed students in the school cafeteria and classrooms performing "Hitler salutes," both to each other and to D.C. (Defs.' 56.1 Resp. ¶ 321; D.C. 72–73, 85–86.) D.C. testified that these students "didn't hide" their behavior and made "no attempt to conceal" it, and that D.C. "c[ouldn't] really imagine [adults in the school] missing it." (Defs.' 56.1 Resp. ¶ 322; D.C. 86.)

6

When D.C. was in tenth grade, a student in D.C.'s trigonometry class was "constantly making anti-Semitic jokes" and picking on another Jewish student.  (Defs.' 56.1 Resp. ¶ 323; D.C. 92–95.)  D.C. confronted the student, who was sitting "in the first row" only "two feet" from the teacher, Ms. King.  (Defs.' 56.1 Resp. ¶¶ 324–328; D.C. 92–95.)   Ms. King told the offending student to "stop it."  (Defs.' 56.1 Resp. ¶ 328; D.C. 94.)  Ms. King spoke with the offending student, during which time the student discussed "how he could kick [D.C.'s] ass." (Defs.' 56.1 Resp. ¶ 329; D.C. 94.)  While Defendants do not dispute this exchange for the purposes of the instant motion, Ms. King claims to have provided the offending student with an oral warning to "make sure that [he] understood that he could not make comments like that at PBHS," and she claims that the student "apologized to [Ms. King]," "indicated . . . that he would not do it again," and "did not threaten D.C. during [the] conversation."  (Defs.' 56.1 Resp. ¶ 328; Affidavit of Kelly King ("King Aff.") ¶¶ 11–12 (Dkt. No. 82).)

Later, in Ms. King's math class, another student shouted that another classmate was a "fucking jew" and smirked at D.C, but was not punished.  (Defs.' 56.1 Resp. ¶ 331; D.C. 94.) Defendants dispute this later incident, as Ms. King claims to have neither heard the statement nor had the statement reported to her—in fact, Ms. King claims that she "did not ever hear students make anti-Semitic jokes about any student" when D.C. was in her class.  (Defs.' 56.1 Resp. ¶ 323; King Aff. ¶¶ 3, 13, 14.)

During his time at Crispell and PBHS, D.C. witnessed "swastikas everywhere" and testified that they were so prominently displayed that "[i]t would be impossible for [teachers or administrators] to miss the swastikas."  (Defs.' 56.1 Resp. ¶ 55; D.C. 11.)  Specifically, D.C. witnessed swastikas in the school bathrooms and on binders, lockers, and desks.  (*See* Defs.' 56.1 Resp. ¶ 55; D.C. 13–14.)  He also witnessed swastikas in the textbooks issued to students

for use in class or available in the school library.  (*See* D.C. 19.)  He reported swastika-defaced textbooks to his teachers "a couple of times," (Defs.' 56.1 Resp. ¶ 303; D.C. 20), but Plaintiffs claim that the teachers and District officials never effectively addressed the problem and that swastikas remained in "a majority of the textbooks," (Defs.' 56.1 Resp. ¶ 305; D.C. 17–19).  The District disputes the textbook grafitti, claiming that a search of "almost 500 textbooks" used for "at least ten years at Crispell" yielded "no such swastikas" and only two books with grafitti that were "even arguably anti-Semitic."  (Defs.' 56.1 Resp. ¶¶ 304–05; Affidavit of John Boyle ("Boyle Aff.") ¶¶ 14–16 (Dkt. No. 73).)

The harassment D.C. suffered throughout his time in the District made him feel unsafe, as though "[e]very day . . . was the wors[t] day of [his] life" and led D.C. to contemplate suicide.  (Defs.' 56.1 Resp. ¶¶ 66–67; D.C. 123–24.)  After the bus incident in sixth grade, D.C. felt that "Mr. Boyle didn't really care or couldn't do anything about [the harassment]," and that "the system had apathy towards [D.C.], so [he] didn't know who to talk to and [D.C.] thought [he] was on [his] own."  (Defs.' 56.1 Resp. ¶ 302; D.C. 41.)  Furthermore, "after alerting the teachers in eighth grade and seeing their . . . inability . . . to correct the problem," D.C. felt "overwhelmed" and "did not report a lot of swastikas because [he] felt like [he] was fighting a losing battle and [that he] couldn't make a difference."  (Defs.' 56.1 Resp. ¶ 312; D.C. 20.)

### 2.  Plaintiff T.E.

T.E. is a female student who claims to have suffered anti-Semitic harassment and witnessed anti-Semitic incidents during her time at PBE and Crispell.  Like D.C., T.E. witnessed swastika grafitti in the bathroom and on textbooks, desks, people, books, binders, notebooks, walls, and posters.  (*See* Defs.' 56.1 Resp. ¶ 33; T.E. Deposition Tr. ("T.E.") 196, 267–68 (Wilson Decl. Ex. 8 (Dkt. No. 79)).)

Several of the incidents about which T.E. complains occurred during the 2008–2009 school year, when T.E. was in fifth grade at PBE.  (*See* Defs.' 56.1 Resp. ¶ 68; T.E. 6, 17.)  In March 2009, a student on T.E.'s bus called her a "Jew" and gave the middle finger to T.E. and her mother.  (*See* Defs.' 56.1 Resp. ¶ 96; T.E. 34.)  Mrs. E. reported the incident to both the bus driver, (*see* T.E. 35), and PBE Principal Fisch, (*see* Defs.' 56.1 Resp. ¶ 97; Fisch 111–13.)  Fisch discussed the incident with the offending student, who admitted to calling T.E. "a Jew and dirty Jew and other epithets."  (Defs.' 56.1 Resp. ¶ 98; Fisch 122.)  The student was given a 50-minute "recess detention," and his parents were called, but the student was not forced to apologize to T.E. or her mother, do any assignment, or be subject to suspension or after-school detention. (*See* Defs.' 56.1 Resp. ¶ 99; Fisch 131–134.)

In April 2009, two of T.E.'s classmates—one of whom was the same student who had called T.E. a "Jew" on the bus—showed T.E. swastikas that were drawn in their planners.  (*See* Defs.' 56.1 Resp. ¶ 102; T.E. 25–30.)  Mrs. E., T.E.'s mother, reported this incident to Fisch, who allegedly told her "[w]hat's the big deal, they didn't aim [the swastikas] towards [T.E.], they were just writing in their book."  (Defs.' 56.1 Resp. ¶¶ 104–05; Mrs. E. Deposition Tr. ("Mrs. E.") 56–57 (Wilson Decl. Ex. 9 (Dkt. No. 79)).)  While Defendants do not dispute Plaintiffs' description of this incident for the purposes of the instant motion, they do note that "T.E. testified that she happened to see the swastikas, not that [the students] showed them to her," and also contest the date on which this incident occurred.  (*See* Defs.' 56.1 Resp. ¶ 102.)  Defendants also note that, during Fisch's deposition, he denied saying "[w]hat's the big deal" to Mrs. E.  (*See* Defs.' 56.1 Resp. ¶ 105.)  After Mrs. E. persisted, Fisch agreed to "talk with the kids."  (Defs.' 56.1 Resp. ¶ 107; Mrs. E. 58.)  He found swastikas in both students' planners, spoke with the students for 15–20 minutes, and further spoke with Superintendent Steinberg,

who did not recommend discipline.  (*See* Defs.' 56.1 Resp. ¶¶ 108–10, 113; Fisch 59–63;

Steinberg Deposition Tr. ("Steinberg") 133, 169–70 (Wilson Decl. Ex. 1 (Dkt. No. 79)).)  The

Parties dispute whether any "disciplinary consequences" resulted from this incident, as

Defendants assert that an oral warning or conference with the Principal is considered discipline

under the District's Code of Conduct.  (*See* Defs.' 56.1 Resp. ¶ 111.)  Fisch testified that he

spoke with the offending students about "the significance of the swastika" and "what an

offensive symbol it was to a particular group [including Jewish people]."  (Fisch 62.)

   Also in April 2009, T.E. saw a swastika carved into the slide on the PBE playground.

(*See* Defs.' 56.1 Resp. ¶ 76; T.E. 40–42.)  Mrs. E. reported the swastika to Fisch no later than

May 1, 2009.  (*See* Defs.' 56.1 Resp. ¶ 78; Fisch 152; Mrs. E. 73–75.)  Fisch saw the swastika

and claims to have put in a work order to have it removed.  (*See* Defs.' 56.1 Resp. ¶¶ 79–80;

Fisch 155–59.)  Mrs. E. claims to have raised the issue with Fisch in June 2009 and again in

September 2009, however, the swastika was still not removed.  (*See* Defs.' 56.1 Resp. ¶¶ 82–84;

Fisch 165–67; Mrs. E. 76.)  Defendants dispute the June and September reports, as Fisch

testified that he did not remember Mrs. E. discussing the issue with him on those dates.  (*See*

Defs.' 56.1 Resp. ¶¶ 83–85; Fisch 166–68.)  At oral argument before the Court on July 17, 2014,

Defendants continued to dispute whether Mrs. E. notified Fisch two or four times about the

swastika, but contend that this dispute is irrelevant for the purposes of their Motion for Summary

Judgment, as Fisch filed a work order to have the grafitti removed.  (*See* July 17, 2014 Tr. 15.)

In any case, Plaintiffs allege that between April 2009 and April 2010, Fisch never checked to

confirm that the swastika had been removed, nor did anyone tell him that the swastika was

removed, rather he simply "believe[d] it had been taken care of."  (Defs.' 56.1 Resp. ¶¶ 86–87;

Fisch 162, 178–79.)

On April 19, 2010, when T.E. was in sixth grade and enrolled at Crispell, Mrs. E. saw that the swastika was still present on the slide at PBE, took a picture, and emailed the photo to the District's Assistant Superintendent.  (*See* Defs.' 56.1 Resp. ¶¶ 88, 140; Maazel Decl. Ex. 19; Mrs. E. 100–05, 129–30.)  Defendants do not dispute this account, for the purposes of the instant Motion, but note that it is not clear that the swastika observed was the same one that existed in April 2009.  (*See* Defs.' 56.1 Resp. ¶ 88; Fisch 179; July 17, 2014 Tr. 11.)  In the same email, Mrs. E. noted that students on T.E.'s bus had been making "swastika symbols with their hands," performing Hitler salutes, and discussed "do[ing] something . . . to celebrate" the "anniversary of Hitler's birthday."  (Defs.' 56.1 Resp. ¶ 141; Maazel Decl. Ex. 19; Mrs. E. 102, 130.)  The Assistant Superintendent forwarded Mrs. E.'s email to Fisch, Hopmayer, and Boyle and suggested that Fisch get the swastika removed.  (*See* Defs.' 56.1 Resp. ¶¶ 89–90; Fisch 169–73.)  Fisch replied to suggest that "we go out and look at [the swastika grafitti] on cannabis culture day[, April 20, 2010]."  (Defs.' 56.1 Resp. ¶ 90; Fisch 173–76.)  Fisch and the Assistant Superintendent then inspected the slide on April 20, 2010 and found the swastika.  (*See* Defs.' 56.1 Resp. ¶¶ 91–92; Fisch 177–78.)  Fisch conducted no investigation into the origin of the grafitti and no one was disciplined as a result.  (*See* Defs.' 56.1 Resp. ¶ 95; Fisch 163.)

Despite the fact that the Assistant Superintendent forwarded Mrs. E.'s April 19, 2010 email reporting students making "swastika symbols with their hands," saluting Hitler, and planning to do something to "celebrate" the "anniversary of Hitler's Birthday," to Fisch, Boyle, Hopmayer, and Peters, (*see* Defs.' 56.1 Resp. ¶¶ 141–42; Maazel Decl. Ex. 19; Mrs. E. 102; Fisch 181–82), nobody interviewed any students on T.E.'s bus or asked T.E. which students were making the offensive symbols and salutes, (*see* Defs.' 56.1 Resp. ¶¶ 143–44; Carbone Deposition Tr. ("Carbone") 297–99, (Wilson Decl. Ex. 2 (Dkt. No. 79)).)  Defendants do not

11

dispute that Fisch, Boyle, Peters, and Hopmayer did nothing in response to Mrs. E.'s complaint. (*See* Defs.' 56.1 Resp. ¶¶ 146–49; Fisch 185; Boyle 181–192; ); Peters Deposition Tr. ("Peters") 269–79 (Wilson Decl. Ex. 6 (Dkt. No. 79)); Hopmayer 308–09, 313.)

T.E. did not attend school on April 20, 2010, but when she boarded the bus the next day, the driver "yelled at [her] in front of everybody on the bus" and "called [her] a liar." (Defs.' 56.1 Resp. ¶¶ 151–52; T.E. 56, 62–63.)  When T.E. took out her phone to contact Mrs. E., the driver told T.E. to "put [her] phone away," was "screaming in [her] face," and told T.E. to "stop crying." (Defs.' 56.1 Resp. ¶ 153; T. E. 65.)  After this incident, T.E.'s mother drove T.E. to school for the rest of the year.  (*See* Defs.' 56.1 Resp. ¶ 154; T.E. 66.)

During T.E.'s seventh grade year, the anti-Semitic harassment continued.  In April 2011, Mrs. E. sent an email to Winter, Steinberg, and others explaining that a student in T.E.'s English class had called T.E. "[c]rispy" and said that "she should have been burned."  (Defs.' 56.1 Resp. ¶ 168; Steinberg 263; Maazel Decl. Ex. 8.)  T.E. also reported similar comments made by another student to Winter, specifically that T.E. "[w]as crispy" and "should have been burned a while ago."  (Defs.' 56.1 Resp. ¶ 169; T.E. 115.)[6]  The Parties dispute whether discipline resulted from the reporting of these incidents.  Defendants claim that Winter "investigated by speaking with T.E." and the offending students, and that Winter gave one student an oral warning and counseled him about the statement.  (Defs.' 56.1 Resp. ¶ 169.)  Defendants further claim that Winter determined that the statement by the second student had been "made eight months before the report" and that "T.E. had called him 'fat,'" but otherwise do not dispute Plaintiffs' assertion that no discipline resulted from this incident.  (*Id.*)  Moreover, Defendants do not dispute

---

[6] Defendants' 56.1 Response misquotes T.E.'s testimony.  The Court quotes directly from the transcript of T.E.'s testimony.

Plaintiffs' assertion that when Mrs. E. told Winter that T.E. was "coming home on a daily basis upset and afraid to go to school . . . that there [were] swastikas everywhere [including] in her classroom, [and] that its being ignored, th[at] kids are allowed to treat her this way," Winter responded by saying that "anti-Semitism is prevalent in the community . . . and that it's rather hard to stop something that's inbred in the community." (Defs.' 56.1 Resp. ¶ 169(d–e); Mrs. E. 117–19.)

On April 28, 2011, in T.E.'s math class, one student said that another student "didn't know something because he was a Jew." (Defs.' 56.1 Resp. ¶ 207; T.E. 160.) Defendants dispute whether this incident is reflected in Winter's notes and whether T.E.'s testimony refers to the Amended Complaint or Winter's notes, but Defendants do not dispute that the incident occurred. (*See* Defs.' 56.1 Resp. ¶ 207.)

In May 2011, T.E. reported a swastika on her desk to her music teacher, who "immediately" took the desk out of the room and notified Winter. (Defs.' 56.1 Resp. ¶ 175; T.E. 167–68.) The Parties dispute whether the swastika remained on the desk for "two weeks," as T.E. testified, or was promptly removed by Winter and a custodian the same day, as Winter testified. (Defs.' 56.1 Resp. ¶ 175; T.E. 167–68; Winter Deposition Tr. ("Winter") 187–88 (Wilson Decl. Ex. 3 (Dkt. No. 79)).) Regardless, Defendants do not dispute that no student was disciplined as a result of the graffiti, nor that T.E.'s next music desk also was defaced with a swastika. (*See* Defs.' 56.1 Resp. ¶ 175; T.E. 170.)

Around the same time, T.E. reported anti-Semitic grafitti in the boys' bathroom to Winter. (*See* Defs.' 56.1 Resp. ¶ 176; T. E. 242–43.) The graffiti read "[f]uck the Jews" and also featured a Star of David with a male eighth-grade student's name inside. (*See* Defs.' 56.1 Resp. ¶ 176; T.E. 242.) In response to T.E.'s reporting, Winter told her that she "was looking for

the trouble now." (Defs.' 56.1 Resp. ¶ 176; T.E. 243.) The Parties dispute whether any investigation resulted from this report, but Winter testified that he spoke with the male eighth-grade student, who reported that he had not experienced any anti-Semitism, apart from the grafitti. (*See* Defs.' 56.1 Resp. ¶ 176(d); Winter 426.) Defendants do not dispute Plaintiffs' contention that no discipline was imposed with respect to this grafitti. (Defs.' 56.1 Resp. ¶ 175; Winter 425–26.)

By May 24, 2011, T.E. was "stressed every single day going to school . . . to the point [where T.E. was] upset every day [when she came] home and complained how terrible it was at school." (Defs.' 56.1 Resp. ¶ 209; Mrs. E. 173–75.) Mrs. E. emailed Winter, Steinberg, Carbone, Boyle, and PBCSD Board member Eric Meier ("Meier"), telling them that the harassment of her daughter over a period of three years "has escalated every year to the point that [T.E.] now begs me to not have to return to this school." (Defs.' 56.1 Resp. ¶¶ 211–12; Maazel Decl. Ex. 22; Winter 182.) In fact, Mrs. E. had multiple communications with Winter about anti-Semitic harassment, (*see* Defs.' 56.1 Resp. ¶ 184; Winter 181, 388–89), and Winter admitted to being informed of "18 or more anti-Semitic incidents" in the 2010–2011 school year, (Defs.' 56.1 Resp. ¶ 185; Winter 400).

In response to Mrs. E.'s complaints, Mr. Winter told her "that [T.E. and O.C.] would not have [had to] know about most of the Swastikas if they had not asked people to inform them if they saw any," and that if they "weren't asking to be shown the offenses they wouldn't be as stressed /upset by them." (Defs.' 56.1 Resp. ¶¶ 214–15; Maazel Ex. 24; *see* Winter 208–09.) Mrs. E. memorialized Winter's statements in a May 26, 2011 email to Winter, to which she copied Steinberg, Carbone, Boyle, Meier, PBCSD Board member Lloyd Greer ("Greer"), and

others.  (*See* Defs.' 56.1 Resp. ¶ 216; Maazel Decl. Ex 24.)[7]

On May 31, 2011, Mrs. E. emailed Winter, Steinberg, Carbone, Boyle, Meier, and others,

relaying an incident that T.E. witnessed on the bus in which one student had drawn a picture on

his stomach and "said it is a Hasidic Jew, so let's shove pennies in his mouth."  (Defs.' 56.1

Resp. ¶ 213; Maazel Decl. Ex. 25; T.E. 161–65.)[8]  Defendants do not dispute that the offending

student was not disciplined for this incident, though they note that he refused to return to the

school and withdrew from the District.  (*See* Defs.' 56.1 Resp. ¶ 213.)

Also on May 31, 2011, Mrs. E. emailed Winter, Steinberg, Carbone, Boyle, Meier, and

others to tell them that she had received "a frantic message from [T.E.] regarding [a PBHS

student on her bus who] has a history of chanting white power and pro[-]Hitler statements."

(Defs.' 56.1 Resp. ¶ 218; Maazel Decl. Ex. 26; T.E. 152–53.)  This email stated that the older

student "pushed [T.E.] in [a seat] and sat with her" and said that when T.E. "is in 8th grade that

she is going to get her ass kicked."  (Maazel Decl. Ex. 26.)  Neither Winter, Steinberg, Carbone,

nor Boyle spoke with the offending student, interviewed T.E. or witnesses about the incident,

imposed any discipline, or stopped the offending student from riding the bus with T.E.  (*See*

Defs.' 56.1 Resp. ¶ 219.)  Defendants note that "[n]o punishment could be imposed on [the

offending student] because he was graduating and no longer rode the bus."  (*Id.*)  T.E. testified

that she witnessed students making Hitler salutes and singing white power chants on the school

---

[7] Defendants' 56.1 Response acknowledges that Mrs. E. sent the May 26, 2011 email to "others," but does not mention Board member Lloyd Greer by name.  The copy of the email and Mrs. E's testimony, however, supports that Greer was one of the individuals that Mrs. E. copied on the email.  (Maazel Decl. Ex. 24; Mrs. E. 168–69).

[8] Although Mrs. E's email states that one student was involved in the relevant incident, T.E. testified that one student "lifted up his shirt and said '[l]ook at the Hasidic Jew,'" and then another student said, "'[l]et's shove pennies in its mouth.'"  (T.E. 161–65).

bus on a "daily" basis.  (Defs.' 56.1 Resp. ¶ 34; T.E. 51, 90, 197–98.)

When T.E. was in sixth or seventh grade at Crispell, Mrs. E. had "a conversation with Mr. Steinberg regarding what was going on in the schools and how upset [T.E.] was."  (Defs.' 56.1 Resp. ¶ 201; Mrs. E. 109.)  Mrs. E. told Steinberg about the swastika grafitti "on the bathroom walls," "on the desks," "on the lockers," and "on people's notebooks," and expressed that T.E. "does not feel comfortable here."  (Defs.' 56.1 Resp. ¶¶ 202–03; Mrs. E. 110.)  Steinberg responded by saying that "when [he] had this issue when [his] kids were in school, [he] moved."  (Defs.' 56.1 Resp. ¶ 204; Mrs. E. 110.)

When T.E. was in eighth grade, she continued to hear anti-Semitic slurs "on almost a daily basis" and recalls that "people would use Jew like they would use the N word."  (Defs.' 56.1 Resp. ¶ 264; T.E. 196.)  She also saw swastikas "everywhere" in the school, (Defs.' 56.1 Resp. ¶ 265; T.E. 196), though Defendants dispute this point based on T.E.'s failure to provide specifics about this grafitti upon cross-examination, (*see* Defs.' 56.1 Resp. ¶ 265; T.E. 276–80).  T.E. also recalls people "salut[ing] Hitler all the time."  (Defs.' 56.1 Resp. ¶ 266; T.E. 197.)

At some point in T.E.'s eighth grade year, she noticed swastika graffiti in one of the school bathrooms.  (*See* Defs.' 56.1 Resp. ¶ 267; T.E. 196–97.)  T.E. "told [Boyle] exactly where it was," but Boyle claimed not to see it.  (Defs.' 56.1 Resp. ¶ 267; T.E. 196.)  When T.E. went in the bathroom later, it was still there.  (*See* Defs.' 56.1 Resp. ¶ 268; T.E. 196–97.)

On January 23, 2012, during T.E.'s math midterm examination, she witnessed several students "saluting Hitler."  (Defs.' 56.1 Resp. ¶ 272; T.E. 213–15.)  The Parties dispute whether T.E. reported this incident to the Crispell Assistant Principal Christopher Mummery, (*see* Defs.' 56.1 Resp. ¶ 273; T.E. 216; Affidavit of Christopher Mummery ("Mummery Aff.") ¶ 18 (Dkt. No. 75)), but do not dispute that no investigation was conducted or that nobody was disciplined

with respect to this incident, (*see* Defs.' 56.1 Resp. ¶ 274).

On January 24, 2012, a student sitting in the front of T.E.'s health class made an anti-Semitic "joke" about Jews and concentration camps.  (*See* Defs.' 56.1 Resp. ¶ 275; T.E. 216–17; Mummery Aff. ¶ 20.)  T.E. reported this statement to Mummery, who met with the student and gave him two lunch detentions.  (*See* Defs.' 56.1 Resp. ¶ 276, 278; T.E. 218; Mummery Aff. ¶¶ 20–22.)  Mummery also asserted that he "directed [the offending student] to write an essay about the Holocaust" as part of his punishment.  (Mummery Aff. ¶ 21.)

On January 25, 2012, a student threw a coin at T.E. in the Crispell hallway.  (*See* Defs.' 56.1 Resp. ¶¶ 41, 279; T.E. 220–28.)  Defendants concede that this incident was reported to Boyle, but state that the students Boyle questioned disputed T.E.'s accusation.  (*See* Defs.' 56.1 Resp. ¶ 280; Boyle 85–86.)

The same day, T.E. told her mother that "if she had to go back to the school ever again she was going to have a nervous breakdown."  (Defs.' 56.1 Resp. ¶ 281; Mrs. E. 201.)  Mrs. E. took T.E. to Mobile Mental Health, to meet with a counselor "who said that . . . [Crispell] was [not] a healthy place for her."  (Defs.' 56.1 Resp. ¶ 282; Mrs. E. 201.)  T.E. subsequently left PBCSD and was home schooled.  (*See* Defs.' 56.1 Resp. ¶ 283; T.E. 235–36; Mrs. E. 201–02.)

### 3.  Plaintiff O.C.

O.C. is a female student, the sister of D.C., and a classmate of T.E., who also claims to have suffered anti-Semitic harassment during her time at PBE, Crispell, and PBHS.  O.C. testified to observing swastika grafitti in the bathrooms and on books, desks, her yearbook picture, her school locker, binders, windowsills, and on the cafeteria door.  (*See* Defs.' 56.1 Resp. ¶ 47; O.C. Deposition Tr. ("O.C.") 52–54, 84, 89, 107–08, 119–20, 137, 215–16 (Wilson Decl. Ex 10 (Dkt No. 79)).)

17

During O.C.'s sixth grade year, 2009–2010, O.C. suffered several incidents of harassment.  When her class was watching a Holocaust video, a student made "his hand in the shape of a gun[,] [pointed it] at [O.C.'s] head[,]" and, when T.E. asked what he was doing, replied that "he was killing Jews.'"  (Defs.' 56.1 Resp. ¶ 127; O.C. 9; T.E. 77.)  T.E. and O.C. reported this to their teacher, who spoke with the offending student in the hallway.  (*See* Defs.' 56.1 Resp. ¶¶ 128–29; O.C. 9–12.)  When the student returned to class, he was crying.  (*See* Defs.' 56.1 Resp. ¶ 129; O.C. 12.)  However, the same student continued to "mak[e] ethnic slurs towards [O.C.]," even after this incident.  (Defs.' 56.1 Resp. ¶ 130; O.C. 13.)

The same year, while at a picnic with her class, another student "found a penny" in the volleyball pit, "picked it up and said '[l]ook I am being a Jew.'"  (Defs.' 56.1 Resp. ¶ 46; O.C. 14.)  When O.C. told the student that his statement was offensive, "he took the sand and smashed it in [O.C.'s] hair."  (Defs.' 56.1 Resp. ¶ 46; O.C. 14–15.)  A fight between O.C.'s then-boyfriend and the offending student resulted.   (*See* Defs.' 56.1 Resp. ¶ 131; O.C. 14–18; T.E. 81–84.)  Mrs. E. was told that the anti-Semitism that started [the fight] "didn't matter" and that the school would only look into the fight.  (Mrs. E. 113.)

O.C. also testified another student threw pennies at her "during recess for an entire month" in sixth grade.  (Defs.' 56.1 Resp. ¶ 49: O.C. 79–80.)  At some point that year, Mr. C. reported to Peters that O.C. had pennies thrown at her and that she had been subjected to anti-Semitic jokes.  (*See* Defs.' 56.1 Resp. ¶ 133; Mr. C. 15–18.)  Peters told Mr. C. that he would "look into it," (Defs.' 56.1 Resp. ¶ 134; Mr. C. 18–19), but Peters does not remember Mr. C. ever complaining about anti-Semitism at Crispell, (*see* Defs.' 56.1 Resp. ¶ 133; Peters 214).

When O.C. was in seventh grade (2010–2011), students called her "Christ killer" and "dirty Jew," and told anti-Semitic jokes, including "what is the difference between a pizza and a

Jew[?] [W]hen it goes in the oven a pizza doesn't scream." (Defs.' 56.1 Resp. ¶ 48; O.C. 99–100.)

On April 14, 2011, O.C. told Boyle that her best friend had been held down and that two students had drawn a swastika on her friend's face. (*See* Defs.' 56.1 Resp. ¶ 170; O.C. 68; Boyle 7.) Defendants dispute several aspects of this incident, as Boyle testified that he spoke with the student involved, who said that the students were "joking" and that the incident was not meant to be offensive. (Defs.' 56.1 Resp. ¶ 170(a); Boyle 97.) When O.C. spoke with Boyle, she was crying, and O.C. testified that Boyle asked her why she found the incident offensive if it wasn't directed toward her. (*See* Defs.' 56.1 Resp. ¶ 170(b); O.C. 68.) Defendants dispute this exchange, as Boyle testified that he never made such a statement to O.C. and instead testified that he remembered "saying it's offensive to everybody." (Defs.' 56.1 Resp. ¶ 170(c); Boyle 198.) On a separate occasion in seventh grade, two students held O.C.'s hands behind her back at recess and "tried to shove a quarter down [her] throat." (Defs.' 56.1 Resp. ¶ 45; O.C. 63–64.) On April 27, 2011, a student called O.C. a "F'ing Jew." (Defs.' 56.1 Resp. ¶ 172; Winter 95.) Winter gave this student two hours of detention and his parents were notified. (*See* Defs.' 56.1 Resp. ¶ 172(a); Winter 110; Sneed Decl. Ex. EE (Dkt. No. 77).)

One day in seventh grade English class, O.C. saw a swastika on her desk and reported it to Winter. (*See* Defs.' 56.1 Resp. ¶ 174; O.C. 43–44; Winter 89–90.) The swastika was removed, but "a different swastika" appeared on her desk "[t]he next day." (Defs.' 56.1 Resp. ¶ 174; O.C. 45–46.) O.C. again reported it to Winter and, the following day, another student told O.C. that there were "three swastikas on [O.C.]'s desk with [O.C.'s] name" in the swastikas and "die Jew" or "damn Jew." (Defs.' 56.1 Resp. ¶ 174; O.C. 45–46, 53–54.) O.C. asked her English teacher if she could see Winter, and the teacher "made a speech in front of the class" to

the effect that students "shouldn't get up during class" and that O.C. should "sit at a different desk." (Defs.' 56.1 Resp. ¶ 174(h); O.C. 49.)  O.C. later reported this incident to Winter because she "felt threatened and [she] wanted to figure out who did it." (Defs.' 56.1 Resp. ¶ 174; O.C. 47.)  O.C. testified that Winter told her English teacher "to just watch the desk," (Defs.' 56.1 Resp. ¶ 174(j); O.C. 48), though Defendants dispute this and suggest that Winter conferred with the teacher, looked at seating charts, and spoke to O.C. and the student who witnessed the grafitti, but could not determine who was responsible, (*see* Defs.' 56.1 Resp. ¶ 174(j); Winter 92–93).  The Parties dispute whether O.C. later told Winter that a student had admitted to being the perpetrator, as there is no evidence that O.C. told Winter that the student had confessed, and Winter was under the impression that the student was not responsible. (*See* Defs.' 56.1 Resp. ¶ 174(k); O.C. 48; Winter 93.)

During their seventh grade year, T.E. and O.C. regularly reported anti-Semitic harassment to Winter. (*See* Defs.' 56.1 Resp. ¶ 182; Winter 60–61, 70–71, 77, 88, 95, 97, 113, 141, 189, 303-04, 393–94, 425.)  The girls complained to Winter so frequently that he told them to "stop coming as often as [they] did," and that they "were looking for trouble." (Defs.' 56.1 Resp. ¶ 159; T.E. 102.)  In response, T.E. and O.C. began writing down each incident of anti-Semitic harassment and "bring[ing] it to [Winter] at the end of the week," to which Winter responded that they "were now just looking for trouble and that [they] were causing [their] own problems." (Defs.' 56.1 Resp. ¶ 160; T.E. 102–03.)

The same year, Mr. C. had "at least three phone conversations" with Winter about the anti-Semitic harassment that O.C. suffered, specifically that O.C. was "called Christ killer, dirty Jew, stinking Jew, ha[d] pennies thrown at her and . . . [found] swastikas," including the one near O.C.'s yearbook picture. (Defs.' 56.1 Resp. ¶¶ 177–78; Mr. C. 20–22.)  In response, Winter

20

said that he would "deal with it on an individual basis."  (Defs.' 56.1 Resp. ¶ 179; Mr. C. 21.)

Mr. C. told Winter that "this isn't an individual problem, this is systemic, and . . . a much

broader problem and you cannot deal with it individually."  (Defs.' 56.1 Resp. ¶ 180; Mr. C. 22.)

The Parties dispute whether Winter did "anything to address . . . systemic anti-Semiti[c]

harassment and bullying in the school."  (Defs.' 56.1 Resp. ¶ 181; Mr. C. 59.)  Defendants

submit that, during Winter's year as Crispell Assistant Principal, "there were three anti-bullying

assemblies, a District[-]wide anti-bullying seminar for parents in June 2011, and bullying and

anti-Semitism were addressed within the curriculum, including through a Holocaust unit in

eighth grade."  (*See* Defs.' 56.1 Resp. ¶ 181; Affidavit of Joan Carbone ("Carbone Aff.")

¶¶ 12–13, 30 (Dkt. No. 51).)

On June 15, 2011, a student showed T.E. a swastika "made out of pipe cleaner" and told

T.E. that he was going to give it to O.C.  (Defs.' 56.1 Resp. ¶ 251; O.C. 55–56, T.E. 95–96,

Winter 303–06).  During the last week of seventh grade, O.C. reported to Winter that a swastika

had been drawn near her photo in another student's yearbook.  (*See* Defs.' 56.1 Resp. ¶ 253;

O.C. 84–85; Winter 393–97.)  Winter documented the name of the student who had drawn the

swastika in his notes and crossed out the symbol with a marker.  (*See* Defs.' 56.1 Resp. ¶ 253(b);

O.C. 85; Winter 393).  The Parties dispute whether the District imposed discipline on the student

responsible for the drawing, beyond merely speaking with the student, but Winter testified that

he imposed a two-day out of school suspension for both the pipe-cleaner and yearbook incident,

and wrote a letter to the student's mother about the suspension and misconduct.  (*See* Defs.' 56.1

Resp. ¶ 253(c); Winter 305–06).

When O.C. was in eighth grade (2011–2012), she reported a drawing of a swastika and

the word "gay" on a poster of President Obama to two teachers.  (*See* Defs.' 56.1 Resp. ¶ 284,

OC 103–04; TE 269; Mummery Aff. ¶ 8.)  The Parties dispute whether O.C. reported the swastika to Mummery once or twice before he removed it.  (*See* Defs.' 56.1 Resp. ¶ 285; O.C. 104; Mummery Aff. ¶¶ 7–9.)  The Parties also dispute whether any action was taken or whether an investigation was made to determine who had defaced the poster.  (*See* Defs.' 56.1 Resp. ¶ 286; Mummery Aff. ¶ 8; Boyle 42.)

O.C. also told Mummery that a student had drawn a swastika on her locker.  (*See* Defs.' 56.1 Resp. ¶ 287; O.C. 90–93.)  Mummery testified that the grafitti was a Star of David rather than a swastika, but, regardless, he removed the grafitti from O.C.'s locker and had the offending student perform research and write an essay about ths history of the Star of David.  (*See* Defs.' 56.1 Resp. ¶ 288; Mummery Aff. ¶¶ 9–10 and Ex. B.)

The anti-Semitic incidents continued when O.C. enrolled in ninth grade at PBHS.  She heard "ethinic slurs" and "Jew" in the PBHS hallways "every day."  (Defs.' 56.1 Resp. ¶ 44; O.C. 217–18.)  She was called a "f'ing Jew," (Defs.' 56.1 Resp. ¶ 289; O.C. 211–12), and also witnessed students threaten to hold another student down so that they could draw a swastika on the student, (*see* O.C. 213–15).  In April 2013, O.C. noticed a swastika on a door in the cafeteria.  (*See* Defs.' 56.1 Resp. ¶ 47(k), 289; O.C. 215.)  When she reported it to a security guard, he told her that the swastika had "been there five years."  (Defs.' 56.1 Resp. ¶ 47(k), 289; O.C. 215–16.)  After O.C. reported the swastika on the door, PBHS Principal Hopmayer asked the security guard to investigate but ultimately could not determine who drew the swastika; however, Hopmayer instructed a school custodian to remove it from the door.  (*See* Defs.' 56.1 Resp. ¶ 47(k); Hopmayer 375–84.)

### 4.  The District's Response

In response to Plaintiffs' allegations, the District contends that it responded appropriately

to each of the incidents of which it was aware.  Moreover—and in response to Plaintiffs'
allegation that the District never took widespread steps to address anti-Semitism among
PBCSD's students—the District lists a number of measures it took to prevent harassment and
bullying generally. With respect to Plaintiffs D.C., T.E., and O.C., the District points to two
assemblies held at these Plaintiffs' schools.

In May 2009, when T.E. and O.C. were in fifth grade at PBE, Fisch held an assembly to
discuss the "bullying problem" in the fifth grade class and sent a letter to students' parents
informing them about the consequences of "any verified complaints about bullying
behavior . . . from any school related area including the bus."  (Defs.' 56.1 Resp. ¶ 122; Fisch
139–42.)  Fisch did not discuss anti-Semitism in the assembly, despite the fact that the assembly
was held after the incidents in PBE involving swastikas on a slide and in student notebooks, and
after a student called T.E. a "dirty Jew" on the bus.  (Defs.' 56.1 Resp. ¶ 122; Fisch 296–97.)

On June 10, 2011, when T.E. and O.C. were in seventh grade, Crispell held an assembly
in which a Holocaust survivor addressed a group of seventh grade students.  (*See* Defs.' 56.1
Resp. ¶¶ 222–23; Boyle 47.)  While Defendants do not dispute Plaintiffs' contention that "no one
addressed anti-Semitism in Pine Bush [S]chools" at this assembly, (Defs.' 56.1 Resp. ¶ 223;
Steinberg 264), Defendants note that both Winter and Steinberg spoke at the assembly and that
Boyle testified that "Winter spoke of anti-Semitism or of discrimination," (Defs.' 56.1 Resp.
¶ 223; Boyle 158–59).  While the Holocaust survivor spoke, one student told T.E. that "that was
fucking stupid."  (Defs.' 56.1 Resp. ¶ 224; T.E. 255; Winter 294.)  Winter spoke with the student
and made him apologize to the guest speaker.  (*See* Defs.' 56.1 Resp. ¶ 224; Winter 294–95.)
Another student was removed from the assembly because she was "talking nonstop."  (Defs.'
56.1 Resp. ¶ 223; O.C. 71; Winter 292–93.)  After the assembly, O.C. overheard people saying

23

that the assembly was a waste of their time.  (*See* Defs.' 56.1 Resp. ¶ 226; O.C. 71.)

On June 7, 2011, Mrs. E. and Mr. C. met with Steinberg, Greer, and others.  (*See* Defs.' 56.1 Resp. ¶ 228; Steinberg 268–69.)  In this meeting, the parents told Steinberg about the swastikas, name-calling, Holocaust "jokes," and that students had called their children "ashes" and "crispy."  (Defs.' 56.1 Resp. ¶ 229; Mr. C. 46, 60.)  They also showed Steinberg pictures of some of the swastikas that T.E. and O.C. had taken, and told Steinberg that the girls were "singled out and being bullied for being Jewish" and that T.E. and O.C. did not feel safe and wanted "to go to another school system" if Steinberg "c[ouldn't] fix the problem."  (Defs.' 56.1 Resp. ¶¶ 230–32; Mr. C. 46.)  Mr. C. asked Steinberg to invite groups to school such as the Anti-Defamation League and to require online classes for the teachers.  (Defs.' 56.1 Resp. ¶ 234; Mr. C. 42–43.)  The parents also requested that Steinberg allow T.E. and O.C. to transfer to another middle school and provide transportation to the new school.  (*See* Defs.' 56.1 Resp. ¶ 235; Mr. C. 49–50; Steinberg 271; Boyle 269–70.)  Steinberg told them that "he didn't know that the school would pay for that."  (Defs.' 56.1 Resp. ¶ 236; Mr. C. 50.)

On June 14, 2011, Mr. C. emailed Steinberg requesting that he "[p]lease talk to the girls SOON [as t]hey continue to hear slurs on a daily basis."  (Defs.' 56.1 Resp. ¶ 247; Maazel Decl. Ex. 28; Steinberg 284–85.)  The same day, Mrs. E. emailed Winter, Steinberg, and others to say that she had "been reporting these issues . . . for 3 years and there has been no change," and that the "current system of handling it on a case basis is not working.  It has increased to being a daily occurrence."  (Defs.' 56.1 Resp. ¶ 249; Maazel Decl. Ex. 29; Steinberg 287–88.)  The following day, Mrs. E. emailed Winter, Steinberg, and others and said that "[w]e are still waiting for Mr. Steinberg to go speak with the girls."  (Defs.' 56.1 Resp. ¶ 250; Maazel Decl. Ex. 29.)

On June 17, 2011, Steinberg met with T.E. and O.C.  (*See* Defs.' 56.1 Resp. ¶ 240;

Steinberg 285.)  In this meeting, the girls asked to transfer to a different middle school.  (*See* Defs.' 56.1 Resp. ¶ 241; Steinberg 315; Boyle 269, O.C. 73–78; T.E. 120–21, 177–79.)  The Parties dispute whether Steinberg refused to pay for a bus for O.C. and T.E.  (*See* Defs.' 56.1 Resp. ¶ 242; O.C. 73–78; T.E. 120–21; 177–79; Boyle 269–70; Steinberg 315–16; Mrs. E. 187–88.)  Defendants submit that Steinberg informed Mrs. E. in June 2011 that T.E. and O.C. could transfer but that he did not have bus transportation available at the time, and requested that Mrs. E. "speak [to] him over the summer."  (Defs.' 56.1 Resp. ¶ 242; Steinberg 315–17.)  Steinberg claims that he "never heard from [Mrs. E.] after that meeting."  (Defs.' 56.1 Resp. ¶ 242; Steinberg 316.)

The Parties dispute whether the District's schools had any anti-bullying efforts in place that specifically addressed anti-Semitism prior to June 2011.  (*See* Defs.' 56.1 Resp. ¶¶ 383–85; Steinberg 234–35; Fisch 147; Boyle 47.)  The District contends that its anti-bullying and tolerance programs and curriculum were "geared toward tolerance for all races and religions and sometimes specifically mentioned anti-Semitism."  (Defs.' 56.1 Resp. ¶¶ 383–85; Carbone Aff. ¶¶ 1–36 (cataloguing the District's anti-bullying programs)).)  The District further argues that anti-Semitism is discussed in the District curriculum.  (Defs.' 56.1 Resp. ¶¶ 383–85; Carbone Aff. ¶¶ 11–13.)

The Parties also dispute whether any letter was ever sent to parents or students about anti-Semitic conduct in a PBCSD school, (Defs.' 56.1 Resp. ¶ 386), though Defendants dispute this point by referring to letters sent to individual students' parents, explaining that such letters are always sent to students who receive suspensions, (*see* Defs.' 56.1 Resp. ¶ 386; Maazel Decl. Exs. 38, 39).  As an example, Defendants cite the letter sent to the parents of the student who made a swastika out of pipe cleaners and showed it to T.E.  (*See* Maazel Decl. Ex 38.)

In addition, the Parties dispute whether any District employee met with parents as a group to discuss anti-Semitism, (*see* Defs.' 56.1 Resp. ¶ 387; Fisch 235; Winter 431–32), though the District argues that a meeting between Steinberg, Mr. C., and Mrs. E. during which they discussed the harassment of T.E. and O.C. constituted such a meeting, (*see* Defs.' 56.1 Resp. ¶ 387; Steinberg 268–69).  Regardless, Defendants concede that no survey was conducted to study anti-Semitism or bullying in the District's schools.  (*See* Defs.' 56.1 Resp. ¶ 346; Steinberg 388; Fisch 234; Boyle 327.)  The Parties also dispute whether administrators and teachers were trained about anti-Semitic bullying issues, (*see* Defs.' 56.1 Resp. ¶ 389; Boyle 195–96, 301–02; Winter 172; Fisch 236, 301–02), with Defendants claiming that the District provided training on hate crimes and dealing with anti-Semitism in the classroom during the Superintendent's Conference Days in September 2009, (*see* Defs.' 56.1 Resp. ¶ 389, Carbone Aff. ¶¶ 30(m),(o).)

B.  Procedural History

On March 28, 2012, Plaintiffs filed their Initial Complaint.  (*See* Dkt. No. 1).  Plaintiffs filed their Amended Complaint on January 7, 2013.  (*See* Dkt. No. 25.)  In their Amended Complaint, Plaintiffs assert violations of their rights under Title VI of the Civil Rights Act against the District.  They also assert violations of their right to equal protection under the U.S. Constitution and violations of New York Civil Rights Law against the District and several district administrators, specifically PBCSD Superintendent Philip G. Steinberg, former Principal of Pine Bush Elementary Steve Fisch, and former Assistant Principal of Crispell Middle School Eric Winter, all in their individual capacities.  (*See id.*)  In addition, Plaintiffs name several individuals in their official capacities as school administrators, specifically Steinberg, Hopmayer, Boyle, and Fisch.

Defendants filed an Amended Answer on April 5, 2013.  (*See* Dkt. No. 37.)  On

26

December 6, 2013, Defendants filed their Motion for Partial Summary Judgment ("Defs.'

Mem.") and supporting papers, (*see* Dkt. Nos. 50–57), to which Plaintiffs timely responded with

a Memorandum of Law in Opposition ("Pls.' Mem.") and supporting papers. (*See* Dkt. Nos. 63,

70–71.) Defendants filed a Reply Memorandum of Law in Support ("Defs.' Reply") along with

supporting documents on February 21, 2014. (*See* Dkt. Nos. 81–84.) In addition to the Parties'

filings, on January 15, 2014, the United States Department of Justice requested leave to file a

statement of interest in this Action. (*See* Dkt. No. 61.) The Court granted this request, (*see id.*),

and the Department filed its Statement of Interest of the United States on January 24, 2014. (*See*

Dkt. No. 67.) The Court heard oral argument on July 17, 2014.

## II.  DISCUSSION

### A.  Standard of Review

Summary judgment shall be granted where the movant shows that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir.

2014) (same). "In determining whether summary judgment is appropriate," a court must

"construe the facts in the light most favorable to the non-moving party and . . . resolve all

ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653

F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper*

*Saddle River, N.J. v. Rockland Cnty. Sewer Dist. No. 1*, No. 07-CV-109, 2014 WL 1621292, at

*12 (S.D.N.Y. Apr. 22, 2014) (same). Additionally, "[i]t is the movant's burden to show that no

genuine factual dispute exists." *Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241,

244 (2d Cir. 2004); *see also Aurora Commercial Corp. v. Approved Funding Corp.*, No. 13-CV-

230, 2014 WL 1386633, at *2 (S.D.N.Y. Apr. 9, 2014) (same). "However, when the burden of

proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point

to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim,"

in which case "the nonmoving party must come forward with admissible evidence sufficient to

raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P.*

*v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alterations and internal

quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a non-

movant] need[s] to create more than a metaphysical possibility that his allegations were correct;

he need[s] to come forward with specific facts showing that there is a genuine issue for trial,"

*Wrobel v. Cnty. of Erie,* 692 F.3d 22, 30 (2d Cir. 2012) (emphasis and internal quotation marks

omitted) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87

(1986)), and "cannot rely on the mere allegations or denials contained in the pleadings," *Walker*

*v. City of New York*, No. 11-CV-2941, 2014 WL 1244778, at *5 (S.D.N.Y. Mar. 26, 2014)

(internal quotation marks omitted) (citing, *inter alia*, *Wright v. Goord*, 554 F.3d 255, 266 (2d

Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other

evidentiary materials, the party opposing summary judgment may not merely rest on the

allegations or denials of his pleading . . . .")).

     "On a motion for summary judgment, a fact is material if it might affect the outcome of

the suit under the governing law."  *Royal Crown Day Care LLC v. Dep't of Health & Mental*

*Hygiene of City of New York*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks

omitted).  At summary judgment, "[t]he role of the court is not to resolve disputed issues of fact

but to assess whether there are any factual issues to be tried."  *Brod*, 653 F.3d at 164 (internal

quotation marks omitted); *see also In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab.*

*Litig.*, MDL No. 1358, No. M21-88, 2014 WL 840955, at *2 (S.D.N.Y. Mar. 3, 2014) (same).

28

Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)); *see also Schatzki v. Weiser Capital Mgmt., LLC*, No. 10-CV-4685, 2013 WL 6189465, at *14 (S.D.N.Y. Nov. 26, 2013) (same).

> B.  Plaintiffs' Title VI Claims

> > 1.  Jewish Identity and Title VI

Title VI prohibits a recipient of federal funds from discriminating on the basis of race, color, or national origin.  *See* 42 U.S.C. § 2000(d).[9]  The United States Department of Education's regulations regarding Title VI further state that a recipient of federal funds may not, "on ground of race, color, or national origin . . . [r]estrict an individual in any way in the enjoyment of any advantage or privilege enjoyed by others receiving any service, financial aid, or benefit under the program."  34 C.F.R. § 100.3(b)(1)(iv).  Nor may a funding recipient, such as the District in this Action, "[d]eny an individual an opportunity to participate in the program through the provision of services or otherwise or afford him an opportunity to do so which is different from that afforded others under the program" on the basis of race, color, or national origin.  *Id.* § 100.3(b)(1)(vi).

While Defendants do not seek dismissal of this Action on standing grounds, they

---

[9] Title VI of the Civil Rights Act of 1964, provides that

> [n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d.

sheepishly raise the question of whether Plaintiffs may bring a Title VI claim on grounds of deliberate indifference to anti-Semitic harassment, stating that Defendants have found "no prior case holding that claims of discrimination based on the [P]laintiffs' identification as Jewish come within Title VI's protection."  (Defs.' Mem. 25.)  Defendants appear to correctly identify an area of legal ambiguity, at least to the extent that they suggest that there is a question as to whether religious bias alone can form the basis of a Title VI claim where it is not "deeply intertwined" with national origin.[10]  Moreover, some courts have held that "allegations of discrimination because one is Jewish . . . do not by themselves state a claim for national origin discrimination."  *Larson v. Portage Twp. Sch. Corp.*, No. 05-CV-431, 2006 WL 1660752, at *5 (N.D. Ind. June 14, 2006); *see also Lapine v. Edward Marshall Boehm, Inc.*, No. 99-CV-8420, 1990 WL 43572, at *5 (N.D. Ill. Mar. 28, 1990) (noting that "Jews, like Catholics and Protestants, hail from a variety of different countries" and "find[ing] that plaintiff has [not] stated a claim for discrimination based on national origin," because being "Jewish gives no indication of an individual's country of origin[,]" "[n]or does it indicate the country of origin of one's ancestors or suggest the physical or cultural characteristics of a national origin group"); *cf. Puckett v. McPhillips Shinbaum*, No. 06-CV-1148, 2008 WL 906569, at *13 (M.D. Ala. Mar. 31, 2008) (declining to decide whether "being Jewish" is a "protected classification for purposes of a Title VII national origin claim").  This Court, however, need not address these issues in the instant Action.

---

[10] In a recent Summary Order, the Second Circuit suggested, without citation, that religious bias that is "deeply intertwined" with national origin bias may provide grounds for a Title VI claim, but did not address the issue, because "even if [the court] were to decide it in plaintiffs' favor, we would conclude that the complaint was properly dismissed for the reasons stated in [the] text."  *Kajoshaj v. N.Y.C. Dep't of Educ.*, 543 F. App'x 11, 13 n.2 (2d Cir. 2013).

Regardless of whether religious bias alone can form the basis of a Title VI claim or anti-Semitism can provide a basis for national origin discrimination, courts have regularly found that anti-Semitic harassment and discrimination amount to racial discrimination.  *See Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617–18 (1987) (explaining "that the Court of Appeals erred in holding that Jews cannot state a § 1982 claim against other white defendants"); *Sherman v. Town of Chester*, 752 F.3d 554, 567 (2d Cir. 2014) (holding that "Jews are considered a race for the purposes of §§ 1981 and 1982"); *United States v. Nelson*, 277 F.3d 164, 177 (2d Cir. 2002) (holding that "Jews count as a 'race' under certain civil rights statutes enacted pursuant to Congress's power under the Thirteenth Amendment")*; Bachman v. St. Monica's Congregation*, 902 F.2d 1259, 1261 (7th Cir. 1990) (finding that Jews constitute a race within the meaning of federal civil rights statutes); *Lenoble v. Best Temps, Inc.,* 352 F. Supp. 2d 237, 247 (D. Conn. 2005) (noting that "Jews are a distinct race for § 1981 purposes"); *Powell v. Independence Blue Cross, Inc.*, No. 95-CV-2509, 1997 WL 137198, at *6 (E.D. Pa. Mar. 26, 1997) (finding that "[§] 1981 must be read to encompass discrimination against a plaintiff because of his Jewish ancestry or ethnicity"); *Singer v. Denver Sch. Dist. No. 1*, 959 F. Supp. 1325, 1331 (D. Colo. 1997) (noting that Jews are "a distinct racial group for the purposes of § 1981").

Furthermore, the Office for Civil Rights has made clear that "anti-Semitic harassment can trigger responsibilities under Title VI . . . when the harassment is based on the group's actual or perceived shared ancestry or ethnic characteristics, rather than solely on its members' religious practices."  (Dear Colleague Letter from Russlynn Ali, Assistant Secretary for Civil Rights, Office for Civil Rights, U.S. Dep't of Education (Oct. 26, 2010) (Maazel Decl. Ex 1, at 4).)  Such agency interpretations of ambiguities in an agency's own regulation merit "substantial deference," as the courts have "no reason to think that the agency's interpretations do not reflect

31

its fair and considered judgment on the matter in question." *Biediger v. Quinnipiac Univ.*, 691

F.3d 85, 96–97 (2d Cir. 2012) (internal quotation marks omitted).  *Cf.* Kenneth L. Marcus,

Jurisprudence of the New Anti-Semitism, 44 Wake Forest L. Rev. 371, 388–89 (2009)

(chronicling U.S. Department of Education's Office for Civil Rights letters dating back to 2004

that conclude "that Title VI covers harassment of students of Jewish heritage" (internal quotation

marks omitted)).

      Plaintiffs' Amended Complaint asserts that Plaintiffs faced discrimination on the basis of

national origin, specifically their "Jewish ancestry," rather than on the basis of their religious

beliefs or observance.  (*See* Am. Compl. ¶¶ 104, 111, 118.)  As summarized above, the

harassment Plaintiffs allege did not concern Plaintiffs' religious beliefs or practices, but rather

drew on hackneyed stereotypes, bigoted "jokes," and painful references to the Holocaust and

Naziism.  In short, the harassment alleged is rooted in Plaintiffs' actual or perceived national

origin or race rather than just Plaintiffs' faith or religious practices.  The Court finds that,

regardless of whether they assert their claims on "national origin" or "race," Plaintiffs are within

their rights to assert a claim under Title VI based on anti-Semitic discrimination.

### 2.  Application to Plaintiffs' Case

      As noted, Title VI prohibits recipients of federal funds from discriminating on the basis

of race, color, or national origin.  42 U.S.C. § 2000(d).  Obviously, this includes prohibition of

intentional discrimination.  *See Alexander v. Sandoval*, 532 U.S. 275, 280–81 (2001).  Moreover,

in certain circumstances, courts view the deliberate indifference of third parties to discrimination

as a violation of Title VI by the recipient.  *See, e.g.*, *Davis ex rel. LaShonda D. v. Monroe Cnty.*

*Bd. of Educ.*, 526 U.S. 629, 643–44 (1999) (holding that a board of education could be liable for

student-on-student harassment where the board acted with deliberate indifference).  The Second

Circuit has articulated the circumstances under which a school district may be held civilly liable

for its deliberate indifference to student-on-student harassment under Title VI.  Such "[l]iability

only arises if a plaintiff establishes: (1) substantial control, (2) severe and discriminatory

harassment, (3) actual knowledge, and (4) deliberate indifference."  *Zeno v. Pine Plains Cent.

Sch. Dist.*, 702 F.3d 655, 665 (2d Cir. 2012).[11]

       "A school district . . . exercises substantial control over the circumstances of the

harassment when it occurs 'during school hours and on school grounds.'"  *Id.* (quoting *Davis*,

526 U.S. at 646.)  "Similarly, a school district's authority to take remedial action lies in its

longstanding disciplinary oversight over its students."  *Id.*  With regard to harassment, the

Second Circuit has advised that "not all harassment is actionable."  *Id.*  Instead, to be covered by

Title VI, the harassment must be "'severe, pervasive, and objectively offensive' and

discriminatory in effect."  *Id.* (quoting *Davis*, 526 U.S. at 650–51); *see also Carabello v. N.Y.C.

Dep't of Educ.,* 928 F. Supp. 2d 627, 643 (E.D.N.Y. 2013) (noting that "[t]o meet the [severity]

requirement, the harassment must have been serious enough to have had a systemic effect of

denying the victim equal access to an educational program or activity, and more than episodic; it

must have been sufficiently continuous and concerted" (citation and quotation marks omitted));

*Doe v. Derby Bd. of Educ.*, 451 F. Supp. 2d 438, 444 (D. Conn. 2006) (same).  Discriminatory

actions proscribed by Title VI include exclusion of educational benefits or programs.  *Zeno*, 702

F.3d at 665–66.  Educational benefits "include an academic environment free from racial

---

[11] Courts generally interpret Title VI and Title IX consistently with one another.  *See
Barnes v. Gorman*, 536 U.S. 181, 185 (2002) (noting that "the Court has interpreted Title IX
consistently with Title VI"); *Zeno v. Pines Plains Cent. Sch. Dist.*, 702 F.3d 655, 665 n.9 (2d Cir.
2012) ("Historically, the Supreme Court has applied parallel analyses to claims brought under
Title IX and Title VI.").  The Court will thus rely on cases that assess claims under either statute
in considering the instant Motion.

hostility." *Id.* at 666; *see also Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 750 (2d Cir. 2003) (holding that misconduct that "simply created a disparately hostile educational environment relative to [the student's] peers . . . could be construed as depriving [that student] of the benefits and educational opportunities available at [the school]"); *Oliveras v. Saranac Lake Cent. Sch. Dist.*, No. 11-CV-1110, 2014 WL 1311811, at *14 (N.D.N.Y. Mar. 31, 2014) ("Educational benefits include an academic environment free from racial hostility." (internal quotation marks omitted)); *T.Z. v. City of New York*, 634 F. Supp. 2d 263, 272–73 (E.D.N.Y. 2009) (noting that "even where a Title IX plaintiff's academic performance does not suffer but the harassment simply creates a disparately hostile educational environment relative to her peers, the issue of whether the harassment deprived the plaintiff of educational opportunities and benefits is one for the trier of fact" (alteration and internal quotation marks omitted)).

Finally, to be liable, a school district must actually know of the harassment; constructive knowledge is insufficient. *See Davis*, 526 U.S. at 641–43; *Zeno*, 702 F.3d at 666. Moreover, the district must be deliberately indifferent to the harassment, meaning that its actions must be "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648; *see also, Zeno*, 702 F.3d at 666. In evaluating the reasonableness of a school district's response to alleged harassment, "a court must accord sufficient deference to the decisions of school disciplinarians." *Zeno*, 702 F.3d at 666; *see also Davis*, 526 U.S. at 648 ("[C]ourts should refrain from second-guessing the disciplinary decisions made by school administrators.").

In considering Defendants' Motion, the Court must determine whether any genuine issues of material fact exist such that a reasonable jury could find these requirements satisfied. Defendants do not appear to contest that Plaintiffs can satisfy the first two of these requirements, at least for the purposes of the instant Motion. Regardless, the Court addresses all four of the

34

requirements and concludes that a jury could reasonably find that Plaintiffs have demonstrated

the District's substantial control over the circumstances of the harassment, that Plaintiffs

suffered severe and discriminatory harassment, that the District had actual knowledge of the

harassment, and that the District was deliberately indifferent to the harassment.

### a.  Substantial Control

With respect to Defendants' substantial control, the incidents alleged by Plaintiffs

occurred entirely on PBCSD grounds, property (including buses the District hired), or during

supervised school trips.  *See Zeno*, 702 F.3d at 668 (noting that the fact that the harassment

occurred on school grounds or its contracted buses supported the jury's finding that the district

had substantial control over the circumstances of the harassment); *see also Davis*, 526 U.S. at

646 (finding that a school has control over harassment that occurs "during school hours and on

school grounds").  Furthermore, Plaintiffs' harassers were fellow students over whom the

District had disciplinary oversight.  A reasonable jury could therefore conclude that PBCSD

possessed the control required to incur liability under Title VI.  *See Zeno*, 702 F.3d at 668

(noting that "[b]ecause school officials are charged with prescribing and controlling conduct in

the schools, the District had disciplinary oversight over the harassers" and therefore had

"substantial control" over the harassment (alterations, internal quotation marks, and citation

omitted)).

### b.  Severe and Discriminatory Harassment

Plaintiffs have also identified sufficient facts to support a jury conclusion that T.E., O.C.,

and D.C. were subjected to severe and discriminatory harassment.  These Plaintiffs' depositions

catalogue numerous incidents for each Plaintiff that exceed the sort of "non-actionable 'simple

acts of teasing and name-calling among school children.'"  *Id.* at 667 (quoting *Davis*, 526 U.S. at

652); *see also DiStiso v. Cook*, 691 F.3d 226, 242–43 (2d Cir. 2012) (finding that allegations that

a student's "classmates called the child racial epithets or disparaged his race . . . by calling him

'nigger' [and] 'blackie,' and [] by suggesting that the boy's skin remained dirty even after

washing" indisputably "raise[d] a question of severe harassment going beyond simple teasing

and name-calling").  Taking Plaintiffs' testimony as true for the purposes of the instant Motion,

the three Plaintiffs here had anti-Semitic slurs repeatedly directed at them, witnessed swastika

graffiti, and were subjected to anti-Semitic "jokes."  Both T.E. and D.C. were also called

"crispy" or told that they should have been burned in the Holocaust.  In addition, D.C. and O.C.

both claim to have suffered physical harassment, including being slapped, physically restrained,

and having coins thrown at them.  Plaintiffs allegedly continued to suffer harassment at PBE,

Crispell, and, for D.C. and O.C., throughout the duration of their time at PBHS.  Moreover,

Plaintiffs suffered from more than one or two isolated incidents of racial harassment.

Accordingly, a jury could reasonably conclude that Plaintiffs suffered "severe, pervasive, and

objectively offensive" harassment.  *Zeno*, F.3d at 665 (internal quotation marks omitted); *cf. HB

v. Monroe Woodbury Cent. Sch. Dist.*, No. 11-CV-5881, 2012 WL 4477552, at *15 (S.D.N.Y.

Sept. 27, 2012) (rejecting Plaintiffs' claims as insufficiently severe to support a Title VI

violation because "the utterance of one comment by a student cannot be said to be so "severe,

pervasive and objectively offensive" that it effectively denied [the plaintiff] educational

benefits" (internal quotation marks omitted)).

     A jury could further conclude that Plaintiffs were improperly denied educational benefits

as a result of this harassment.  At minimum, Plaintiffs were "deprived of a supportive, scholastic

environment free of racism and harassment."  *Zeno*, 702 F.3d at 667.  In addition, Plaintiffs

report being emotionally distressed by the harassment; T.E., for example, sought mental health

services and was on the verge of a nervous breakdown, (*see* Mrs. E. 233–34), and D.C. contemplated suicide, (D.C. 82–83).  Ultimately, T.E. withdrew from public schooling at Crispell.  (Mrs. E. 201).  Given these facts, a jury could reasonably find that Plaintiffs suffered severe and discriminatory harassment that denied Plaintiffs educational benefits under Title VI.  *See Zeno*, 702 F.3d at 667 (finding that the plaintiff was deprived of educational benefits where he "was driven to leave" the school after three-and-a-half years where "the decision to withdraw was motivated by a racially hostile educational environment"); *Hayut*, 352 F.3d at 750 (holding that "to the extent the evidence suggests that [the harasser's] conduct . . . caused [the plaintiff] to withdraw from [the university] altogether, . . . the above-described harassment could be construed as depriving [the plaintiff] of the benefits and educational opportunities available at [the university]"); *Herndon v. Coll. of Mainland,* No. 06-CV-286, 2009 WL 367500, at *26 (S.D. Tex. Feb. 13, 2009) (noting that "evidence such as stress-related illness, stomach problems, falling grades, or a student's withdrawal from the school due to fear of harassment can constitute harassment sufficiently severe to deprive the student of an educational benefit").  Accordingly, Plaintiffs have provided enough evidence to satisfy the first two requirements for Title VI liability.

### c.  Actual Knowledge

As noted, to hold a school district liable under Title VI, a plaintiff must also demonstrate that the defendant school district actually knew of the harassment—constructive knowledge is insufficient.  *See Zeno*, 702 F.3d at 666 ("Constructive knowledge is not enough; only actual knowledge is a predicate to liability." (citing *Davis*, 526 U.S. at 641–43).)  This means that a school official who "at a minimum has authority to address the alleged [harassment] and to institute corrective measures on the [school district's] behalf" must have actual knowledge of

student-on-student harassment in order for the district to be liable. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998); *see also Manolov v. Borough of Manhattan Cmty. Coll.*, 952 F. Supp. 2d 522, 532 (S.D.N.Y. 2013) (noting that "when [a Title VI or Title IX] discrimination claim fails to implicate the official policy of a defendant, a damages remedy will not lie unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond" (alteration and internal quotation marks omitted)); *Zimmerman v. Poly Prep Country Day Sch.*, 888 F. Supp. 2d 317, 331–32 (E.D.N.Y. 2012) (same).

Defendants admit that both T.E. and O.C. reported harassment to school administrators. (*See* Defs.' Mem. 30, 33.)  Such notice is sufficient to provide a basis for a finding of actual knowledge on the part of the District.  *See Zeno,* 702 F.3d at 668 (noting that the reporting of harassment to the school principal and school administrators were some of the many ways in which the District "actually knew" of the harassment against the plaintiff); *Romero v. City of New York*, 839 F. Supp. 2d 588, 604 (E.D.N.Y. 2012) (holding that informing the assistant principal and principal about alleged misconduct constituted the defendants' actual knowledge of the misconduct); *DT v. Somers Cent. Sch. Dist.,* 588 F. Supp. 2d 485, 495 (S.D.N.Y. 2008) (holding that the plaintiff's conversation with his principal and three letters sent to school officials about the harassment that the plaintiff suffered placed the defendants on notice of racial hostility), *aff'd*, 348 F. App'x 697 (2d Cir. 2009).

With respect to D.C., however, Defendants claim that "there is no evidence that any appropriate person in a position to institute corrective measures on the school district's behalf had actual knowledge that D.C. was experiencing such harassment."  (Defs.' Mem. 28

(alterations and internal quotation marks omitted).)  Sufficient facts exist to dispute Defendants'
contention.

As an initial matter, the Court acknowledges that D.C.'s testimony that he reported
incidents of harassment to his teachers on several occasions is insufficient to establish actual
notice.  Specifically, D.C. remembered "actually point[ing] out swastikas [in textbooks] to [his]
teachers," but he could not remember the specific teachers to whom he showed them.  (D.C. 20.)
He reported a swastika in the bathroom to his eighth grade science teacher, and, when it
reappeared later, to his Spanish teacher.  (*See id.* at 11–13.)  He also told Ms. King, his tenth
grade trigonometry teacher, that another student was "making anti-Semitic remarks" in her class,
(*id.* at 93–94), and testified that Ms. King was present and teaching when another student "called
[a student] a fucking Jew at the top of his lungs" and then "looked at [D.C.] and . . . smirked,"
(*id.* at 94–95).

D.C.'s reports to PBCSD faculty, however, were insufficient to provide actual knowledge
to the District.  As previously discussed, Title VI only recognizes actual notice when information
is provided to a school official with authority to institute corrective measures on the district's
behalf.  Despite Plaintiffs' broad assertion that "[i]n this District, teachers have authority to
institute corrective measures on the district's behalf," because "[t]eachers ha[ve] essentially
unlimited discretion whether and how to give discipline," (Pls.' Mem. 49–50 (alterations and
internal quotation marks omitted)), Defendants claim that teachers' disciplinary authority is
cabined by the Code of Conduct, (Pls.' 56.1 Resp. ¶¶ 30–31).  In any case, D.C. alleges "rampant
anti-Semitic discrimination and harassment" at the hands of "multiple" students at both Crispell
and PBHS that a teacher would not likely be able to effectively combat by disciplining
individual students.  (*See* Am. Compl. ¶¶ 75–78.)

Moreover, even if PBCSD teachers possessed the control necessary to take corrective action and end the discrimination against D.C., imputing knowledge on the part of the teachers to the District would undermine Title VI's clear bar on *respondeat superior* liability.  *See DT*, 588 F. Supp. 2d at 494 (finding that "[a]s Title VI requires actual notice, the principle of *respondeat superior* will not impute [a teacher's] knowledge of [the harassment suffered by the plaintiff] to defendants" where a teacher observed but failed to report racial harassment).  Thus, even if faculty members were required to report harassment to administrators, it would still be improper to impute the teachers' knowledge to the District, absent evidence that the teachers followed the policy and, accordingly, made reports.  *See id.* (holding that the fact that a non-defendant teacher witnessed an incident of harassment was insufficient to impute knowledge of the incident to the defendants, absent evidence in the record that the defendants were informed, and despite a district protocol "which would [require the teacher] to contact other administrators and speak to other staff"); *accord C.S. v. Couch*, 843 F. Supp. 2d 894, 913 (N.D. Ind. 2011) (finding that the defendant did not have actual knowledge of racial harassment, and refusing to "impute the knowledge of [the plaintiff's] fifth grade teacher or the football coaches" who were aware of the harassment and who may have had the authority to stop the offending behavior, "[b]ecause Title VI requires actual notice," and despite the teacher's alleged promise to talk to the principal about the harassment, there was no evidence that the teacher ever reported the harassment to the principal).[12]  Thus, to the extent that D.C.'s teachers were aware of

---

[12] One court addressed this issue in the context of sexual harassment of a student by a teacher, however, such Title IX cases are not analogous to Title VI peer-harassment cases.  *See Romero v. City of New York*, 839 F. Supp. 2d 588, 605 n.9 (E.D.N.Y. 2012) (noting that, although the Supreme Court has stated that "the knowledge of the wrongdoer himself is not pertinent to the actual knowledge analysis, neither the Supreme Court nor the Second Circuit has addressed whether a teacher . . . who does not have supervisory authority over the offending

harassment, but did not report it to administrators, the District cannot be found to have had "actual knowledge" of these instances of harassment.

Nevertheless, there is evidence in the record that administrators knew of the anti-Semitic harassment that D.C. suffered.  Testimony from Mr. C. provides one instance in which a school administrator was contemporaneously notified that D.C. was the victim of anti-Semitic harassment.  When D.C. was in sixth grade, his father called Boyle and reported that his son "had been the butt of many Jewish jokes," that an older student on D.C.'s bus had called D.C. a "fucking Jew," and that his son had been subject to Jewish jokes and slurs from "multiple kids over the course of that year."  (Mr. C. 10–11, 13.)  D.C. testified that he later attempted to raise the issue with Boyle himself, but that Boyle "dismissed it" and instead reprimanded D.C. for playing video games in the computer lab.  (D.C. 29.)  The reporting of harassment to Principal Boyle when D.C. was in sixth grade provided Defendants with actual knowledge of D.C.'s harassment at Crispell.  Though the District's response to this knowledge is disputed by Defendants, this dispute is within the bounds of Title VI.

Plaintiffs further submit that Mr. C. notified Boyle, two Assistant Superintendents, a member of the PBCSD School Board, and Steinberg of his son's harassment in a 2011 email. (Pls.' Mem. 48.)  However, the relevant email, in which Mr. C. conveys that D.C. "spent 9th grade in fear of Seniors on his bus who pushed him around while chanting 'White Power' and telling him that he should have died in the Holocaust," was sent in May 2011, when D.C. was

_____

employee and cannot fire or suspend the employee, is a school official with authority to address the alleged discrimination and to institute corrective measures" (alterations and internal quotation marks omitted)).  In the context of teacher-on-student harassment, it seems less likely that one teacher would have any authority over a fellow teacher to remedy the harassment, than a teacher would have to address student-on-student harassment.

nearing the end of the tenth grade and when the older students involved in this harassment would have graduated from the school.  (*See* Maazel Decl. Ex. 27.)  Moreover, there is no evidence that Mr. C. raised concerns about harassment of D.C. at the meeting that resulted from this email. (*See* Mr. C. 37–52 (describing the content of the meeting with school administrators and noting that "the reason why they were there was because of all of the things that we understood were happening to T.[E.] and O.[C.]").)  Here, a jury could not reasonably conclude that the 2011 email provided the District with actual knowledge of the harassment suffered by D.C. at PBHS prior to the date of the email.  As the email did not suggest that the harassment D.C. experienced in ninth grade had persisted, and as Mr. C. did not raise the issue at the resulting meeting, it would not be reasonable to consider the email as providing actual knowledge of harassment of D.C. when he was in ninth grade.

A jury could conclude, however, that Mr. C.'s 2011 email sufficiently provided the District with knowledge that D.C. might be harassed at PBHS from that point forward based on the harassment he had suffered in the past.  Moreover, complaints about the harassment of other students, including O.C. and T.E., provide actual knowledge to the District that D.C. himself suffered harassment.  *See DT*, 588 F. at 494 (noting that "actual notice of every single event is not required" but rather, "at minimum" "the institution . . . must have possessed enough knowledge of the harassment that it reasonably could have responded with remedial measures to address the kind of harassment upon which plaintiff's legal claim is based" (internal quotation marks omitted)); *Crandell v. N.Y. Coll. of Osteopathic Med.,* 87 F. Supp. 2d 304, 320 (S.D.N.Y. 2000) (noting that "actual knowledge of every incident could not possibly be required, as this would burden the plaintiff unfairly in cases of frequent harassment to report many separate incidents to the appropriate authorities and would oblige the court to determine whether each

incident alleged was reported and therefore is actionable").

Finally, D.C.'s testimony indicating that anti-Semitic graffiti, including swastikas, was so ubiquitous throughout Crispell and PBHS that "it would be impossible for [teachers and administrators] to miss the swastikas," (D.C. 11), is sufficient to support a finding that PBCSD administrators were aware of the graffiti and anti-Semitic harassment in general. (*See* Defs.' Mem. 24–25.) *See Derby Bd. of Educ.*, 451 F. Supp. 2d at 446 (finding that evidence of substantial media coverage of harassment was sufficient to create a fact dispute about actual knowledge of a school board); *Tesoriero v. Syosset Cent. Sch. Dist.*, 382 F. Supp. 2d 387, 397 (E.D.N.Y. 2005) (noting that "most courts agree that . . . the actual notice standard does not set the bar so high that a school district is not put on notice until it receives a clearly credible report of [misconduct] from the plaintiff-student" (citation and internal quotation marks omitted)). Therefore, a reasonable jury could find that the information provided to Principal Boyle by D.C. and his father when D.C. was in sixth grade, the 2011 email, and pervasive and obvious grafitti provided the District with actual knowledge that D.C. was being harassed.

### d.  Deliberate Indifference

In addition to the other elements of a Title VI claim, as discussed above, Plaintiffs must prove that the District was deliberately indifferent to the student-on-student harassment.  In other words, PBCSD's action—or inaction—must "at a minimum, [have] caused students to [have] undergo[ne] harassment or [made] them liable to or vulnerable to it." *Zeno*, 702 F.3d at 666 (internal quotation marks omitted) (citing *Davis*, 526 U.S. at 645).  "[A] finding of deliberate indifference depends on the adequacy of a school district's response to the harassment." *Id.*; *see also Oliveras*, 2014 WL 1311811, at *14 (same); *DT*, 588 F. Supp. 2d at 495 (same).  "A failure to respond, a response that only follows after a lengthy and unjustified delay, and a response that

amounts to deliberate indifference to discrimination, have all been found inadequate." *Zeno*, 702 F.3d at 666 (citations and internal quotation marks omitted); *see also T.C. v. Valley Cent. Sch. Dist.*, 777 F. Supp. 2d 577, 596 (S.D.N.Y. 2011) (noting that a court may find deliberate indifference when the "defendant's response to known discrimination is clearly unreasonable in light of the known circumstances or when remedial action only follows after a lengthy and unjustified delay" (internal quotation marks omitted); *DT*, 588 F. Supp. 2d at 495 (noting that "remedial action [that] only follows after a lengthy and unjustifiable delay" can be unreasonable and thereby support a finding of deliberate indifference); *Derby Bd. of Educ.*, 451 F. Supp. 2d at 446–48 (holding that the plaintiff "proffer[ed] sufficient evidence to permit a finding that the [defendant's] response was unreasonably delayed and inadequate so as to constitute deliberate indifference"). This inquiry is "not a mere reasonableness standard [of the type that would] transform[] every school disciplinary decision into a jury question." *Gant ex rel. Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 141 (2d Cir. 1999) (internal quotation marks omitted). Indeed, "[i]n an appropriate case, there is no reason why courts, on a motion . . . for summary judgment . . . , could not identify a response as not clearly unreasonable as a matter of law." *Id.* (internal quotation marks omitted).

When weighing the adequacy of a response, a court must accord sufficient deference to the decisions of school disciplinarians. *See Zeno*, 702 F.3d at 666; *see also Davis*, 526 U.S. at 648 ("[C]ourts should refrain from second-guessing the disciplinary decisions made by school administrators."). To that end, victims do not have a right to specific remedial measures. *See Zeno*, 702 F.3d at 666; *Doe v. Galster*, 768 F.3d 611, 621 (7th Cir. 2014) (finding that, because "*Davis* does not entitle plaintiffs to any specific remedial measure . . .[t]he school was not required by federal law to give [the plaintiff] a formal safety plan"); *Oliveras*, 2014 WL

44

1311811, at *14 (noting that "victims do not have a right to specific remedial measures" when weighing the adequacy of a school district's response to peer harassment); *T.C.*, 777 F. Supp. 2d at 596 ("The Supreme Court has rejected the notion that victims of peer harassment have a right under Title VI to make particular remedial demands."); *DT*, 588 F. Supp. 2d at 496 ("[C]ourts have been skeptical of arguments premised on the degree to which a school punishes its students" on the basis that "[t]he Supreme Court has rejected the argument that victims of peer harassment have a Title VI right to make particular remedial demands on the school." (citations and internal quotation marks omitted)).

Here, the District argues that a reasonable jury could not find it to have been deliberately indifferent because its officials appropriately responded to the incidents of harassment of which they were aware and took steps as needed to address anti-Semitism more systematically in the school community.  However, the undisputed facts, as well as those that the District contests in its Response to Plaintiffs' Rule 56.1 statement, do not foreclose a jury from coming to the conclusion that the District was deliberately indifferent.  Given the numerous incidents of harassment alleged by D.C., T.E., and O.C., which the District does not dispute, a jury could find that the District was aware of such inadequacies, and that the District nonetheless failed to take reasonable steps to combat anti-Semitic harassment.

"Responses that are not reasonably calculated to end harassment are inadequate." *Zeno*, 702 F.3d at 669; *see also Doe v. Sch. Bd. of Broward Cnty. Fla.,* 604 F.3d 1248, 1261 (11th Cir. 2010) (noting that "where a school district has knowledge that its remedial action is inadequate and ineffective, it is required to take reasonable action in light of those circumstances to eliminate the behavior"); *Vance v. Spencer Cnty. Pub. Sch. Dist.,* 231 F.3d 253, 262 (6th Cir. 2000) ("Where a school district has actual knowledge that its efforts to remediate are ineffective,

and it continues to use those same methods to no avail, such district has failed to act reasonably in light of the known circumstances."); *Tesoriero*, 382 F. Supp. 2d at 399 (same).

The circumstances that the Second Circuit considered in *Zeno* are informative to the Court's consideration of the District's response in the instant case. There, the court found that "five circumstances should have informed the [d]istrict's continued response to student harassment of [the plaintiff]." *Zeno,* 702 F.3d at 669. First, the court noted that the district knew that disciplining the students who were harassing the plaintiff failed to deter further harassment from other students. *Id.* Here, the District had knowledge that meting out discipline to the students who harassed Plaintiffs (to the extent there was such discipline) did not deter others from harassing D.C., O.C., and T.E. In addition to the large number of complaints by Plaintiffs about harassment by different students, Superintendent Steinberg acknowledged that "it was different children that were making [harassing comments to T.E. and O.C.]," (Defs.' 56.1 Resp. ¶ 237), and, in a meeting with administrators, Plaintiffs' parents stressed the "systemic" nature of the harassment that their children regularly faced, (*see id.* ¶¶ 179–80). Second, the *Zeno* court noted that the harassment that the plaintiff there suffered "grew increasingly severe," and included two violent incidents, three threats on the plaintiff's life, and two incidents which resulted in orders of protection against the students involved in the harassment. *Id.* The instant case does not present the dramatic escalation of harassment from verbal taunts to physical assaults that the plaintiff in *Zeno* experienced, however, the uncontested facts suggest that harassment of Plaintiffs began at PBE, persisted through their time at Crispell, and, for D.C. and O.C., who remained in District schools, continued throughout their time at PBHS. Third, the discipline given by the administrators in *Zeno* "had little effect, if any, on the taunting and other hallway harassment, which persisted until [the plaintiff] left [the high school]." *Id.* Here, too,

attempts at disciplining students for harassment did not appear to have had an effect on the slurs, "white power chants," Hitler salutes, and swastika graffiti that Plaintiffs allege to have endured on a regular basis. (*See*, *e.g.*, Defs.' 56.1 Resp. ¶¶ 125–30; O.C. 9–13; T.E. 77 (describing an incident in which a student pantomimed shooting O.C. and made a comment about "killing jews" during a video about the Holocaust, was spoken to by the teacher, but continued to make ethnic slurs toward O.C. after the incident). Fourth, the school district in *Zeno* "knew that the harassment predominately targeted [the plaintiff's] race and color." *Id.* There is no dispute that Plaintiffs here were harassed because they were Jewish. Last, the district in *Zeno* was offered "both a free shadow, to accompany [the plaintiff] during the school day, and a free racial sensitivity training series" by the Human Rights Commission and N.A.A.C.P. *Id.* The Defendants here were similarly aware of other options and resources for countering anti-Semitic sentiment in the District—if only because Plaintiffs' parents told Defendants about them. (*See* Defs.' 56.1 Resp. ¶ 234; Mr. C. 42–43 (describing Mr. C.'s request to Steinberg "to invite in organizations like the [Anti-Defamation League] and NAACP" into the schools and require online classes for teachers). In light of these considerations, the Court concludes that a jury could find that the District's response was unreasonable.

To be clear, the District need not entirely cleanse its schools of harassment to avoid liability under Title VI. *See Davis*, 526 U.S. at 648 (noting that "purging . . . schools of actionable peer harassment" is not required); *Zeno*, 702 F.3d at 670 (explaining that "*actually* eliminating harassment is not a prerequisite to an adequate [Title VI] response" (emphasis in original)); *Carabello*, 928 F. Supp.2d at 642 (acknowledging that the defendant "was not required to 'purge' [the school] of peer harassment, engage in any particular disciplinary action, or expel [the offending student]," and further noting that the "[d]efendant's disciplinary

measures over time . . . reflected a school district's ability to use discretion in disciplining its student"); *Preusser ex rel E.P. v. Taconic Hills Cent. Sch. Dist.,* No. 110-CV-1347, 2013 WL 209470, at *11 (N.D.N.Y. Jan. 17, 2013) (noting that "actually eliminating harassment is not a pre-requisite to an adequate response").  Rather, the District needed only to undertake actions that could "have plausibly changed the culture of bias at [the school] or stopped the harassment directed at [Plaintiffs]."  *Zeno*, 702 F.3d at 670.  When, however, a district has knowledge that its current method of addressing the harassment is ineffective, it cannot rest on its past remedial efforts.  *See id.* at 671 (noting that a school district cannot ignore "signals that greater, more directed action was needed"); *Vance*, 231 F.3d at 261 (holding that "where a school district has knowledge that its remedial action is inadequate and ineffective, it is required to take reasonable action in light of those circumstances to eliminate the behavior [and that w]here a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act reasonably in light of the known circumstances").

Here, the District argues that it took measures to combat anti-Semitism in its schools beyond that of the individual disciplining of offending students.  PBE Principal Fisch held an assembly to address general bullying issues when T.E. and O.C. were in fifth grade, (*see* Defs.' 56.1 Resp. ¶ 122), and later Crispell held a seminar in which a Holocaust survivor spoke to T.E. and O.C.'s seventh-grade class, (*see id.* ¶ 223).  The Parties dispute the extent to which the District engaged in any other programs to combat anti-Semitism, though Defendants argue that the District's anti-bullying efforts encouraged tolerance generally and "sometimes specifically mentioned anti-Semitism."  (*Id.* ¶¶ 383–85.)  In addition, District administrators met with Plaintiffs' parents and the students themselves to discuss the harassment and possible solutions,

including transferring T.E. and O.C. to a middle school other than Crispell.  (*See id.* ¶¶ 240–41.)

Some courts have concluded that general anti-bullying programs (among other actions) prevent a district from being found deliberately indifferent when such programs are used as part of a larger strategy that targets the harassment.  *See, e.g., Williams v. Port Huron Sch. Dist.*, 455 Fed. App'x. 612, 620 (6th Cir. 2012) (holding that a principal was not deliberately indifferent where he "made extensive efforts to combat student-on-student racial harassment," including removing a racial slur from a locker, setting up video surveillance in locations where harassment occurred, participating in a group dedicated to improving relations in the community, ordering students to remove confederate flags from their cars and clothes, expelling a racist student, and conducting "assemblies at which he told the students to treat everyone with respect and dignity"), *rev'g* No. 06-CV-14556, 2010 WL 1286306 (E.D. Mich. Mar. 30, 2010); *S.S. v. E. Kentucky Univ.*, 532 F.3d 445, 454–55 (6th Cir. 2008) (holding that a school district was not deliberately indifferent where the record demonstrated that the district, in addition to investigating and disciplining the students involved, responded to allegations of racial discrimination in many different ways, including "identifying related topics for discussion at assemblies" and small groups); *Doe ex rel. Doe v. Bellefonte Area Sch. Dist.*, No. 02-CV-1463, 2003 WL 23718302, at * 7, 10 (M.D. Pa. Sept. 29, 2003) (granting summary judgment to a school district that "took . . . preventative measures [other than dealing with specific offenders] in the wake[] of [each reported sexual harassment incident] . . . including conducting "assemblies that addressed the issue of harassment"), *aff'd*, 106 F. App'x 798 (3d Cir. 2004).

But conducting assemblies, even ones that specifically address the discrimination complained of, does not immunize a school district from liability, as the school district's response must be assessed "in light of the known circumstances."  *Davis*, 526 U.S. at 648.  In

49

*Zeno*, for example, despite evidence demonstrating that the school district disciplined the plaintiff's harassers immediately and held an assembly as an attempt to combat school-wide racial harassment, the court nonetheless found the district's response to have been unreasonable. *See* 702 F.3d at 655.  In particular, the court affirmed judgment for the plaintiff on grounds that the jury had reasonably found the district's actions could not have plausibly changed the culture of bias or stopped the harassment and could find that the district ignored many signals that greater, more directed action was needed.  *Id.* at 669–70.

And so it is here.  A reasonable jury could find that, while the District may have taken some steps to combat the culture of anti-Semitism in its schools, the handful of assemblies—which addressed only students in T.E. and O.C.'s grade—could not have plausibly changed the anti-Semitic sentiments of the student harassers, many of whom were not classmates of T.E. and O.C.  These assemblies also did nothing to target anti-Semitism among the students who harassed D.C.  *See id.* at 670 (finding that, despite the defendant school district's training program that "was for one day only and focused on bullying and sexual harassment, rather than racial discrimination," morning announcements with "messages meant to inculcate civic and personal values, rather than address racism and discrimination," an attendance-optional bias-specific training that was not held until "nearly twenty-one months after peer harassment of [the plaintiff] began," and the formation of an extracurricular student group aiming at addressing prejudice, a reasonable jury could have found the district's response to have been unreasonable).  A reasonable jury could find that the number of incidents of harassment against Plaintiffs and the fact that this harassment did not cease following the District's assemblies provided ample indication that additional efforts to change the anti-Semitic culture were required.  Moreover, the administrators in question appear to have done nothing to attempt to address anti-Semitism in the

District across schools, despite the fact that the incidents that occurred on the school bus involved students who were older than Plaintiffs and who did not attend the same school.  (*See* Peters 273–74 (admitting that the April 19, 2010 bus incident involved T.E., who was in middle school, and high school students); T.E. 150 (testifying that "in addition to middle school kids, there were high school kids on the bus" that T.E. rode in seventh grade).)  Furthermore, taking Plaintiffs' evidence as true, a jury could find that the District also failed to raise awareness among the administration and faculty about the rampant harassment, and that the District failed to implement programs to assist in determining the sources and potential solutions to the culture of anti-Semitism among the District's students.  A jury also could reasonably conclude that there were no broad measures put in place to address anti-Semitic graffiti, which appears to have been handled on a case-by-case basis, despite the fact that graffiti often reappeared shortly after it had been removed.  (*See*, *e.g.*, Defs. 56.1 Resp. ¶¶ 174–75, 306–16.); *see also Zeno*, 702 F.3d at 670 (finding that it was reasonable for the jury to have found that the defendant district's selection of some remedial actions "in lieu of the free shadow or racial sensitivity training offered by the Dutchess County HRC and N.A.A.C.P." was an unreasonable response to the plaintiff's harassment); *DiStiso*, 691 F.3d at 245 (holding that a reasonable jury could have found the fact that the school principal spoke to the student's teacher, but did not conduct a full investigation of the reported incidents, to have been an unreasonable response to the reported harassment).

Furthermore, a jury could find that the District's response in instituting programs to target anti-Semitism was unreasonably delayed, as it came several years after D.C. reported harassment in sixth grade and after Mrs. E. reported the swastika graffiti in fifth grade.  A jury could reasonably discount the District's prior anti-bullying program, which the District claims included broad lessons of tolerance and specific mentions of anti-Semitism, as an obviously

inadequate remedy for an ongoing problem.  *See Zeno*, 702 F.3d at 670 (finding the district's

programs, which "did not focus on racial bias or prejudice" and "made attendance optional"

provided a reasonable basis for a jury to deem the district's response inadequate).

The Court acknowledges that the school administrators here were faced with the difficult

task of disciplining students for harassment of Plaintiffs without violating the rights of the

offending students.  *See, e.g., Lopez v. Bay Shore Union Free Sch. Dist.*, 668 F. Supp. 2d 406,

419 (E.D.N.Y. 2009) (noting that "New York State statutory law provides certain procedural

safeguards to students facing suspensions of more than five days, including the right to

reasonable notice, the right to call and examine witnesses, and the right to legal representation,"

as well as a right to due process under the Fourteenth Amendment to the Constitution (citing

N.Y. Educ. Law § 3214(3)(c)(1)); *Bd. of Educ. of City Sch. Dist. of City of New York v. Mills*,

741 N.Y.S.2d 589, 590 (N.Y. App. Div. 2002) (noting that "school suspensions and expulsions

implicate liberty and property interests of the student and, therefore, require the protections

afforded by constitutional due process of law"); *Manico v. S. Colonie Cent. Sch. Dist.*, 584

N.Y.S.2d 519, 521 (Sup. Ct. 1992) (noting that "Education Law, section 3214, which governs

serious academic suspensions, mandates a full hearing where the suspension is for greater than

five (5) days"); N.Y. Comp. Codes R. & Regs. tit. 8, § 100.2(l)(2)(p) (permitting a school's code

of conduct to set "a minimum suspension period, for any student who repeatedly is substantially

disruptive of the educational process or substantially interferes with the teacher's authority over

the classroom, provided that the suspending authority may reduce such period on a case-by-case

basis to be consistent with any other State and Federal Law").  Meting out discipline in response

to peer harassment while respecting the rights of the offending students presents a challenge that

all New York school administrators face—and which is reflected in the courts' reluctance to

hold attempts to combat harassment deficient merely because the victimized student or the student's parents are dissatisfied with the administrator's disciplinary decision. *See Zeno*, 702 F.3d at 666 (noting that "victims do not have a right to specific remedial measures" (citing *Davis*, 526 U.S. at 648)).  While the record is clear that the District made some attempts to address the harassment suffered by D.C., T.E., and O.C., both in responding to individual incidents and with additional remedial measures, the District's Title VI liability turns on whether its response was "clearly unreasonable in light of the known circumstances." *Id.* (internal quotation marks omitted).

The Parties dispute the specifics of a number of incidents, including whether the District was aware of certain incidents of harassment and if—and how—the District responded to the incidents of which it was aware.  These disputes render the Court unable to conclusively determine that no reasonable jury would find the District's response to have been deliberately indifferent, particularly in light of the District's acknowledgment that the harassment Plaintiffs faced was more than a collection of individual instances of bigotry.  Rather, there is ample evidence that the District officials themselves believed that Plaintiffs faced a culture of anti-Semitism in the District and maybe even in the community.  (*See* Mrs. E. 117–19 (testifying that Winter told Mrs. E that "anti-Semitism is prevalent in the community . . . and that it's rather hard to stop something that's inbred in the community").)  Assuming the disputed facts in the light most favorable to Plaintiffs, a reasonable jury could find not only that the District failed to adequately respond to specific incidents of reported harassment, but also that it failed to take steps as necessary to combat the atmosphere of anti-Semitism which permeated the District's schools.  A jury could further find that the District failed to monitor the effectiveness of the measures it *did* take or implement measures that would enable the District to track bias-related

harassment as distinct from non-bias-related bullying, thereby failing to take the ongoing, iterative steps needed to respond to a culture of bias, as required by Title VI.  For these reasons, a jury could reasonably conclude that Defendants were deliberately indifferent in their response to the harassment suffered by D.C., O.C., and T.E.

### C.  Plaintiffs' Equal Protection Claims

#### 1.  Merits

In addition to Plaintiffs' Title VI claim against the District, Plaintiffs T.E. and O.C. assert violations of their right to equal protection against several Defendants.  As with Title VI, a Plaintiff can prevail on an equal protection claim against school officials based on deliberate indifference to invidious student-on-student harassment.  *See Gant*, 195 F.3d at 140.  Specifically, T.E. asserts an equal protection claim against Steinberg, Fisch, and Winter, and O.C. asserts a claim against Steinberg and Winter.[13]  To succeed on a § 1983 equal protection claim asserting student-on-student harassment, plaintiff must prove: "(1) that the child in question was in fact harassed by other students based on [membership in a protected group], (2) that such race-based harassment was actually known to the defendant school official, and (3) that the defendant's response to such harassment was so clearly unreasonable in light of the known circumstances as to give rise to a reasonable inference that the defendant himself intended for the harassment to occur."  *DiStiso*, 691 F.3d at 241 (internal citations and quotation marks omitted); *Oliveras*, 2014 WL 1311811, at *19 (same).  These "elements work together to ensure that the ultimate inquiry in a deliberate indifference case is one of racially discriminatory purpose on the part of the defendant himself."  *DiStiso*, 691 F.3d at 241 (original alterations and internal

---

[13] D.C.'s § 1983 claims against individual defendants were previously dismissed, per Magistrate Judge Davison's December 6, 2012 Order.  (*See* Dkt. No. 19, at 20–22.)

quotation marks omitted); *Oliveras*, 2014 WL 1311811, at *19 (same).

The Court finds that T.E. and O.C. have satisfied the first of these requirements, as discussed above in the Title VI context. *See supra* § II(B)(2)(b).[14]  Plaintiffs have also sufficiently demonstrated that T.E., O.C., and their respective parents reported a number of incidents of anti-Semitic harassment to Defendants Steinberg, Fisch, and Winter, providing sufficient grounds for a jury to find the actual notice requirement satisfied with respect to these Defendants. *See supra* § II(B)(2)(c). *See also DiStiso*, 691 F.3d at 241 (noting that "race-based harassment [must be] 'actually known' to the defendant school official" in order to trigger § 1983 liability).

The Court cannot foreclose the possibility that a reasonable jury might infer the requisite discriminatory intent required to hold individual Defendants Fisch, Steinberg, and Winter liable, based on their responses to T.E. and O.C.'s complaints.  While the law does not require administrators' responses to peer-on-peer harassment to be perfect, the facts, many of which are disputed, suggest that these Defendants' responses may have been inadequate.  Thus, a jury ought to consider whether "the measures taken [were] so inadequate that a degree of discriminatory intent may be inferred—allowing the trier of fact to conclude that Defendants

---

[14] In *Gant ex rel. Gant v. Wallingford Board of Education*, the Second Circuit noted that the Supreme Court articulated a severity requirement in Title IX for peer-harassment claims in *Davis*, finding that school officials could not be liable under Title IX for failing to respond to harassment consisting of "simple acts of teasing and name-calling among school children," even when those acts were gender-based.  195 F.3d 134, 140 n.5 (2d Cir. 1999) (quoting *Davis*, 526 U.S. at 652).  The Second Circuit "specifically declined to decide whether [this] severity requirement . . . also applied to deliberate indifference claims under the Constitution's Equal Protection Clause." *DiStiso*, 691 F.3d at 242.  Thus, it is possible that "the degree of racial harassment necessary to support a deliberate indifference claim under the Equal Protection Clause is less" than that required under Title IX and Title VI. *Id.*  This is of no moment, however, as T.E.'s and O.C.'s claims meet the more exacting requirements of Title VI, as the Court has already explained.

intended for the discrimination to occur," and thus whether these Defendants are liable under § 1983.  *Yap v. Oceanside Union Free Sch. Dist*, 303 F. Supp. 2d 284, 295 (E.D.N.Y. 2004); *see also Gant*, 195 F.3d at 140 (finding there was sufficient evidence that school officials acted unreasonably by not conducting a full investigation into a racial harassment incident).

With respect to Principal Fisch, his failure to ensure the removal of swastika graffiti from the PBE playground slide is certainly regrettable, but his response to reports about the graffiti by Mrs. E. is more problematic.  The Parties dispute the number of times that Mrs. E. informed Fisch that there was still a swastika on the playground slide before he investigated himself, (*see* July 17, 2014 Tr. 11–17), but Defendants do not contest that, when Fisch received an email documenting that the grafitti was still present in 2010, Fisch emailed the Assistant Superintendant and suggested that "[they] go out and look at [the swastika grafitti] on cannabis culture day[, April 20, 2010]."  (Defs.' 56.1 Resp. ¶ 90; Fisch 173–76.)  It is also uncontested that Fisch conducted no investigation into the origin of the grafitti and, as a result, disciplined no one.  (*See* Defs.' 56.1 Resp. ¶ 95; Fisch 163.)  In addition, Fisch, along with other administrators who actually presided over the school in which the offending student was enrolled, was notified about the bus incident involving T.E. and an older student via email, however, he took no steps to ensure that the offending student was disciplined.  From these incidents, a reasonable jury could find Fisch's response to have been inadequate and that this demonstrated Fisch's deliberate indifference to the issue.  *See, e.g., DiStiso*, 691 F.3d at 245 (affirming that defendant's failure to do anything, let alone conduct a full investigation of reported incidents in which children repeatedly called a student "racial epithets, including a reviled racial epithet," could be found unreasonable); *Doe ex rel. Doe v. Coventry Bd. of Educ.*, 630 F. Supp. 2d 226, 237 (holding that "a jury could reasonably conclude . . . that the [d]efendant's

56

conduct . . . amounted to deliberate indifference" where the plaintiff testified that the defendant "did nothing in response to [plaintiff's and her parents'] complaints about [plaintiff's] treatment by her peers . . . [and where] the principal answered their complaints by saying he 'couldn't do anything about it'").[15]

With respect to Assistant Principal Winter, both T.E. and O.C. identify incidents where Winter either failed to respond to reported harassment or where Plaintiffs dispute facts about his response. They claim that Winter failed to discipline the student on T.E.'s bus who made the threatening remarks to her. (*See* Defs.' 56.1 Resp. ¶¶ 218–21). Plaintiffs dispute whether and to what extent Winter responded to the incident in which another student called T.E. "crispy" and said that she should have been burned in the Holocaust, (*see id.* ¶¶ 168–69), and the instances in

---

[15] Defendants have repeatedly noted that Principal Fisch and Superintendent Steinberg are themselves Jewish. (*See, e.g.*, Defs.' Mem. 35–36; Defs.' Reply 26). "Some courts have inferred that it is less likely that a member of a protected group will discriminate against a member of the same group," at least in the context of employment discrimination. *Meder v. City of New York*, No. 06-CV-504, 2007 WL 2937362, at *9 (E.D.N.Y. Oct. 9, 2007); *see also Hargrove v. N.Y.C. Sch. Const. Auth.*, No. 11-CV-6344, 2014 WL 3756303, at *5 (E.D.N.Y. May 7, 2014) (noting that "[a] well-acknowledged inference against discrimination exists where the person who participated in the allegedly adverse decision is also a member of the same protected class (internal quotation marks omitted)), *adopted by*, 2014 WL 3756342 (E.D.N.Y. July 30, 2014); *White v. Pacifica Found.*, 973 F. Supp. 2d 363, 380 (S.D.N.Y. 2013) ("Although [t]he Supreme Court has rejected any conclusive presumption that an employer or, presumably, his agents, will not discriminate against members of their own race or gender[,] . . . the fact that both [plaintiff] and [decision-maker] are African-American undermines any possible inference of discriminatory animus.") (alterations, citation, and internal quotation marks omitted). However, Defendants did not cite—nor has the Court identified in its research—a case drawing such an inference in the case of an administrator's deliberate indifference to student-on-student harassment. The Court is not persuaded that the mere fact that several PBCSD officials are Jewish would preclude a reasonable jury from concluding that these individuals were deliberately indifferent to the harassment alleged by Plaintiffs. *See Feingold v. New York*, 366 F.3d 138, 155 (2d Cir. 2004) (noting that the Supreme Court has rejected the conclusive presumption that an employer or his agents would not discriminate against members of their own race or gender and holding that "[i]t is no more reasonable to presume that individuals will not discriminate against practitioners of their own religious faith").

which T.E.'s and O.C.'s desks were defaced with swastikas, (*see id.* ¶¶ 174–75). They further

allege that Winter told them to stop coming to him as frequently with their harassment and

graffiti complaints. (*See id.* ¶¶ 159–60.) They do not dispute that Winter crossed out the

swastika that was drawn near O.C.'s picture in a yearbook, but do dispute whether the student

responsible was disciplined. (*See id.* ¶ 253.) Furthermore, in phone calls with Mr. C., Winter

stated his intent to handle harassment issues on an individual basis rather than targeting the

systemic anti-Semitism at Crispell. (*See id.* ¶¶ 179–81.) The undisputed facts in this case

suggest that Winter did respond to most of these incidents, but a reasonable jury could determine

that the alleged failure to investigate racially-biased harassment was unreasonable. *See Distiso*,

691 F.3d at 245 (denying the individual defendant's summary judgment motion because he

allegedly "did nothing" in response to purported actual knowledge that children "were

repeatedly calling a student racial epithets [that] . . . could be found unreasonable"); *G.D.S. ex*

*rel. Slade v. Northport-E. Northport Union Free Sch. Dist.,* 915 F. Supp. 2d 268, 279 (E.D.N.Y.

2012) (noting that, for motion to dismiss purposes, "[g]iven the severe and shockingly offensive

nature of the anti-Semitic slurs allegedly being made to the Plaintiff by other students, it appears

to this Court that the supposed lack of action by the Defendants to either educate students about

the harms of such religious discrimination or investigate and discipline the harassers was an

inadequate response and thus, clearly unreasonable").

    With respect to Superintendent Steinberg, Plaintiffs claim that Steinberg also failed to

respond to the incident in which T.E. was threatened on the bus, (*see* Defs.' 56.1 Resp.

¶¶ 218–21), and the incident in which another student called T.E. "crispy," (*see id.* ¶¶ 168–69).

His response to Mrs. E.'s complaint about rampant anti-Semitic graffiti is disputed, but Plaintiffs

claim that Steinberg told Mrs. E. that when his children had a similar problem, they moved. (*See*

*id.* ¶¶ 201–02.)  When T.E., O.C., and their parents approached him about a similar solution, specifically transferring the girls to another middle school with accompanying financial support, Steinberg is alleged to have denied the request.  (*See id.* ¶¶ 235–43.)  While this factor may not be sufficient to prove that Steinberg possessed the requisite intent, it is informative to the analysis nonetheless.  *See Yap*, 303 F. Supp. 2d at 295 (explaining that the court considered the district's refusal to allow the student in question to transfer or skip a grade, "in contravention of a[n] indisputably well-established custom to the contrary," but noting that the plaintiffs also failed to provide any proffer that either remedy would alleviate the reported problems).  Steinberg's failure to raise the issue of anti-Semitic harassment in any of his many meetings with the PBCSD School Board, (*see* Steinberg 53), which may have led to a District-wide strategy for combating anti-Semitic harassment, might further lead a jury to conclude that he acted unreasonably to the point of being deliberately indifferent to Plaintiffs' harassment.

Plaintiffs here have offered more "than a proffer indicating the ultimate inadequacy of preventative and curative measures" undertaken by Fisch, Winter, and Steinberg.  *Yap*, 303 F. Supp. 2d at 294–95.  Indeed, they have adduced facts that, if accepted by the jury, could support a jury conclusion that Fisch, Winter, and Steinberg were deliberately indifferent.

### 2.  Qualified Immunity

As Plaintiffs' claims against the individual defendants do not clearly merit Summary Judgment in Defendants' favor, the Court must consider whether Fisch, Winter, and Steinberg are shielded from liability by the qualified immunity doctrine.  Qualified immunity shields a "government official[] from liability for civil damages insofar as [his or her] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Messerschmidt v. Millender*, 132 S.Ct. 1235, 1244 (2012) (internal quotation

marks omitted).  When successfully asserted by a defendant, "[q]ualified immunity is an immunity from suit rather than a mere defense to liability."  *Pearson v. Callahan*, 555 U.S. 223, 237 (2009) (internal quotation marks omitted).  To determine whether qualified immunity is appropriate, courts first look to whether the facts, "show the officer's conduct violated a constitutional right[.]"  *Id.* at 232 (internal quotation marks omitted).  Here, the facts adduced by Plaintiffs and in dispute suggest that Plaintiffs' constitutional rights may have been violated.  Thus, the Court must examine "whether the right at issue was clearly established at the time of [the] defendant's alleged misconduct."  *Pearson*, 555 U.S. at 232 (internal quotation marks omitted).

For fifteen years—well before Plaintiffs enrolled in PBCSD—the Second Circuit has clearly prohibited the "deliberate indifference of school boards, administrators, and teachers to invidious harassment in the school environment, of a student by other children" on the basis of the student's race.  *DiStiso*, 691 F.3d at 240–41 (internal quotation marks omitted) (citing *Gant*, 195 F.3d at 140).  Defendants correctly note the absence of a case in the Second Circuit holding an administrator individually liable under § 1983 for anti-Semitic student-on-student harassment, but this is not dispositive.  *Gant* provided administrators with notice of their liability with respect to racial discrimination generally, and courts both within and outside of the Second Circuit have held that anti-Semitic harassment can amount to actionable racial discrimination.  *See supra* § II(B)(1).  Furthermore, there are disputed issues of fact as to whether Fisch, Winter, and Steinberg's responses to the harassment Plaintiffs suffered was reasonable.  Accordingly, these Defendants are not entitled to qualified immunity.  *See DiStiso*, 691 F.3d at 245 (noting that the

60

factual disputes regarding the reasonableness of the defendants' response rendered the same defendants "not entitled to judgment on the ground of qualified immunity").

### 3. *Monell* Liability

Defendants also seek summary judgment on the issue of whether Plaintiffs' equal protection claim against the District fails on *Monell* grounds.  It is well-settled that a municipality may not be held liable under § 1983 "by application of the doctrine of *respondeat superior.*"  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986); *see also Vassallo v. Lando*, 591 F. Supp. 2d 172, 201 (E.D.N.Y. 2008) (noting that "a municipal entity may only be held liable where the entity *itself* commits a wrong").  Instead, there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation."  *City of Canton v. Harris,* 489 U.S. 378, 385 (1989); *see also Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012) ("[A] municipality can be held liable under Section 1983 if the deprivation of Plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality." ).  In other words, "to establish municipal liability under § 1983, a plaintiff must prove that action pursuant to official municipal policy caused the alleged constitutional injury." *Cash v. Cnty. of Eerie*, 654 F.3d 324, 333 (2d Cir. 2011) (internal quotation marks omitted).  "A municipal policy may be pronounced or tacit and reflected in either action or inaction."  *Id.* at 334.

#### a.  Final Policymaking Authority

Plaintiffs first contend that the District is liable because "its final policymakers, Steinberg and the principals, are liable."  (Pls.' Mem. 58).  "When an official has final authority

61

over significant matters involving the exercise of discretion, the choices he makes represent government policy." *Nagle v. Marron*, 663 F.3d 100, 116 (2d Cir. 2011) (internal quotation marks omitted).  Accordingly, "'municipal liability [under § 1983] may be imposed for a single decision by municipal policymakers.'" *Id.* (quoting *Pembaur*, 475 U.S. at 480).

Where, as here, Plaintiffs "seek[] to hold a municipality liable for a single decision by a municipal policymaker, [plaintiffs] must show that the official had final policymaking power." *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008) (citation and internal quotation marks omitted).  "[T]he critical inquiry is not whether an official generally has final policymaking authority; rather, the court must specifically determine whether the government official is a final policymaker with respect to the particular conduct challenged in the lawsuit." *Id.*; *see also Eldridge v. Rochester City Sch. Dist.*, 968 F. Supp. 2d 546, 562 (W.D.N.Y. 2013) ("An official may be a final policymaker as to some issues but not as to others.").  "[T]he question of whether a given official is the . . . final policymaking official in a given area is a matter of law to be decided by the court" "*before* the case is submitted to the jury." *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000) (emphasis in original) (internal quotation marks omitted); *see also City of Waterbury*, 542 F.3d at 37 ("Whether an official has final policymaking authority is a legal question, determined on the basis of state law.").  Further, "[w]here a plaintiff relies not on a formally declared or ratified policy, but rather on the theory that the conduct of a given official represents official policy, it is incumbent on the plaintiff to establish that element as a matter of law." *Jeffes*, 208 F.3d 49 at 57.

Plaintiffs argue that Steinberg was a final policymaker within the District, with the authority to "ensure[] students [were] free from harassment and bullying," and that the principals, including Fisch and Boyle, were final policymakers because the Board delegated

62

disciplinary matters to their discretion.  (Pls.' Mem. 58).  Under New York law, however, the

Superintendent does not have the authority to "*promulgate* or otherwise create rules, regulations,

or policies of his own."  *Port Washington Teachers' Ass'n v. Bd. of Educ. of Port Washington*

*Union Free Sch. District*, 478 F.3d 494, 501 (2d Cir. 2007) (quoting N.Y. Educ. Law § 1711)

(emphasis in original).  Instead, he has the "power to *enforce* all provisions of law and all rules

and regulations relating to the management of the schools and other educational, social and

recreational activities *under the direction of the board of education*."  *Id.* (first emphasis in

original, second emphasis added) (internal quotation marks omitted).  There is nothing, in turn,

to indicate that principals have rule-making or policymaking authority with respect to discipline

under New York law.  Rather, New York law provides that the Board of Education "shall have

power, and it shall be its duty . . . [t]o establish such rules and regulations concerning the order

and discipline of the schools . . . as [it] may deem necessary to secure the best educational

results."  N.Y. Educ. Law § 1709;[16] *see also Pratt v. Indian River Cent. Sch. Dist.*, 803 F. Supp.

2d 135, 145 (N.D.N.Y. 2011) (citing N.Y. Educ. Law § 1709 for school board's responsibility to,

among other things, "provide adequate training to its employees with respect to discrimination,

bullying, or harassment based on sexual orientation or sex").[17]  Moreover, although the Board

---

[16] This provision is applicable to central school districts.  *See* N.Y. Educ. Law § 1804(1) ("Each such central school district shall be managed by a board of education consisting of five, seven or nine members, which board shall have the same powers and duties as boards of education in union free school districts as prescribed by this chapter.")

[17] Under New York law, a superintendent may be a final policymaker for some purposes. Specifically, the Second Circuit has held that under New York law, "because no potential employee can obtain full school board approval without the superintendent's recommendation, [the superintendent] may . . . be deemed the final decisionmaker with respect to personnel appointments, because his recommendations are essentially those of the governmental body." *Nagle v. Marron*, 663 F.3d 100, 117 (2d Cir. 2011) (internal quotation marks omitted).  To reach its conclusion, the court cited New York Education law, which provides that "boards of

has the power to delegate its authority, *Port Washington Teachers' Ass'n*, 478 F.3d at 501 (citing

N.Y. Educ. Law § 1709(33) to support that the board of education had authority to delegate

under New York law), Plaintiffs do not point to any "formally declared or ratified policy" that

supports the Board's delegation of its rule-making authority to prevent student-on-student

harassment. *Jeffes*, 208 F.3d 49 at 57.

These principles notwithstanding, courts in the Second Circuit are split as to whether a

principal may qualify as a final policymaker for purposes of *Monell* liability. *See Eldridge*, 968

F. Supp. 2d at 562 n.7 ("Some cases may be read to suggest that a split of authority exists within

this Circuit concerning the issue of whether a principal constitutes a final policymaker for the

purposes of alleging municipal liability against a school district."); *Dressler v. N.Y.C. Dep't of*

*Educ.*, No. 10-CV-3769, 2012 WL 1038600, at *18 (S.D.N.Y. Mar. 29, 2012) (noting that

"district court decisions in this Circuit have disagreed on whether a principal is a final

─────────────────────

education or trustees of common school districts appoint teachers 'upon the recommendation of
the superintendent of schools, for a probationary period of three years,' . . . . [the] probationary
period 'may be discontinued at any time on the recommendation of the superintendent of
schools, by a majority vote of the board of education or the trustees of a common school
district,' . . . . [and] [a]t the end of the probationary term, 'the superintendent of schools shall
make a written report to the board of education' recommending the grant or denial of tenure."
*Id.* at 116 (quoting N.Y. Educ. Law § 3012). "[T]he critical inquiry[,]" however, "is not whether
a [superintendent] generally has final policymaking authority[,] [but] rather . . . whether the
[superintendent] is a final policymaker with respect to the particular conduct challenged in the
lawsuit." *City of Waterbury*, 542 F.3d at 37. Here, Plaintiffs challenge the Superintendent's
failure to adequately address and discipline students for harassment and bullying. Unlike the
scheme for personnel appointments, the superintendent of a central school district does not have
a statutory obligation to make recommendations to the school board with respect to discipline.
Rather, the superintendent is bound to "enforce all provisions of law and rules and regulations
relating to the management of the schools . . . under the direction of the board of education."
N.Y. Educ. Law § 1711(2)(b). Moreover, although the Board has the authority to "prescribe" the
"powers and duties" of the Superintendent, *see id.* § 1711(3), which makes it possible that a
superintendent could have policymaking authority over discipline, here Plaintiffs point to
nothing in the record that demonstrates the Superintendent had the power or the duty to make
recommendations as to discipline.

policymaker").  A review of these cases suggest that, under certain circumstances, "a public school principal may be a final policymaker where the 'harm that befell the plaintiff was under the principal's control.'" *Eldridge,* 968 F. Supp. 2d at 562 (quoting *Zambrano-Lamhaouhi v. N.Y.C. Bd. of Educ.*, 866 F. Supp. 2d 147, 175 (E.D.N.Y. 2011)); *Marino v. Chester Union Free Sch. Dist.*, 859 F. Supp. 2d 566, 569 (S.D.N.Y. 2012) ("However, while broad rulemaking authority is vested in the school board by law, policymaking authority may not be so strictly limited.  As a practical matter, principals are the highest ranking officials in the school and thus have policymaking authority in the day-to-day operations of the school."); *T.Z. v. City of New York*, 635 F. Supp. 2d 152, 179 n.27 (E.D.N.Y. 2009), *rev'd in part on other grounds*, 634 F. Supp. 2d 263 (E.D.N.Y. 2009) ("A school principal has final policymaking authority in the management of the school and her conduct represents official district policy within the purview of the school."); *Lovell v. Comsewogue Sch. Dist.*, 214 F. Supp. 2d 319, 324 (E.D.N.Y. 2002) (holding that because the plaintiff contended that defendant principal "was responsible for the investigation into the students' false sexual harassment complaint and he failed to take action in response to her complaints of sexual harassment" the plaintiff "c[ould] proceed under the theory that [the principal's] conduct . . . represents official policy" of the school district); *Rabideau v. Beekmantown Cent. Sch. Dist.*, 89 F. Supp. 2d 263, 268 (N.D.N.Y. 2000) (explaining that the New York "legislature did not intend to impose upon the board of education a duty to make and assume direct responsibility of enforcing rules reaching down into each classroom in the school system," that the principal "was the highest ranking person in the school . . . directly responsible for discipline," and, therefore, the principal's "knowledge of her subordinate's behavior and acquiescence, if not direct participation, in the conduct amounts to a custom or policy attributable to the [d]istrict").

Conversely, "[w]here the final authority for a particular matter is not within the principal's control or is subject to review by another official or entity, the principal is not the final policymaker with respect to that matter." *Eldridge*, 968 F. Supp. 2d at 562; *see also T.P. ex rel. Patterson v. Elmsford Union Free Sch. Dist.*, No. 11-CV-5133, 2012 WL 5992748, at *5 (S.D.N.Y. Nov. 27, 2012) (holding that "neither a principal nor vice principal is a final policymaker with respect to decisions to suspend students for more than five days" because "[o]nly a superintendent or designee may suspend a student for more than five days, and that decision is subject to reversal by the board of education"); *Dressler*, 2012 WL 1038600, at *18 (holding "[b]ecause a principal is not a final policymaker when making an appealable school-level decision subject to the chancellor's regulations, [the p]laintiff has failed to adduce any evidence of a policy that would make [the department of education] liable under *Monell*"); *Meadows v. Lesh*, No. 10-CV-223, 2011 WL 4744914, at *4 (W.D.N.Y. Oct. 6, 2011) (holding that under New York State law charter school principal does not have final policymaking authority); *Shapiro v. N.Y.C. Dep't of Educ.*, 561 F. Supp. 2d 413, 420-21 (S.D.N.Y. 2008) (dismissing ADA claims against defendant school district based on the principal's conduct because "under New York law, New York City school principals do not have final policy making authority over employment decision[s] concerning teachers in their schools"). Therefore, "whether a principal is a final policymaker will depend upon state law and on the particular facts of the case." *Eldridge*, 968 F. Supp. 2d at 562.  Similar principles apply to whether a superintendent may be a policymaker for *Monell* purposes.  *See Tekula v. Bayport-Blue Point Sch. Dist.*, 295 F. Supp. 2d 224, 234 (E.D.N.Y. 2003) (denying the defendant's motion to dismiss Section 1983 claim against the school district because it was plausible that "the superintendent has final policy making activity attributable to the [s]chool [d]istrict");

*McDonald v. Bd. of Educ. of City of New York*, No. 01-CV-1991, 2003 WL 21782685, at *4

(S.D.N.Y. July 31, 2003) (holding that the superintendent's power to discharge employees "is

circumscribed by the [c]hancellor and the [b]oard's authority to overrule the superintendent,"

and, accordingly, "the superintendent cannot be said to be the final policymaker").

 To support their claim that Steinberg and the principals are final policymakers with

respect to how and when to impose discipline or address bullying and harassment in their

schools, Plaintiffs rely on Steinberg's testimony that he was the "person that's in charge of most

of the daily operations of the district."  (Steinberg 27; *see* Pls.' Mem. 58).  Further, Fisch

testified that he had authority to decide what discipline was appropriate for certain misconduct.

(*See* Fisch 256–57).  Some courts in the Second Circuit have held that similar evidence was

enough to suggest that principals have final policymaking authority for *Monell* purposes.  *See*

*Marino*, 859 F. Supp. 2d at 570 (denying the defendant school district's motion for summary

judgment because principal could be deemed a policymaker under *Monell* based on deposition

testimony that "everything inside that school[,] okay, is under control of the school and the

leaders in there" (internal quotation marks omitted)); *Solomon v. Southampton U.F.S.D.*, No. 08-

CV-4822, 2010 WL 3780696, at *5 (E.D.N.Y. June 24, 2010) (testimony that principal was

"responsible for hiring and staffing the intermediate school and for supervision of the staff at the

school" was sufficient for a claim to survive a motion to dismiss a Title VII action on *Monell*

grounds (internal quotation marks omitted)).

 This Court concludes, however, that here Plaintiffs have failed to establish, "as a matter

of law," that Steinberg or the principals are "final policymakers" with respect to ensuring that

students are free from anti-Semitism and bullying.  *Jeffes*, 208 F.3d at 57.  Instead, evidence in

the record reveals that Steinberg and the principals had discretion to determine when to

investigate bullying and harassment and how to respond to the behavior. The Second Circuit has "explicitly rejected the view that mere exercise of discretion [is] sufficient to establish municipal liability." *Anthony v. City of New York*, 339 F.3d 129, 140 (2d Cir. 2003) (citing *Jeffes*, 208 F.3d at 57)). Moreover, the record here confirms that the Board had final policymaking authority with respect to discipline. (*See* Steinberg 25, 38–39; Carbone 9; Fisch 68; Boyle 42; Peters 336; Hopmayer 52). *Cf. McDonald*, 2003 WL 21782685, at *4 (explaining because the superintendent's power was "circumscribed by . . . the Board's authority to overrule the superintendent, . . . the superintendent cannot be said to be the final policymaker"). Specifically, Steinberg testified that the "Board of Education makes policy for the [D]istrict." (Steinberg 27; Pls.' Mem. 33). Furthermore, Plaintiffs acknowledge that although Steinberg and the principals helped draft or review the District's Code of Conduct, it was ultimately "approved by the Board." (Pls.' Mem. 36). Accordingly, because New York Law provides that the Board, not Steinberg or the principals, has the power to "establish . . . rules and regulations concerning the order and discipline of the schools," N.Y. Educ. Law § 1709, Plaintiffs point to no formal delegation of the Board's policymaking authority to Steinberg or the principals, and the record demonstrates that the Board has policymaking and oversight authority with respect to the District's disciplinary policies, the Court concludes that Plaintiffs have failed to carry their burden to establish that Steinberg and the principals are "final policymakers" as a matter of law. *See Port Washington Teachers' Ass'n*, 478 F.3d at 500 (holding that school superintendent had "no rule-making authority" in regard to student discipline, as New York law had assigned that role to the Board.); *Jeffes*, 208 F.3d at 57–58 ("Where a plaintiff relies not on a formally

68

declared or ratified policy, but rather on the theory that the conduct of a given official represents official policy, it is incumbent on the plaintiff to establish that element as a matter of law.").

### b.  Deliberately Indifferent Policies and Practices

Plaintiffs next contend that the District may be liable under § 1983 for its deliberately indifferent policies and practices.  (Pls.' Mem. 59).  The Court agrees.  "To establish deliberate indifference[,] a plaintiff must show that a policymaking official was aware of constitutional injury, or the risk of constitutional injury, but failed to take appropriate action to prevent or sanction violations of constitutional rights."  *Jones*, 691 F.3d at 81.  "[D]eliberate indifference is a stringent standard of fault, and necessarily depends on a careful assessment of the facts at issue in a particular case."  *Cash*, 654 F.3d at 334 (internal citations and quotation marks omitted).  "The operative inquiry," in turn, "is whether those facts demonstrate that the policymaker's inaction was the result of conscious choice and not mere negligence."  *Id* (internal quotation marks omitted); *see also Jones*, 691 F.3d at 81 ("[D]emonstration of deliberate indifference requires a showing that the official made a conscious choice, and was not merely negligent.").  Accordingly, a jury may infer deliberate indifference "where the need to protect against constitutional violations was obvious, but the policymaker failed to make meaningful efforts to address the risk of harm to plaintiffs."  *Cash*, 654 F.3d at 334 (internal citations and quotation marks omitted).

"A school district may be held liable for inadequate training, supervision[,] or hiring where the failure to train, hire[,] or supervise amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact."  *Bliss v. Putnam Valley Cent.*

69

*Sch. Dist.*, No. 06-CV-15509, 2011 WL 1079944, at *8 (S.D.N.Y. Mar. 24, 2011).  The Second

Circuit has identified three requirements to determine whether a "failure to train or supervise

constitutes deliberate indifference." *Jenkins v. City of New York*, 478 F.3d 76, 94 (2d Cir. 2007).

 The plaintiff must show "[1] that [the] policymaker knows to a moral certainty that her

employees will confront a given situation . . . . [2] that the situation either presents the employee

with a difficult choice of the sort that training or supervision will make less difficult or that there

is a history of employees mishandling the situation . . . . [and] [3] that the wrong choice by the

city employee will frequently cause the deprivation of a citizen's constitutional rights." *Id.*

(internal citations and quotation marks omitted).  "A pattern of similar constitutional violations

by untrained employees is ordinarily necessary to demonstrate deliberate indifference for

purposes of failure to train." *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011) (internal

quotation marks omitted).  "Policymakers' continued adherence to an approach that they know

or should know has failed to prevent tortious conduct by employees may establish the conscious

disregard for the consequences of their action—the deliberate indifference—necessary to trigger

municipal liability." *Id.* (internal quotation marks omitted)*; see also City of Canton*, 489 U.S. at

389 (explaining that a city may be liable under Section 1983 "[o]nly where a failure to train

reflects a 'deliberate' or 'conscious' choice by a municipality").   Moreover, "at the summary

judgment stage, plaintiffs must identify a specific deficiency in the city's training program and

establish that that deficiency is closely related to the ultimate injury, such that it actually caused

the constitutional deprivation." *Jenkins*, 478 F.3d at 94  (internal quotation marks omitted).

Here, Plaintiffs have proffered sufficient evidence to survive summary judgment on *Monell* grounds based on the District's response, or lack thereof, to anti-Semitic harassment. As discussed, there are issues of material fact as to whether the District had actual knowledge of the harassment that Plaintiffs allege. *See supra* § II(B)(2)(c). Moreover, there is specific evidence in the record that the Board had actual notice that school administrators were confronting numerous instances of anti-Semitic bullying. *Cf. Jenkins*, 478 F.3d at 94 (explaining that a plaintiff must show that "the policymaker knows to a moral certainty that her employees will confront a given situation" (internal quotation marks omitted)). Mrs. E. copied at least one member of the PBCSD School Board on four emails informing administrators that the harassment of her daughter for three years "escalated every year to the point that [T.E.] . . . beg[ged] [her] to not have to return to . . . school," (Defs.' 56.1 Resp. ¶¶ 211–12; Maazel Decl. Ex. 22; Winter 182), that Winter's response to swastikas throughout the school was inadequate, (*see* Defs.' 56.1 Resp. ¶ 216; Maazel Decl. Ex 24), that T.E. witnessed one student draw a picture on his stomach and say "it is a Hasidic Jew, so let's shove pennies in his mouth," (Defs.' 56.1 Resp. ¶ 213; Maazel Decl. Ex. 25), and that T.E. suffered harassment on her bus from a high school student who had a history of "chanting white power and pro[-]Hitler statements" and threatened T.E. in the future, (Defs.' 56.1 Resp. ¶ 218; Maazel Decl. Ex. 26). Further, Board member Greer was present at Mrs. E. and Mr. C.'s meeting with Steinberg on June 7, 2011, during which the parents discussed multiple incidents of anti-Semitic harassment that T.E. and O.C. suffered and asked administrators to take steps to address the problem. (*See* Defs.' 56.1 Resp. ¶¶ 228–29, 234; Steinberg 268; Mr. C. 42–43, 46, 60). From this evidence, a

reasonable jury could conclude that "there were circumstances putting [the District] on notice of [a] pattern of violations" of students' rights. *E.N. v. Susquehanna Tp. Sch. Dist.*, No. 09-CV-1727, 2011 WL 3608544, at *7 (M.D. Pa. July 5, 2011) (finding that one specific instance of inappropriate sexual behavior by a teacher and the school district's knowledge that the teacher had violated the school's policies in the past put defendants "on notice of [a] pattern of violations" by the teacher); *Karlen v. Westport Bd. of Educ.*, No. 07-CV-309, 2010 WL 3925961, at *11 (D. Conn. Sept. 30, 2010) (holding that parents' complaints to district superintendent and school principals were sufficient to put school board on actual notice about peer-to-peer racial harassment).

Moreover, the emails and the meeting provided the Board with information that anti-Semitic harassment presented administrators and teachers with "difficult choice[s]" concerning discipline and prevention, there was a pattern of school personnel "mishandling the[se] situation[s]," and that those choices had "cause[d] the deprivation of [students'] rights" to be free from harassment and bullying based on their race. *Jenkins*, 478 F.3d at 94; *see L.C. ex rel C.P.C. v. William Penn Sch. Dist.*, No. 05-CV-997, 2005 WL 2396922, at *5 (E.D. Pa. Sept. 28, 2005) (holding that "[p]laintiffs may establish that the alleged failure to train" employees on how to handle student-on-student violence "amounted to deliberate indifference because: (1) the [s]chool [d]istrict . . . knew that their employees would confront violent students . . . who attacked innocent students; (2) such situations would involve difficult questions of discipline and punishment, or such situations resulted in the school employees' failure to deal appropriately with violent students; and (3) the wrong choice by the school employee, i.e.[,] failure to handle

student-on-student violence, will frequently cause deprivation of other students' constitutional rights because the violent students would continue their attacks on innocents").  The Court also notes that Defendants have not presented any evidence nor do they make any claim that Meier or Greer or the Board in general took steps to address harassment, monitor the administrators' response to anti-Semitism or bullying in general, or independently investigate Plaintiffs' claims after the emails or the June 2011 meeting.  *See Ware v. Unified Sch. Dist. No. 492, Butler Cnty., State of Kan.*, 902 F.2d 815, 820 (10th Cir. 1990) (holding that there was sufficient evidence "to create a jury question on whether the [school] board acted with deliberate indifference to" a teacher's First Amendment rights by approving an administrator's recommendation "[n]otwithstanding . . . indications that the board knew [the] recommendation was in retaliation for [the plaintiff's] position . . . [and] made no independent investigation.").

Plaintiffs also "identify . . . specific deficienc[ies] in the [District's] training program" and have presented enough evidence for a jury to determine whether "th[ose] deficienc[ies] [are] closely related to the ultimate injury, such that [they] actually caused the constitutional deprivation." *Jenkins*, 478 F.3d at 94 (internal quotation marks omitted).  Specifically, Plaintiffs allege that the District (i) failed to train employees to maintain files of harassers before middle school, (*see* Steinberg 104; Winter 54–55, 57); (ii) had no policy or training requiring school personnel to document, report, or address anti-Semitic graffiti in school, (*see* Carbone 55–57, 65–66); (iii) had no policy requiring the investigation of harassment in school, (*see id.* at 342); (iv) had no requirement for staff or teachers to report anti-Semitic or bias-related harassment, (*see id.* at 152–54, 176–77; Winter 375; Boyle 124–25); (v) had no tracking system for

harassment and bias incidents, (*see* Carbone 252); and (vi) had no policy or guidelines for how to complete a Violent and Disruptive Incident Report ("VADIR") under New York State law, (*see* Steinberg 346; Carbone 197).  *See E.N.*, 2011 WL 3608544, at *7 (holding that a school district's failure "to formally investigate and make a record of sexual assault complaints could be arguably . . . viewed as increasing the likelihood that sexual harassment would go unchecked and possibly become recurrent and predictable so as to suggest that a failure to train reflects deliberate indifference"); *see also Hill v. Hood*, No. 04-CV-678, 2006 WL 39092, at *4 (S.D. Ill. Jan. 6, 2006) (allowing the plaintiff to proceed on a failure to train theory against the school district because, among other things, even though the district had a policy for searches and seizures at school in place and the superintendent testified that "copies of the policy were distributed to all principals and assistant principals in the [d]istrict," and "that they were supposed to share and review the policy with their staffs[,] . . . no specific followup was done to be sure such information was shared").

In light of evidence of the Board's knowledge of anti-Semitic harassment and its failure to respond in any reasonable way, including through training of school administrators and teachers, a jury could find that the facts demonstrate the District's "inaction was the result of conscious choice and not mere negligence."  *Cash*, 654 F.3d at 334 (internal quotation marks omitted).  Accordingly, Defendants are not entitled to Summary Judgment under *Monell*.

### D.  Plaintiffs' Official Capacity And State Law Claims

Defendants also move to dismiss Plaintiffs' claims against Defendants in their official capacity, as such allegations are redundant, given Plaintiffs' argument that the District is liable

74

under *Monell*.  *See Schubert v. City of Rye*, 775 F. Supp. 2d 689, 699 (S.D.N.Y. 2011) (noting that "where the governmental entity can itself be held liable for damages as a result of its official policy, a suit naming the legislators in their official capacity is redundant").  As Plaintiffs "do not press the[ir] official capacity claims," (Pls.' Mem. 60),  the Court will grant Defendants' request that they be dismissed.

Finally, the claims asserted by Plaintiffs under the provisions of New York Civil Rights Law are governed by similar standards as Plaintiffs' § 1983 claims.  *See Lorenz v. Managing Dir., St. Luke's Hosp.*, No. 09-CV-8898, 2010 WL 4922267, at *9 (S.D.N.Y. Nov. 5, 2010) (noting that federal courts interpreting New York state civil rights law have looked to federal law as a guide to their analysis of discrimination claims), *adopted by,* 2010 WL 4922541 (S.D.N.Y. Dec. 2, 2010).  Accordingly, for the reasons discussed above, the Court denies Defendants' Motion with respect to Plaintiffs' state law claims against the District and T.E. and O.C.'s claims against Fisch and Winter in their individual capacities.

III.  CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment is granted in part and denied in part.  In particular, the Court grants the motion to dismiss Plaintiffs' claims against the individual defendants in their official capacity as redundant with Plaintiffs' claims against the District.  The remainder of Defendants' Motion is denied.  The Clerk of the Court is respectfully requested to terminate the pending motion.  (*See* Dkt. No. 50.)

SO ORDERED.

Dated: November 3, 2014
        White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

76